**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD**

| | | |
|---|---|---|
| DR. RONALD L. SCHROEDER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 17 C 3076 |
| | ) | |
| v. | ) | Judge Sue E. Myerscough |
| | ) | |
| BRUCE RAUNER, et al., | ) | Magistrate Judge Tom Schanzle-Haskins |
| | ) | |
| Defendants. | ) | |

**THE STATE DEFENDANTS' COMBINED MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINT AND
<u>IN RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................2

    A. Health Care Right of Conscience Act................................................................2

    B. SB 1564 Amendment ........................................................................................2

    C. Plaintiffs' Allegations ......................................................................................4

    D. Related Litigation.............................................................................................5

ARGUMENT ........................................................................................................................6

    I.  Plaintiffs' Complaint Should Be Dismissed for Failure to State a Claim............................6

    A. Plaintiffs' Freedom of Religion claim fails. ......................................................7

        1.  Plaintiffs have not made a threshold showing of a substantial burden upon their freedom of religion. ..................................................................................7

        2.  Plaintiffs' arguments for applying strict scrutiny fail. ...............................13

        3.  Even if the Amended Act imposed a substantial burden and strict scrutiny applied, the State's compelling interests would justify that burden, and the State has adopted the least restrictive means of protecting those interests...............14

    B. Plaintiffs' Free Speech, Overbreadth, and Expressive Association claims fail.............18

        1.  Intermediate scrutiny applies to Plaintiffs' free speech claim. ..................19

        2.  The Amended Act survives intermediate or strict scrutiny. ......................21

        3.  The Amended Act is not overbroad. ..........................................................22

        4.  The Amended Act does not violate Plaintiffs' right of expressive association. .......24

    C. Plaintiffs' Due Process Void-for-Vagueness claim fails. ................................25

    D. Plaintiffs' Equal Protection claim fails. ............................................................27

    E. Plaintiffs' claims under the 2016 Consolidated Appropriations Act, the Church Amendment, and the Coats-Snowe Amendment fail. .................................28

        1.  There is no private right of action under these statutes. ............................28

        2.  Even if there were a private right of action under these statutes, the Amended Act does not discriminate against health care providers with conscience-based objections. ..................................................................................31

    F. Plaintiffs' claims against the Governor should be dismissed because he is not a proper defendant. ..............................................................................................32

    II.  Plaintiffs' Motions for Preliminary Injunctions Should Be Denied. .....................33

    A. Plaintiffs are not likely to succeed on the merits of their claims ....................34

    B. Plaintiffs fail to establish irreparable harm. ....................................................34

    C. A preliminary injunction will cause irreparable harm to the State and the public. ........35

CONCLUSION ....................................................................................................................36

Bruce Rauner, the Governor of Illinois; and Bryan A. Schneider, the Secretary of the Illinois Department of Financial & Professional Regulation (the "IDFPR") (collectively, the "State Defendants"); by their attorney, the Illinois Attorney General, submit this Combined Memorandum of Law in Support of their Motion to Dismiss Plaintiffs' Complaint and in Response to Plaintiffs' Motion for Preliminary Injunction.

## INTRODUCTION

This case is not about free speech or religious freedom, but rather about ensuring that Illinois residents receive the information that they need to make informed decisions about their health care. Plaintiffs are pro-life health care providers who have broad protections under the Health Care Right of Conscience Act (the "Conscience Act"). Plaintiffs cannot be held liable for refusing to provide or assist with abortions, for refusing to recommend them, or for refusing to refer patients to doctors who provide them. Under the Conscience Act, as amended by Senate Bill 1564 (the "Amended Act"), health care facilities are merely required to adopt a written protocol to ensure that patients are (a) informed of their "condition, prognosis, legal treatment options, and risks and benefits of treatment options," and (b) provided with information in writing, if they request it, about other health care providers who may offer requested health care services that Plaintiffs or their health care providers refuse to provide for religious reasons. 745 ILCS 70/6.1.

Plaintiffs challenge these modest requirements relating to the provision of information, asserting that they violate the Constitution and certain federal statutes relating to federal spending. While Plaintiffs would have their patients resort to the internet or to phone directories allegedly available at public libraries and other establishments, the requirements of the Amended Act reflect the "current standards of medical practice," including the standards of the American Medical Association, American Nurses Association, American Academy of Physician Assistants, and American Academy of Pediatricians. The Amended Act helps ensure that patients "receive timely

1

access to information" so that "conscience-based objections do not cause impairment of patients' health," and should be upheld accordingly. Plaintiffs' Complaint should be dismissed and their motion for preliminary injunction should be denied.

## BACKGROUND

### A. Health Care Right of Conscience Act

In 1977, the Illinois General Assembly enacted the Health Care Right of Conscience Act ("Conscience Act"), 745 ILCS 70/1 *et seq*. Recognizing that people and organizations hold "different beliefs" about the morality of certain health care services, the General Assembly declared that "[i]t is the public policy of the State of Illinois" to "respect and protect the right of conscience" of health care providers. 745 ILCS 70/2. Thus, Section 4 of the Conscience Act provides that physicians and health care personnel may not be held civilly or criminally liable for refusing to "perform, assist, counsel, suggest, recommend, refer, or participate in any way in any particular form of health care service which is contrary to the conscience of such physician or health care personnel." 745 ILCS 70/4; *see also* 745 ILCS 70/3(e) (defining "conscience"). In addition, Section 5 of the Conscience Act protects persons from discrimination for exercising their right of conscience. 745 ILCS 70/5.

### B. SB 1564 Amendment

The General Assembly amended the Conscience Act through Senate Bill 1564 ("Amended Act"). The Amended Act, effective January 1, 2017, retains Sections 4 and 5 of the Conscience Act without modification, thus preserving health care providers' ability to exercise their right of conscience. But to protect patients from harm if there is a conscience-based refusal of treatment, the Conscience Act was amended to "ensure that patients receive access to information and medically appropriate care." 745 ILCS 70/2. In particular, the General Assembly added Section 6.1, which requires health care facilities to adopt written "access to care and information" protocols

"designed to ensure that conscience-based objections do not cause impairment of patients' health." 745 ILCS 70/6.1.

The written protocols must satisfy several requirements. First, under the protocols, health care providers must "inform a patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options in a timely manner, consistent with current standards of medical practice or care." 745 ILCS 70/6.1(1). Second, if there is a conscience-based objection to performing or participating in a requested health care service, others in the facility may perform the service, or the patient must be referred, transferred, "or given information." 745 ILCS 70/6.1(2). "If requested by the patient or the legal representative of the patient," the provider must "provide in writing information to the patient about other health care providers who they reasonably believe may offer the health care service." 745 ILCS 70/6.1(3). Third, upon request, the patient must be provided with his or her medical records without undue delay. 745 ILCS 70/6.1(4).

During committee hearings, Illinois lawmakers heard testimony from a board-certified obstetrician/gynecologist in support of the Amended Act. Dkt. 1 Ex. B. Dr. Maura Quinlan testified that she had seen instances where patients were not told about all of their treatment options because of a hospital's religious directive; she strongly urged the committee to support the amendments to the Conscience Act to protect "the essential needs of the patients." *Id.* Dr. Quinlan explained that the doctors have "basic ethical obligations" to provide patients with the information they need to "understand their medical condition, consider their treatment options, and obtain care," and that the Amended Act "simply brings Illinois law in line with established medical ethics." *Id.*[1]

---

[1] For this reason, the Amended Act does not impose significant new obligations on health care providers. The Executive Director of the Illinois Catholic Health Association has stated that he believes that SB 1564 "reflects the current medical practices in Catholic hospitals." *Editorial:*

### C.     Plaintiffs' Allegations

Plaintiffs' Complaint challenges the Amended Act. Plaintiffs are Ronald L. Schroeder, M.D.; 1st Way Pregnancy Support Services, d/b/a 1st Way Life Center ("1st Way"); and Pregnancy Aid South Suburbs ("PASS"). *See* Dkt. 1 (Complaint) ¶¶ 4-6. Dr. Schroeder is a pro-life obstetrician and gynecologist who now provides limited *pro bono* medical care to women who may be pregnant. *Id.* ¶¶ 14, 16. 1st Way and PASS are religious, non-profit pregnancy centers providing pregnancy-related information, medical services, and non-medical services. *Id.* ¶¶ 17-21, 28-33.

The State Defendants are Governor Rauner and Secretary Schneider, named in his official capacity as the Secretary of the Illinois Department of Professional Regulation. *Id.* ¶¶ 7-8. Plaintiffs also named Thomas E. Price, Secretary of the federal Department of Health and Human Services ("HHS"); and Sean Cavanaugh, Acting Director of the federal Centers for Medicare & Medicaid Services ("CMMS"), as additional defendants (the "Federal Defendants"). *Id.* ¶¶ 9-10. The Federal Defendants are sued in their official capacities as indispensable parties. *Id.*

Plaintiffs' Complaint includes nine counts. Plaintiffs assert claims under the free speech protections of the First Amendment (Count 1 – free speech, Count 2 – overbreadth, and Count 4 – expressive association); the Due Process Clause of the Fourteenth Amendment (Count 3); the freedom of religion protections of the First Amendment (Count 5); the Equal Protection Clause of the Fourteenth Amendment (Count 6); 114 P.L. 113, Title V, Section 507(d) (the federal "2016 Consolidated Appropriations Act") (Count 7); 42 U.S.C. § 300a-7 (the "Church Amendment") (Count 8); and 42 U.S.C. § 238n (the "Coats-Snowe Amendment") (Count 9). Plaintiffs seek declaratory and injunctive relief and fees and costs.

---

*Health Care, faith and conscience*, Chicago Tribune (May 25, 2015), available online at http://www.chicagotribune.com/news/opinion/editorials/ct-abortion-hospital-conscience-edit-0526-20150522-story.html (last visited May 19, 2017).

Plaintiffs allege that complying with the Amended Act would violate their religious and moral beliefs and conscience. Dkt. 1 ¶¶ 1-2. In particular, they complain about having to discuss the "benefits" of pregnancy termination, contraception, and sterilization. *Id.* ¶¶ 1, 14, 24, 37. They also complain about Section 6.1's written protocol requirement to the extent that it requires them to refer, transfer, or provide "information about entities or individuals who provide such drugs, devices, or procedures." *Id.* ¶ 1; *see also id.* at ¶¶ 16, 24, 37. Plaintiffs also assert that the Amended Act is vague because: (1) "it appears to regulate and compel speech regardless of the limited nature of medical services provided" (*id.* ¶ 66); (2) "it appears to regulate and compel speech" of non-licensed volunteers who do not provide health care or medical advice (*id.*); and (3) the Amended Act "purports to require conduct based upon current standards of professional care although there are no clearly defined standards in the area covered by the statute" and "reasonable professionals can differ in the exercise of their reasonable and professional medical judgment consistent with the standard of care." *Id.* ¶ 67.

### D.     Related Litigation

This is the fifth case that has been filed in state and federal courts across Illinois challenging the Amended Act. *Pregnancy Care Center of Rockford et al. v. Rauner et. al.* ("*Pregnancy Care Center*"), 2016-MR-741 (Winnebago Cty.) (Doherty, J.) was filed in August 2016. This case involves very similar factual allegations and raises claims under the Illinois Religious Freedom Restoration Act and the Illinois Constitution. On December 23, 2016, the *Pregnancy Care Center* court issued a preliminary injunction on behalf of the plaintiffs in that case. [2] A decision on the defendants' motion to dismiss is pending.

---

[2] *See* Ex. H, *Pregnancy Care Center of Rockford v. Rauner*, No. 2016-MR-741, Mem. Op. and Order (Ill. Cir. Ct. Dec. 20, 2016).

*National Institute of Family and Life Advocates v. Bruce Rauner, et al.* ("*NIFLA*"), No. 16 C 50310 (N.D. Ill.) (Kapala, J.) was filed in September 2016. As discussed in the State Defendants' Memorandum in Support of Their Motion to Transfer, the *NIFLA* plaintiffs allege very similar claims to the Plaintiffs here, including violation of their constitutional rights to free speech, freedom of religion, and equal protection and violation of the Coats-Snowe Amendment. A decision on the defendants' motion to dismiss is pending, while the *NIFLA* plaintiffs' reply in support of their motion for a preliminary injunction is due on June 12, 2017.

The third and fourth cases, *Women's Center of Greater Chicagoland v. Bruce Rauner, et al.*, No. 16 CH 52 (Ill. Cir. Ct. Sangamon County) (Cadigan, J.); and *Abigail Women's Clinic v. Bruce Rauner, et al.*, No. 16 CH 52 (Ill. Cir. Ct. Sangamon County) (Cadigan, J.); were filed in February 2017 by Plaintiffs' counsel. These two cases, which were consolidated as substantially similar, involve similar factual allegations to this case and raise claims under the Illinois Constitution. The parties are currently briefing the defendants' motion to dismiss and the plaintiffs' motion for preliminary injunction.

## ARGUMENT

### I.     Plaintiffs' Complaint Should Be Dismissed for Failure to State a Claim.

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In reviewing the sufficiency of a complaint under this standard, the court must accept as true all well-pleaded factual allegations. *McCauley v. City of Chicago,* 671 F.3d 611, 616 (7th Cir. 2011). However, legal conclusions and "conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *Id.* In this case, Plaintiffs' Complaint fails to state a plausible claim for relief and should be dismissed in its entirety.

### A. Plaintiffs' Freedom of Religion claim fails.

Plaintiffs fail to state a claim that the Amended Act violates their First Amendment right to free exercise (Count 5). Where a burden on religious exercise is an incidental effect of a neutral, generally applicable, and otherwise valid law or regulation, the law does not violate the Free Exercise clause of the First Amendment. *Our Savior Evangelical Lutheran Church v. Saville*, 397 Ill.App.3d 1003, 1018 (2d Dist. 2009), *citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah* ("*Lukumi*"), 508 U.S. 520, 531 (1993) and *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872, 878 (1990). A law is not neutral if it is intended "to infringe upon or restrict practices because of their religious motivation." *Id*., *quoting Lukumi*, 508 U.S. at 533. If the law is hostile to the free exercise of religious beliefs, it must be justified by a compelling governmental interest and be narrowly tailored to that interest. *Id*. at 1019, *Lukumi*, 508 U.S. at 533. "Laws are presumed constitutional and the party challenging a law's validity bears the burden of demonstrating a clear constitutional violation." *Id*. Plaintiffs must prove the challenged provisions place "a substantial burden on the observation of a central religious belief or practice." *Hernandez v. C.I.R.,* 490 U.S. 680, 699 (1989).

### 1. Plaintiffs have not made a threshold showing of a substantial burden upon their freedom of religion.

Here, the Plaintiffs have not made a threshold showing that the Amended Act imposes any burden on their practice of religion, much less a substantial one. In enacting the Conscience Act, the Legislature "did not substantially burden a person's exercise of religion, but instead bolstered it, by offering protections to those who seek not to act in the health-care setting due to religious convictions." *Morr Fitz*, 2012 IL App (4th) 110398 ¶ 54. The Amended Act does not impose a substantial burden on Plaintiffs because it does not impose any new substantive requirements on health care providers. Rather, Section 6.1 reflects health care providers' pre-existing ethical

7

obligations to give their patients full, accurate, and relevant medical information. This obligation is

reflected in the standards set by the leading medical professional organizations,[3] including the

American Medical Association ("AMA"),[4] the American Nurses Association ("ANA"),[5] the

American Academy of Physician Assistants ("AAPA"),[6] the American Academy of Pediatricians

---

[3] The Court may take judicial notice of these ethical standards as well as information from other web sites cited herein. *See, e.g.*, Fed. R. Evid. 201(b) (court may take judicial notice of information that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Bolden v. KB Home*, 618 F. Supp. 2d 1196, 1203 (C.D. Cal. 2008) (District court would take judicial notice of facts contained in documents and website of non-profit organization that established standards and qualifications for real estate appraisal practice; information was not subject to reasonable dispute and was capable of accurate and ready determination); *Hotel Employees & Rest. Employees Union, Local 100 of N.Y., N.Y. & Vicinity, AFL CIO v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 549 (2d Cir. 2002) (Court may take judicial notice of website, where "the authenticity of the site has not been questioned.").

[4] *See* Ex. A, *AMA Code of Ethics*, Section 1.1.3(b) (Patients have the right to "receive information from their physicians" and "to discuss the benefits, risks, and costs of appropriate care, including the risks, benefits and costs of foregoing treatment." Patients "should be able to expect that their physicians will provide guidance about what they consider the optimal course of action for the patient based on the physician's objective professional judgment."), Section 1.1.7 ("In following conscience, physicians should: . . . [u]phold standards of informed consent and inform the patient about all relevant options for treatment, including options to which the physician morally objects"), online at https://www.ama-assn.org/sites/default/files/media-browser/code-of-medical-ethics-chapter-1.pdf (last visited April 25, 2017).

[5] *See* Ex. B, *ANA's Code of Ethics for Nurses with Interpretive Statements* Section 1.4 (July 2001) ("Patients have the moral and legal right . . . to be given accurate, complete, and understandable information in a manner that facilitates an informed decision, and to be assisted with weighing the benefits, burdens, and available options in their treatment."), online at https://courseweb.pitt.edu/bbcswebdav/institution/Pitt%20Online/Nursing/NUR%202008/Module%2001/Readings/ANA_ethics.pdf (last visited April 25, 2017).

[6] *See* Ex. C, AAPA, *Guidelines for Ethical Conduct for the Physician Assistant Profession* (2013) ("*AAPA Guidelines*") at 5-6 ("Physician assistants have a duty to protect and foster an individual patient's free and informed choices. . . . At a minimum, this should include the nature of the medical condition, the objectives of the proposed treatment, treatment options, possible outcomes, and the risks involved."), 8 ("Physician assistants have an ethical obligation to provide balanced and unbiased clinical information about reproductive health care. When the PA's personal values conflict with providing full disclosure or providing certain services such as sterilization or abortion, the PA need not become involved in that aspect of the patient's care. By referring the patient to a qualified provider who is willing to discuss and facilitate all treatment options, the PA fulfills their ethical obligation to ensure the patient's access to all legal options."), online at https://www.aapa.org/workarea/downloadasset.aspx?id=815 (last visited April 25, 2017).

("AAP"),[7] the American College of Obstetricians and Gynecologists,[8] the World Medical

Association,[9] as well as in federal regulations.[10] These authorities agree that medical providers

must provide patients with information about all relevant treatment options. While these ethical

codes differ slightly in their delineation of a medical provider's referral duty, they are absolutely

consistent regarding a medical provider's duty to inform patients of their treatment options.

     The Illinois statutes governing medical providers expressly obligate providers to comport

with the standards of ethical medical practice. The Medical Practice Act provides that the IDFPR

may take disciplinary action against a physician who engages in "dishonorable, unethical or

unprofessional conduct of a character likely to deceive, defraud or harm the public." 225 ILCS

60/22(A)(5). In determining what constitutes such conduct, the IDFPR should consider whether the

---

[7] *See* Ex. D, AAP Committee on Bioethics, *Policy Statement - Physician Refusal to Provide Information or Treatment on the Basis of Claims of Conscience,* PEDIATRICS Vol. 124 No. 6 at 1691 (Dec. 2009) ("AAP Statement") ("One responsibility of the physician's role is providing medical information, including risks, benefits, and alternatives, during the informed-consent process. . . . Permitting physicians, on the basis of a claim of conscience, not to disclose a legally available treatment option of which the patient is unaware but might otherwise choose would significantly undermine the practice of medicine."), online at http://pediatrics. aappublications.org/content/pediatrics/124/6/1689.full.pdf (last visited April 25, 2017).

[8] *See* Ex. E, American College of Obstetricians and Gynecologists, *Code of Professional Ethics*, I-5 (2011), (physician's duty to obtain informed consent includes the duty to provide information about "alternative modes of treatment and the objectives, risks, benefits, possible complications, and anticipated results of each treatment."), online at https://www.acog.org/-/media/Departments/ National-Officer-Nominations-Process/ACOGcode.pdf?dmc=1&ts=20161118T1256054925 (last visited April 25, 2017).

[9] *See* Ex. F, World Medical Association, *Medical Ethics Manual*, at 43 (3d ed. 2015) (physician must ensure informed consent, which "involves explaining complex medical diagnoses, prognoses and treatment regimes in simple language, ensuring that patients understand the treatment options, including the advantages and disadvantages of each"), online at http://www.wma.net/en/ 30publications/30ethicsmanual/pdf/Ethics_manual_3rd_Nov2015_en.pdf (visited May 19, 2017).

[10] *See, e.g.*, Ex. G, Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws, 76 FR 9968-02, at 9973 ("The doctrine of informed consent requires that a health care provider inform an individual patient of the risks and benefits of any health care treatment or procedure. In order to give informed consent, the patient must be able to understand and weigh the treatment or procedure's risks and benefits, and must understand available alternatives."), online at https://www.gpo.gov/fdsys/pkg/FR-2011-02-23/pdf/2011-3993.pdf (last visited April 25, 2017).

questioned activities "[a]re violative of ethical standards of the profession," including ethical standards requiring physicians to "respect the rights of patients." 68 Ill. Admin. Code 1285.240(a)(1)(A). "Questionable activities" under this standard include "[c]ommitting any other act or omission that breaches the physician's responsibility to a patient according to accepted medical standards of practice." *Id.* at (a)(2)(E).

The Nurse Practice Act contains an identical prohibition on unethical conduct (*see* 225 ILCS 65/70-5(b)(7)), and the Administrative Code implementing this provision "incorporates by reference the 'Code for Nurses with Interpretive Statements', July 2001, American Nurses Association." 68 Ill. Admin. Code 1300.90(c). As discussed above, this ethical code states that patients "have the moral and legal right . . . to be given accurate, complete, and understandable information in a manner that facilitates an informed decision, and to be assisted with weighing the benefits, burdens, and available options in their treatment." Ex. B § 1.4. Thus, both the Medical Practice Act and the Nurse Practice Act require medical providers to comply with ethical standards of informed consent. In addition, the Medical Patient Rights Act, 410 ILCS 50/1, *et seq.*, codifies the rights of patients to obtain care that is consistent with current standards of medical practice, including the right "[t]o receive information concerning his or her condition and proposed treatment." 410 ILCS 50/3(a).

These ethical standards are also reflected in Illinois common law. Because physicians are "learned, skilled and experienced in subjects of vital importance to the patient but about which the patient knows little or nothing," they have a duty to "advise the patient in accordance with proper medical practice." *Goldberg v. Ruskin*, 128 Ill.App.3d 1029, 1039-40 (1st Dist. 1986). This duty encompasses the obligation to give patients full information necessary to make informed medical decisions, including information on the foreseeable risks and results to an intervention, as well as

10

any reasonable alternatives, including no intervention. *See Guebard v. Jabaay*, 117 Ill.App.3d 1, 6 (2d Dist. 1983); *see also Goldberg,* 128 Ill.App.3d at 1039-40.

As the Fourth Circuit observed, informed consent "requires that the physician convey adequate information about the diagnosis, the prognosis, alternative treatment options (including no treatment), and the risks and likely results of each option." *Stuart v. Camnitz*, 774 F.3d 238, 251-52 (4th Cir. 2014). This duty is not limited to surgical procedures, but applies when any treatment is given. *Crim ex rel. Crim v. Dietrich*, 2016 IL App (4th) 150843, ¶ 48 (Court erred in directing verdict to defendant in informed consent action where plaintiff presented evidence that surgical alternative to natural birth procedure existed and could have mitigated injuries to the infant, and mother testified that she would have chosen C-section if adequately informed of the risks and options.); *Allen v. Harrison*, 374 P.3d 812, 817 (Ok. 2016) (emergency room physician who counseled patient who accidentally swallowed a nail to eat fiber and let the nail pass but did not disclose alternative medical options should have explained the associated risks of proposed treatment and all medically reasonable alternatives). Although Plaintiffs repeatedly claim that the Amended Act requires providers to promote the "benefits" of abortion (*e.g.,* Dkt. 1 ¶¶ 1, 14-15, 24, 37, 57, 86), the requirement that providers discuss the "risks and benefits" of all treatment options is a standard formulation of the informed consent requirement, not an effort by the State to promote any particular procedure. *See*, *e.g*., Ex. A, AMA *Code of Ethics*, Section 1.1.3 (Patients have the right to "to discuss the benefits, risks, and costs of appropriate care, including the risks, benefits and costs of foregoing treatment"), Ex. D, AAP Statement at 1691 ("One responsibility of the physician's role is providing medical information, including risks, benefits, and alternatives, during the informed-consent process."), *see also* footnotes 3-9 above.

Far from burdening health care providers, the Amended Act clarifies that the Conscience Act does not exempt medical providers from fulfilling their pre-existing ethical obligations to give their patients full, accurate, and relevant medical information. *See* 745 ILCS 70/6 ("Nothing in this Act shall relieve a physician from any duty, which may exist under any laws concerning current standards of medical practice or care, to inform his or her patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of treatment options."). The Conscience Act already included the requirement that providers inform patients of their "condition, prognosis, and risks" (745 ILCS 70/6 (1998)); Senate Bill 1564 simply clarifies the informed consent requirement that was already present in the Conscience Act. The Amended Act also asks facilities to develop a plan to "ensure that conscience-based objections do not cause impairment of patients' health and that explains how conscience-based objections will be addressed in a timely manner to facilitate patient health care services." 745 ILCS 70/6.1. Because providers have been granted a significant benefit by the Conscience Act – a defense to a malpractice action or disciplinary proceeding – it is reasonable for the State to ask facilities to help ensure that patients are not injured because of a provider's conscientious objection.

While Plaintiffs object to Section 6.1(3)'s requirement that providers give written information about other health care providers that they "reasonably believe may offer the health care service," this requirement is itself an accommodation, not a burden. A health care provider generally has an ethical duty to provide a referral for health care services that he or she does not perform.[11] In contrast, Section 6.1 does *not* require the provider to refer the patient to another

---

[11] *See, e.g.,* Ex. A, *AMA Code of Ethics*, Section 1.1.7 ("In general, physicians should refer a patient to another physician or institution to provide treatment the physician declines to offer."); Ex. D, AAP Statement at 1692 ("Physicians who consider certain treatments immoral have a duty to refer patients who desire these treatments in a timely manner when failing to do so would harm the patients."); Ex. C, AAPA Guidelines at 4-5 ("If personal moral, religious, or ethical beliefs

provider; rather, Section 6.1 requires that the provider give "information in writing," so that when a patient requests the information, another health care provider can counsel and treat the patient.

### 2. Plaintiffs' arguments for applying strict scrutiny fail.

Plaintiffs also argue that strict scrutiny should apply to the Amended Act because it is neither neutral nor generally applicable (Dkt. 1 ¶ 81, Dkt. 3 at 13), but Plaintiffs' argument misunderstands the test under *Lukumi*. Under *Lukumi*, a "law is not neutral if it is intended 'to infringe upon or restrict practices because of their religious motivation.'" *Our Savior Evangelical Lutheran Church*, 397 Ill.App.3d at 1018, *quoting Lukumi*, 508 U.S. at 533. In this case, the purpose of the Conscience Act was to provide a substantial benefit to health care providers with conscientious objections to certain services. And as discussed above, the purpose of Section 6.1 is to protect patients, not to infringe on the Plaintiffs' religious beliefs or practices.

Plaintiffs' arguments regarding the Amended Act are similar to those of the plaintiffs in *Our Savior Evangelical Lutheran Church*. In that case, a zoning ordinance exempted churches from the need to seek a special use permit if they met the listed requirements, which related to "setbacks, green space, parking, etc." 397 Ill.App.3d at 1019. The plaintiff church argued that one of the listed requirements, that churches abut major or arterial streets, discriminated on its face against churches. The appellate court rejected that argument, holding that the requirement "must be viewed within the context of [the ordinance] as a whole." *Id*. The "overall effect" of the ordinance was "to grant churches a benefit, the opportunity to bypass the special use application process that other, nonreligious land uses must go through." *Id*. The listed requirements "impose[d] a reasonable limitation on a benefit the government has conferred on churches, not a 'substantial burden' on churches or their members." *Id*. at 1020. The court accordingly found that the ordinance

_____

prevent a PA from offering the full range of treatments available or care the patient desires, the PA has an ethical duty to refer a patient to another qualified provider.").

13

did not violate the Free Exercise Clause of the U.S. Constitution or the Illinois Religious Freedom Act. *Id*. at 1019-20. Similarly, in this case the Legislature has conferred a substantial benefit on health care providers by enacting the Conscience Act. Section 6.1 merely places a reasonable limitation on that benefit, rather than a substantial burden on Plaintiffs' rights.

While the Amended Act only applies to medical providers with conscientious objections to providing medical services, this fact alone does not make the law hostile to religion. In *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 632-33 (7th Cir. 2007), the Seventh Circuit held that an amendment to the Religious Freedom Act that only applied to a single religious cemetery was nevertheless neutral because "secular cemeteries presumably would have no extraordinary defense to the power of eminent domain to begin with." Here, the Amended Act applies only to providers with conscience-based objections because other providers are already subject to their ethical obligations to provide information to patients and to provide referrals for care when necessary.

Finally, Plaintiffs claim that the Amended Act is not generally applicable because it does not "impose duties" on "persons who refuse to comply with its requirements for reasons unrelated to conscientious objection to the treatment option." Dkt. 1. ¶ 81. But as discussed above, all medical providers are required to adhere to the same ethical standards. The Amended Act simply provides a means of ensuring that providers who exercise a conscientious objection to providing certain services nevertheless meet their patients' medical needs.

>    **3.     Even if the Amended Act imposed a substantial burden and strict scrutiny applied, the State's compelling interests would justify that burden, and the State has adopted the least restrictive means of protecting those interests.**

Moreover, even if this Court were to find that strict scrutiny should apply, the Amended Act passes that test. First, the State has a compelling interest in protecting the health and autonomy

14

of its citizens by ensuring that they receive the information that they need to make informed medical decisions. *See, e.g., Lasdon v. Hallihan*, 377 Ill. 187, 193 (1941) (State has broad authority to license and regulate the health care professions because "services customarily rendered by those engaged in such professions are so closely related to the public health, welfare and general good of the people, that regulation is deemed necessary to protect such interests."). The State also has a compelling interest in ensuring that health care providers in Illinois conform to the ethical standards of their professions. As the court in *Pregnancy Care Center* court recently held, the "power of the legislature to license and regulate the provision of health care is long-standing and beyond doubt." Ex. H at 12. While the *Pregnancy Care Center* court found that this government interest was "substantial" for purposes of intermediate scrutiny, Illinois appellate courts have also held that this interest is "compelling." *See People v. Ray*, 119 Ill.App.3d 180, 185 (1st Dist. 1983) ("[E]ven if the statute did infringe on rights of expression, section 24 is reasonably drawn to meet the State's compelling interest in regulation of the practice of medicine."); *Rios v. Jones*, 63 Ill.2d 488, 497 (1976) ("The States have a compelling interest in the practice of professions within their boundaries, and as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions. . . . The State's interest in promoting the general welfare by licensing physicians is of great importance."). The Legislature has determined that health care providers with conscience-based objections to providing certain services should develop a plan to ensure that they meet their ethical obligations towards their patients. The Amended Act is well within the powers of the Legislature to regulate the health care professions.

   Plaintiffs argue that the State's interest in requiring providers to provide written information about other providers on request is not substantial or compelling because

15

"[i]nformation about contraceptive drugs and devices, sterilization, and abortion is readily available to all Illinois residents via the internet, phone books, billboard and other advertisements, in public libraries, and through contact with governmental agencies." Dkt. 1 ¶ 42. But while *general* information about these topics may be available from other sources, this does not absolve health care providers of their ethical duty to provide specific information that is relevant to the individual patient's needs and circumstances. Plaintiffs further argue that the Amended Act is not the "least restrictive means of securing" the State's interest because the State "could have tasked its own employees or other public employees to disseminate the information via internet, television, radio, and at public health facilities, schools and libraries." *Id*. ¶ 45. But again, the State cannot possibly create fliers or websites that would address every possible medical situation.

Finally, Plaintiffs argue that the Amended Act is not the "least restrictive means" because the State "could have required healthcare providers themselves to disclose the legal treatment options they could not, for conscience reasons, participate in." *Id*. This allegation is puzzling because this is *exactly* what the Amended Act requires. The additional requirements of the Amended Act—that a health care facility develop a plan for ensuring that patients are not injured because of a provider's conscientious objection —is a reasonable requirement given the health care facilities' own obligations to their patients.

Physicians are "learned, skilled and experienced in subjects of vital importance to the patient but about which the patient knows little or nothing." *Goldberg v. Ruskin*, 128 Ill.App.3d 1029, 1039-40 (1st Dist. 1986). Only a patient's treating provider understands the patient's circumstances, medical condition, and needs as well as the possible treatment options that may be appropriate given the patient's circumstances. If providers send patients away without all of the relevant information about their condition, patients may not know that they should seek

16

information about additional treatment options from another provider. For example, a woman who has an ectopic pregnancy may not know that, as an alternative to surgery, there is a drug therapy (methotrexate) that dissolves the pregnancy, thus avoiding the risks of surgery.[12] Even if a doctor objects to the drug therapy as a direct abortion,[13] accepted standards of medical care require him to inform the patient of the less invasive option. Similarly, a thirteen-year-old girl who was raped may not know that emergency contraception, taken within 72 hours of intercourse, may prevent pregnancy.[14] To allow a provider to remain silent about these options, or to tell these patients nothing more than that they should consult with another provider would "significantly undermine the practice of medicine." Ex. D, AAP Statement at 1691. Thus, Plaintiffs' proposed less restrictive alternative does not fulfill providers' ethical obligations.

---

[12] *See* Mayo Clinic Staff, "Ectopic Pregnancy Treatments and Drugs," online at http://www.mayoclinic.org/diseases-conditions/ectopic-pregnancy/basics/treatment/con-20024262 (last visited May 18, 2017).

[13] *See* Sabrina Rubin Erdely, "Doctors' Beliefs May Hinder Patient Care" (detailing an instance in which a physician refused to administer methotrexate based on the ethical directives of the U.S. Conference of Catholic Bishops), online at http://www.nbcnews.com/id/19190916/#.WR3inpLytpg (last visited May 18, 2017).

[14] Plaintiffs may argue that these are extreme cases outside of their usual practice. But Plaintiffs have made a facial challenge to the Amended Act because their claims do not depend on any specific facts relating to a request for information by a specific plaintiff with a specific medical condition. Because Plaintiffs have filed a pre-enforcement suit that does not depend on a specific factual scenario, any relief could reach "beyond the particular circumstances of these plaintiffs" (even if such relief were limited to providing abortion-related information), and as such, plaintiffs must "satisfy [the] standards for a facial challenge to the extent of that reach." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (challenge to Washington's Public Records Act "only to the extent it covers referendum petitions" considered "facial")*,* cited with approval in *People v. One 1998 GMC*, 2011 IL 110236, ¶ 61. The standards for a facial challenge are strict. "Facial invalidation is manifestly strong medicine that has been employed by the court sparingly and only as a last resort." *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). A facial challenge to a statute is "the most difficult challenge to mount successfully," because an enactment is facially invalid "only if no set of circumstances exists under which it would not be valid." *Napleton v. Vill. of Hinsdale*, 229 Ill. 2d 296, 306 (2008). In other words, an enactment is not facially invalid merely because it could be found unlawful under "some set of circumstances." *Id.* Here, Plaintiffs cannot demonstrate that the Amended Act is invalid in any of its applications, let alone all. Their claims must therefore be dismissed.

Plaintiffs also argue that the Amended Act does not serve a compelling interest because it is "under-inclusive[]"; that is, it "doesn't address and therefore exempts all those who fail to comply for reasons unrelated to conscience." Dkt. 3 at 7; *see also* Dkt. 1 ¶¶ 40, 60. But as discussed above, these providers are already regulated by the Medical Practice Act and the Nurse Practice Act and are required to adhere to the same ethical standards. The Amended Act simply provides a means of ensuring that providers who exercise a conscientious objection to providing certain services nevertheless meet their patients' needs.

Contrary to Plaintiffs' claims (Dkt. 1 ¶¶ 43, 47, 62), neither the Amended Act nor providers' ethical obligations force Plaintiffs to talk about abortion, contraception, or sterilization to patients who do not want or need such information. The dialogue must be tailored to the information that is relevant to the needs, wishes, and circumstances of a given patient – not those of the provider. *See* AAP Statement at 1691 ("[I]nformation disclosed should be accurate, complete, easily understood, and focused on the patients' decisionmaking needs"). Thus, health care providers treating patients with healthy, wanted pregnancies do not need to talk about abortion as a treatment option. And if, as they claim, Plaintiffs have made the limitations of their practice clear to their patients (Dkt. 1 ¶¶ 43, 46, 60), and their patients agree with their objections to certain care, medical ethical standards would not normally require them discuss contraception and sterilization options with those patients. But in general, no up-front limitations on treatment can excuse Plaintiffs from their ethical duties to their patients.

## B.  Plaintiffs' Free Speech, Overbreadth, and Expressive Association claims fail.

Plaintiffs also fail to state a claim that the Amended Act violates their freedom of speech, as protected by the First Amendment. Plaintiffs' free speech claim (Count 1) fails because physician disclosure requirements are reasonable regulations of the medical profession. Plaintiffs' overbreadth claim (Count 2) fails because it is based on a misinterpretation of the Amended Act.

Finally, Plaintiffs' expressive association claim (Count 4) fails because the Amended Act does not affect the Plaintiffs' right or ability to associate.

> **1.**     **Intermediate scrutiny applies to Plaintiffs' free speech claim.**

When the federal courts have considered regulations aimed at medical professionals, they have generally applied intermediate scrutiny to these regulations of professional speech. *See, e.g., Nat'l Inst. of Family & Life Advocates v. Harris* ("*NIFLA*"), 839 F.3d 823, 839-40 (9th Cir. 2016) (applying intermediate scrutiny to regulation requiring pregnancy centers to post notices regarding the "free or low-cost access to comprehensive family planning services (including all FDA-approved methods of contraception), prenatal care, and abortion" and finding that the challenged regulation was "closely drawn to achieve California's interests in safeguarding public health and fully informing Californians of the existence of publicly-funded medical services"); *King v. Governor of N.J.*, 767 F.3d 216, 232 (3d Cir. 2014) (applying intermediate scrutiny when therapists challenged a law prohibiting therapy that purported to change patients' sexual-orientation and determining that an informed consent requirement would not suffice to protect minors); *Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014) (applying intermediate scrutiny when physicians challenged an abortion-related disclosure law they claimed violated their First Amendment rights). These courts have concluded that "a licensed professional does not enjoy the full protection of the First Amendment when speaking *as part of the practice of her profession*." *King*, 767 F.3d at 232 (emphasis added). Speech that occurs between a professional and a client is distinct from other types of speech because professionals, "through their education and training, have access to a corpus of specialized knowledge that their clients usually do not" and that clients put "their health or their livelihood in the hands of those who utilize knowledge and methods with which [they] ordinarily have little or no familiarity." *Id.*

In contrast, the Eighth and Fifth Circuits have applied even lower levels of scrutiny – a "reasonableness test" – when determining whether an abortion-related disclosure law violated physicians' First Amendment rights. In *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008), the Eighth Circuit upheld a law regulating informed consent to abortion, concluding that a state "can use its regulatory authority to require a physician to provide truthful, non-misleading information" to patients in the context of abortion-related disclosures. Similarly, in *Texas Medical Providers Performing Abortion Services v. Lakey*, 667 F.3d 570, 575 (5th Cir. 2012), the Fifth Circuit held that the appropriate level of scrutiny for abortion-related disclosures was "the antithesis of strict scrutiny," upholding a law requiring doctors to show pregnant women sonograms of their fetuses and make audible the fetuses' heartbeats as "part of the state's reasonable regulation of medical practice." *Id*.

Plaintiffs assert that the Amended Act should be subject to strict scrutiny because the statute is a content and viewpoint-based regulation of speech. Dkt. 1 ¶ 57, Dkt. 3 at 5-6. But Plaintiffs' argument ignores the substantial case law holding that intermediate scrutiny should apply to regulations of licensed professionals "when speaking as part of the practice of [their] profession." *King*, 767 F.3d at 232. As the *Pregnancy Care Center* court concluded, "an intermediate standard of review" should apply to the Plaintiffs' free speech claim, because this standard of review "recognizes the State's traditional interest in regulating medical providers while still providing for meaningful protection of the providers' right to be free from compelled speech." Ex. H at 10-11. Moreover, the Conscience Act was amended to ensure that providers with a conscientious objection to providing certain treatments nevertheless provide their patients with sufficient information to make an informed decision regarding their health, and thus is *not* a viewpoint-based regulation. But as the *Pregnancy Care Center* court observed, intermediate

scrutiny has been applied to statutes promoting a particular viewpoint – both to statutes that "reflect[] an effort . . . to convince women about the importance of fetal life," as well as to statutes "trying to ensure that patients were informed of their right to opt for abortion." Ex. H at 10.

Finally, the fact that Plaintiffs offer their services free of charge (Dkt. 3 at 10-11) does not change the analysis. Whether or not they charge for their services, the Plaintiffs are licensed medical professionals and can be regulated accordingly. *NIFLA*, 839 F.3d at 841 (plaintiffs' "non-profit status does not change the fact that they offer medical services in a professional context").

### 2. The Amended Act survives intermediate or strict scrutiny.

To survive intermediate scrutiny, a law concerning speech (1) must "directly advance[] a substantial governmental interest"; and (2) must not burden substantially more speech than necessary to further that interest. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572 (2011); *see also* Ex. H at 12. As the *Pregnancy Care Center* court held, the State's interest in "protecting the health and autonomy of its citizens by ensuring that they receive the information that they need to make informed medical decisions" is a substantial government interest. *Id.* The "power of the legislature to license and regulate the provision of health care is long-standing and beyond doubt." *Id.*, *see also NIFLA*, 839 F.3d at 841 ("California has a substantial interest in the health of its citizens, including ensuring that its citizens have access to and adequate information about constitutionally-protected medical services like abortion.").

Moreover, as discussed above, the Amended Act is narrowly tailored to meet the State's compelling interests. The *Pregnancy Care Center* court has suggested that the Amended Act may not be narrowly tailored in part because "some of the more dire hypothetical circumstances" were already covered by the emergency exception of the Conscience Act. Ex. H at 12. "Consequently, the benefit to be achieved by the statute is limited to non-emergency situations in which a patient may desire, or might benefit from, additional information about the 'legal treatment option' of

abortion." *Id*. However, this statement misunderstands the scope of the emergency exception. As the appellate court found in *Morr-Fitz, Inc. v. Quinn*, the emergency exception applies only when there is "an imminent danger to the patient or the need for immediate attention," such as "a ruptured appendix or surgical shock." 2012 IL App (4th) 110398 ¶ 78, ¶ 76, *quoting Gaffney v. Bd. of Trustees of the Orland Fire Protection Dist.*, 2012 IL 110012, ¶ 62. The court specifically held that emergency contraception did not fall within the emergency exception, even though its effectiveness was limited to the first 72 hours after unprotected sex. *Id* at ¶¶ 77-78. Similarly, an ectopic pregnancy may not fall within the emergency exception unless the patient's fallopian tube had already ruptured. Thus, many cases may be quite urgent without falling within the emergency exception. In these cases, patients rely on their medical providers to give them accurate, complete, and timely information so that the patients can make the best possible decisions. The Amended Act is narrowly tailored to protect patients' health and autonomy. Moreover, even if strict scrutiny applied, as discussed above the Amended Act survives strict scrutiny because it is the least restrictive means of protecting the State's compelling interests in regulating the medical profession and protecting the health and welfare of its citizens.

### 3. The Amended Act is not overbroad.

Plaintiffs make three arguments to support their claim that the Amended Act is overbroad and not narrowly tailored, but each of these fail. First, Plaintiffs argue that the Amended Act is overbroad because it requires them to discuss legal treatment options even when their patients agree to "disclosed limitations of services." Dkt. 1 ¶ 60; Dkt. 3 at 8-9, 10. But as discussed in Section I.A.3 above, while in some instances Plaintiffs may be able to agree with their patients not to discuss certain treatments, Plaintiffs cannot escape their ethical duties to their patients through up-front limitations on treatment.

Second, Plaintiffs argue that the Amended Act is overbroad because it "compels Plaintiffs and others to discuss certain legal treatment options with patients" even if those patients do not want or need such information. Dkt. 1 ¶ 61-62. But as discussed in Section I.A.3 above, neither the Amended Act nor providers' ethical obligations require Plaintiffs to talk about abortion or contraception to patients who do not want or need such information.

Finally, Plaintiffs allege that the Amended Act is overbroad and not narrowly tailored because it regulates the speech of "private citizens who serve as staff or volunteer counselors," who are not licensed health care professionals and "who do not provide medical advice." Dkt. 1 ¶¶ 44, 63; *see also* Dkt. 3 at 10. However, this argument overstates the reach of the Amended Act.

The Conscience Act defines "health care personnel" to include any "nurse, nurses' aide, medical school student, professional, paraprofessional or any other person who furnishes, or assists in the furnishing of, health care services." 745 ILCS 70/3(c). Although it is not entirely clear from the Complaint, Plaintiffs apparently believe that their unlicensed volunteers and lay staff can be considered to "assist in the furnishing of health care services" as defined in the statute. Dkt. 1 ¶ 51. However, Plaintiffs also allege that these staff and volunteer counselors "are not licensed healthcare professionals, . . . do not hold themselves out as such to the public as licensed healthcare providers, and . . . do not provide medical advice." *Id.* ¶ 63; *see also* Dkt. 3 at 9 ("These are conversations among private citizens discussing personal situations. [The Amended Act] applies to, and regulates, these conversations only because they take place at a location where some healthcare is delivered.")

If, as Plaintiffs allege, their unlicensed volunteers and lay staff do not provide health care, then according to the plain language of the statute they cannot be considered to be "health care personnel" who "assist[] in the furnishing of, health care services." *See People v. Burpo*, 164 Ill. 2d

23

261, 267 (1995) (internal quotations omitted) ("Common sense must play a role in the construction of statutes. . . . It cannot be presumed that the General Assembly, in legislating, intended obscurity, or to override common sense."). The Amended Act therefore does not apply when Plaintiffs' unlicensed volunteers and lay staff "discuss[] personal situations" with their clients (Dkt. 3 at 9); the Amended Act only applies if and when those volunteers and staff are providing health care.

### 4. The Amended Act does not violate Plaintiffs' right of expressive association.

Plaintiffs' First Amendment "expressive association" claim (Count 4) also fails and should be dismissed. The right of expressive association is implicated in cases of "forced inclusion," when the government compels a group to accept certain members it does not desire, and may also apply when the government penalizes individuals because of their membership in a group, requires disclosure of the members of a group seeking anonymity, or interferes with the "internal organization or affairs" of a group. *See, e.g.*, *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622-63 (1984). None of these situations is presented here.

The Amended Act neither directly nor indirectly regulates who may associate with pregnancy care centers. It merely requires health care providers with conscience-based objections to provide certain information to their patients, to ensure that such objections do not cause impairment of patients' health. 745 ILCS 70/6-1. Plaintiffs' allegation that the Amended Act's regulation of *patient care* could cause some individuals to discontinue their association with them (Dkt. 1 ¶¶ 70-76) does not allege the sort of interference with group affairs that implicates the right of expressive association. And even if it did, Plaintiffs' claim would still fail, because the State has a compelling interest in protecting patients' health. *See Dale*, 530 U.S. at 648 (noting that freedom of association is not absolute).

24

C.      **Plaintiffs' Due Process Void-for-Vagueness claim fails.**

Plaintiffs' due process void-for-vagueness claim (Count 3) also should be dismissed. First, Plaintiffs argue that the statute is vague because "it appears to regulate and compel speech regardless of the limited nature of medical services provided." Dkt. 1 ¶ 66. But as discussed above, the Amended Act requires health care providers to meet the ethical duties of their profession, regardless of any stated limits on their practice. Second, Plaintiffs argue that the Amended Act is vague because it appears to apply to nonlicensed lay volunteers who are not providing medical care (*id.*), but as discussed above, the Amended Act does not apply to these individuals.

The Amended Act requires health care providers to inform patients of their legal treatment options and the risks and benefits of those options, "consistent with current standards of medical practice or care." 745 ILCS 70/6.1(1). Plaintiffs allege that the Act's incorporation of current standards of medical care renders it unconstitutionally vague because "there are no clearly defined standards in the areas covered by the statute" and "reasonable professionals can differ in the exercise of their reasonable and professional medical judgment." Dkt.1 ¶ 81. But in *Burpo*, the Illinois Supreme Court rejected this same argument. There, a doctor facing criminal sexual assault charges claimed that the statute at issue was unconstitutionally vague to the extent that it referred to "reasonable medical standards." 164 Ill. 2d at 265. The Supreme Court disagreed and upheld the statute, noting that "[m]edical standards are not amenable to precise and explicit statutory codification." *Id.* at 266 ("medicine is not an exact science" but rather "a profession which involves the exercise of individual professional judgment").

Similarly, the federal courts have repeatedly upheld statutes that rely on a physician's professional judgment. *See, e.g., United States v. Vuitch*, 402 U.S. 62, 72 (1971) (holding that a statute allowing abortion for preservation of the mother's life or health not unconstitutionally vague because "whether a particular operation is necessary for a patient's physical or mental health

25

is a judgment that physicians are obviously called upon to make routinely whenever surgery is considered."); *Doe v. Bolton*, 410 U.S. 179, 191 (1973) (holding that statute allowing abortion when physician determined in "his best clinical judgment that an abortion is necessary" was not unconstitutionally vague because this was "a professional judgment that the Georgia physician will be called upon to make routinely"). As another court explained:

> The health sciences are dynamic and as a result, it is impossible to compile a list of every conceivable form of 'acceptable' and 'unacceptable' medical practice. Courts have therefore recognized that 'statutes affecting medical practice need not delineate the precise circumstances constituting the bounds of permissible practice.' Instead, the health professions are regulated by statutes of general terminology, complemented by continually evolving and changing non-statutory standards fashioned to meet contemporary needs.

*Waltz v. Herlihy*, 682 F. Supp. 501, 507 (S.D. Ala. 1988) (dismissing physician's due process void-for-vagueness claim as "entirely without merit") (internal citations omitted).

The Amended Act's reference to "current standards of medical practice or care" fully comports with due process requirements. A statute will not be stuck down as unconstitutionally vague unless its terms are "so ill-defined that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts." *Burpo*, 164 Ill. 2d at 265-66. And that is not the case here. *Id.* at 266-67 ("[T]he legislative use of the term 'reasonable medical standards' is sufficient."). The due process clause does not preclude the State from protecting Plaintiffs' patients by requiring Plaintiffs to comport with current standards of medical care. *See, e.g., People of Territory of Guam v. Winkler*, No. 86-060A, 1988 WL 242599, at *2 (D. Guam Aug. 2, 1988) (statute criminalizing "medical treatment or examination of the victim in a manner or for purposes which are medically recognized as unethical or unacceptable" not unconstitutionally vague); *Lang v. Berger*, 427 F. Supp. 204, 210 (S.D.N.Y. 1977) (regulations prohibiting "care of poor and unacceptable quality" and "provision of excessive, unnecessary, professionally unacceptable, unproven or experimental care" not unconstitutionally vague).

26

D.      **Plaintiffs' Equal Protection claim fails.**

Plaintiffs' equal protection claim (Count 6) also fails and should be dismissed. Plaintiffs claim that the Amended Act discriminates against health care providers "who have conscience-based objections to abortion, contraception and sterilization," while it imposes "no similar requirement on providers who have no conscience-based opposition to the treatment options mentioned and decline to discuss them for different reasons such as that they would lose business if a patient selected a mentioned treatment option, or they believed that information about the option was unnecessary to talk about because it was already available to the patient, or because they simply couldn't be bothered talking about it." Dkt. 1 ¶ 86.

But as a threshold matter, these two groups are *not* "similarly situated," as required for an equal protection claim. *See Desris v. City of Kenosha*, 687 F.2d 1117, 1119 (7th Cir. 1983) ("It is axiomatic that the Equal Protection clause of the Fourteenth Amendment only guarantees like treatment to persons similarly situated."). As discussed above, the Amended Act provides a substantial *benefit* to health care providers with conscientious objections relative to other health care providers—*i.e.*, a defense to a malpractice action or disciplinary proceeding that other health care providers do not have. Plaintiffs' claim fails for this reason alone.

Moreover, Plaintiffs' equal protection claim adds nothing to their other constitutional claims. The equal protection claim should be dismissed for the same reasons that Plaintiffs' other constitutional claims should be dismissed. *See Goodman v. Carter*, No. 2000 C 948, 2001 WL 755137, at *7 (N.D. Ill. Jul. 2, 2001) (stating that "[t]he protection afforded religious practice by the Equal Protection Clause is no greater than that granted by the First Amendment" and finding a separate equal protection analysis "unnecessary").

### E. Plaintiffs' claims under the 2016 Consolidated Appropriations Act, the Church Amendment, and the Coats-Snowe Amendment fail.

Plaintiffs' claims under the 2016 Appropriation Act, the Church Amendment, and the Coats-Snowe Amendment (Counts 7-9) all fail for similar reasons.

#### 1. There is no private right of action under these statutes.

Private rights of action must be created by Congress. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.*; *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002). To create new enforceable rights, Congress must do so in "clear and unambiguous terms." *Doe*, 536 U.S. at 290. Spending Clause legislation rarely gives rise to enforceable rights, and defendants are aware of no case finding a private right of action under any of the three statutes at issue here. *Id.* at 280 (noting that recent Supreme Court decisions "have rejected attempts to infer enforceable rights from Spending Clause statutes").

*First*, the 2016 Appropriation Act, 114 P.L. 113, Title V, § 507(d), does not create a private right of action. It states that federal appropriations may not be made available to a State government that "subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." *Id.* at § 507(d)(1). This limitation on federal spending does not confer enforceable rights "on a particular class of persons," and therefore does not create a private right of action. *Alexander*, 532 U.S. at 289; *see also Res. Council of Allen Pkwy Vill. v. U.S. Dep't of Urban Hous. & Dev.*, 980 F.2d 1043, 1052-53 (5th Cir. 1993) ("[C]ourts have been reluctant to infer a congressional intent to create private rights under appropriations measures."), citing *Calif. v. Sierra Club*, 451 U.S. 287, 297 (1981) (finding no private right of action under the Rivers and Harbors Appropriation Act).

*Second*, the Church Amendment, 42 U.S.C. § 300a-7, does not create a private right of action. It states that "[n]o individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions." *Id.* at § 300a-7(d). While it references individuals, there is no evidence of Congressional intent to create a private remedy. Instead, the Church Amendment is Spending Clause legislation enforced by the Office for Civil Rights of the Department of Health and Human Services. 45 C.F.R. § 88.2.

Courts have consistently held that the Church Amendment does not create a private right of action. In *Nead v. Board of Trustees of Eastern Illinois University*, the Central District of Illinois dismissed a claim under the Church Amendment, finding no evidence that Congress intended to create a private right of action. 2006 WL 1582454, at *5 (C.D. Ill. Jun. 6, 2006) ("The defendants argue that the Church Amendment does not confer a private right of action. The defendants are correct; it does not."). And other courts have reached the same conclusion. *See, e.g.*, *Cenzon-DeCarlo v. Mt. Sinai Hosp.*, 626 F.3d 695, 698 (2d Cir. 2010) ("While there may be some colorable evidence of intent to confer or recognize an individual right, there is *no* evidence that Congress intended to create a right *of action*."); *Hellwege v. Tampa Family Health Ctrs.*, 103 F. Supp. 3d 1303, 1307-13 (M.D. Fla. 2015) (holding that "no private right of action exists under the Church Amendments"); *Moncivaiz v. DeKalb Cty.*, 2004 WL 539994, at *3 (N.D. Ill. Mar. 12, 2004) (same).

*Third*, the Coats-Snowe Amendment, 42 U.S.C. 238n, does not create a private right of action. In relevant part, this provision states that the Federal Government and any State or local

government that receives federal financial assistance "may not subject any health care entity to discrimination on the basis that the entity refuses to undergo training in the performance of induced abortions, to require or provide such training, to perform such abortions, or to provide referrals for such training or such abortions." 42 U.S.C. § 238n(a)(1). The term "health care entity" is defined to include "an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions." *Id.* at § 238n(c)(2).[15] The Coats-Snowe Amendment, like the Church Amendment, is spending clause legislation enforced by the Office for Civil Rights of the Department of Health and Human Services, which provides assistance with compliance and may terminate funding or require a return of funds in the event of non-compliance. 45 C.F.R. § 88.2; *see also* 76 FR 9968-02, 2011 WL 606395, at *9972 (describing the administrative enforcement system).

For the same reasons that courts have consistently found no private right of action under the Church Amendment (*see* cases cited above), there is no private right of action under the Coats-Snowe Amendment, which is similar "right of conscience" Spending Clause legislation. Indeed, the case for a private right of action under Coats-Snowe is even weaker, because Coats-Snowe does not reference individual rights at all. "Statutes that focus on the person regulated rather than the individuals protected 'create no implication of an intent to confer rights on a particular class of persons.'" *Alexander*, 532 U.S. at 289, citing *Calif. v. Sierra Club*, 451 U.S. 287, 294 (1981); *see also Cannon v. Univ. of Chicago*, 441 U.S. 677, 692-93 (1979) (noting that there is "far less

---

[15] Based on this definition, the Coats-Snowe Amendment does not apply to any of the plaintiffs except for Dr. Ronald L. Schroeder, a licensed physician. Dkt. 1 ¶ 4. The other plaintiffs are pro-life pregnancy centers. *Id.* at ¶¶ 5-6. They are not "individual physicians," nor do they claim to be "postgraduate physician training programs" or "participants in a program of training in the health professions." As such, they are not covered by the Coats-Snowe Amendment, *see* 42 U.S.C. § 238n(c)(1), and their claims can be dismissed for this reason alone.

30

reason" to infer a private right of action under a statute that operates as a "ban on discriminatory conduct by recipients of federal funds").

> **2.** **Even if there were a private right of action under these statutes, the Amended Act does not discriminate against health care providers with conscience-based objections.**

Even if there were a private right of action under these statutes (there is not), Plaintiffs would still fail to state a claim because the Amended Act does not discriminate against health care providers with conscience-based objections. The Conscience Act *benefits* religious objectors, and the Amended Act, SB 1564, only clarifies that such objectors must comply with their pre-existing ethical obligations so that "conscience-based objections do not cause impairment of patients' health." 745 ILCS 70/6.1.

Nor does the Amended Act create a "referral" requirement, as Plaintiffs allege. While the Amended Act may require (as one option) providers asserting conscience-based objections to provide information to their patients "about other health care providers who they reasonably believe" may offer the objected-to-service, this is *not* is referral requirement. Indeed, the Amended Act, SB 1564, left intact the language in the Conscience Act specifically stating that health care providers cannot be held liable for refusing "refer" patients for services contrary to their conscience. 745 ILCS 70/4.

In sum, Plaintiffs' claims under 2016 Appropriation Act, Church Amendment, and Coats-Snowe Amendment (Counts 7-9) should be dismissed. Plaintiffs' misplaced request for an injunction "prohibiting the State Defendants from accepting federal funds from HHS or its agencies, including CMMS" unless they stipulate that they will not enforce the Amended Act (Pls. Compl. at p. 25) only underscores that their claims are based on Spending Clause legislation that does not create a private right of action.

F.    **Plaintiffs' claims against the Governor should be dismissed because he is not a proper defendant.**

Plaintiffs have sued Governor Rauner solely in his official capacity as the Governor of the State of Illinois. Dkt. 1 ¶ 7. The claims against the Governor should be dismissed because he is not a proper defendant for a challenge to the constitutionality of the statute at issue. While the Eleventh Amendment allows suits against state officials for injunctive relief, the official must have a sufficiently close connection to the enforcement or implementation of the statute at issue. *See, e.g., Weinstein v. Edgar*, 826 F. Supp. 1165, 1166-67 (N.D. Ill. 1993), *citing Ex parte Young*, 209 U.S. 123, 157 (1908); *Illinois League of Advocates for the Developmentally Disabled v. Quinn*, No. 13 C 1300, 2013 WL 5548929, at *4 (N.D. Ill. Oct. 8, 2013). These courts have consistently held that a governor's "general obligation to faithfully execute the laws" does not make the governor the proper defendant for a constitutional challenge to a statute. *Weinstein*, 826 F. Supp. at 1167 (holding that plaintiff could not sue governor of Illinois in constitutional challenge to statute making Good Friday a school holiday); *Illinois League of Advocates*, 2013 WL 5548929 at 4 (holding that the governor of Illinois was not the proper defendant for constitutional challenge to the state's closing of two facilities for developmentally disabled individuals). Likewise, in this case the Governor has no specific duty to enforce or implement the Amended Act. Thus, the Eleventh Amendment bars suit against the Governor, and he should be dismissed accordingly.

The Governor should also be dismissed because of the lack of "case or controversy" between Plaintiffs and the Governor. *Weinstein*, 826 F. Supp. at 1168 n.2. The proper defendant to name in a constitutional challenge is "the person whose actions cause injury, not the author of the legal rule that leads to those actions." *Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998)*; see also Quinones v. City of Evanston, Illinois,* 58 F.3d 275, 277 (7th Cir. 1995). Declaratory relief may be obtained only when there is a "substantial controversy[] between parties having adverse legal

32

interests." *Alcan Aluminium Ltd. v. Dep't of Revenue of State of Or.*, 724 F.2d 1294, 1298 (7th Cir. 1984). As both the Illinois and federal courts have held, where the Governor is not involved with implementing or enforcing a statute, there is no controversy between the parties as required for a declaratory judgment action. *See Illinois Press Ass'n v. Ryan*, 743 N.E.2d 568, 569 (2001) (holding that the governor was not a proper defendant because he had no authority over the legislative branch's ethics commission); *Weinstein*, 826 F. Supp. at 1167, 1168 n.2 (plaintiff could not sue governor of Illinois in constitutional challenge to statute making Good Friday a school holiday).

In this case, the Governor is likewise not a proper defendant. Plaintiffs have not alleged that the Governor has any connection to the enforcement of the challenged statute. Because the Governor has not enforced or threatened to enforce the statute against Plaintiffs, the Governor has caused no injury to the Plaintiffs and there is no case or controversy between the Governor and Plaintiffs. Accordingly, the Governor should be dismissed from this action.

## II.    Plaintiffs' Motions for Preliminary Injunctions Should Be Denied.

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). To obtain a preliminary injunction, a plaintiff must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010). The court "must balance the competing claims of injury and must consider the effect on each party of granting or withholding the requested relief," paying "particular regard for the public consequences in employing the

extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. The balance of these factors clearly shows that Plaintiffs are not entitled to a preliminary injunction.

### A.    Plaintiffs are not likely to succeed on the merits of their claims.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits." *Winter*, 555 U.S. at 20. To meet their initial burden, Plaintiffs must show that they have a "better than negligible" chance of success on the merits. *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 387 (7th Cir. 1984). Where it is more likely than not that a defendant will prevail, injunctive relief is improper, particularly where the balance of harms tips decidedly in favor of the defendant. *See Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 826-27, 829 (7th Cir. 1998). Even if a plaintiff makes the required showing, however, the court must determine how likely it is that the plaintiff actually will succeed: "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach. Co.*, 749 F.2d at 387. Moreover, when there are "two equally credible versions of the facts the court should be highly cautious in granting an injunction without the benefit of a full trial." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986) (citation omitted).

For the reasons explained above, Plaintiffs fail to establish a likelihood of success on the merits of their claims. Since Plaintiffs have little if any chance of success on the merits, the balance of harms must weigh very heavily in their favor. However, as discussed below, the balance of harms actually weighs *against* granting a preliminary injunction.

### B.    Plaintiffs fail to establish irreparable harm.

Plaintiffs' motion should be denied because they cannot establish irreparable harm. *Winter*, 555 U.S at 2 (Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction") (emphasis in original). Plaintiff 1st Way asserts that its medical director has resigned

34

to avoid any possibility of sanctions from noncompliance with the Amended Act, and that it is therefore currently unable to offer medical services to its clients. Dkt. 3 at 2-3. But as discussed above, the Amended Act places reasonable limitations on the statutory benefit conferred on medical providers to refuse to provide health care services based on their religious objections to those services. Rather than create new duties, the Amended Act merely reflects health care providers' pre-existing ethical obligations to give their patients full, accurate, and relevant medical information. It is difficult to understand how Plaintiffs will be harmed by the requirement that they fulfill their ethical duties to their patients. Nor does the requirement that medical providers develop a protocol for dealing with religious objections cause irreparable harm. Because the Amended Act only requires that health care providers fulfill their ethical duties, it is not unreasonable to ask those providers to develop a plan for how they will fulfill those duties when they have (or an employee has) a religious objection to providing a medical service.

Moreover, Plaintiffs waited over seven months after the Amended Act was signed into law on July 29, 2016, and three months after the *Pregnancy Care Center* court held that the preliminary injunction entered in that case only applied to the plaintiffs in that case, before filing this motion for preliminary injunction. Ex. H at 15. Plaintiffs' lengthy delay in moving for a preliminary injunction "undercuts [their] claims of irreparable harm" and "may be considered as circumstantial evidence that the potential harm to [Plaintiffs] is not irreparable or as great as claimed." *Fenje v. Feld*, No. 01 C 9684, 2002 WL 1160158, at *2 (N.D. Ill. May 29, 2002). Their delay further confirms that they cannot establish irreparable harm.

### C. A preliminary injunction will cause irreparable harm to the State and the public.

Under the "balance of harms" portion of the analysis, Plaintiffs must establish that "the harm they would suffer without the injunction is greater than the harm that preliminary relief

35

would inflict on the defendants." *Mich. v. U.S. Army Corps of Eng'g*, 667 F.3d 765, 769 (7th Cir. 2011). Because a movant need not establish that it is more likely than not that they will succeed on the merits to obtain injunctive relief, a movant "must compensate for the lesser likelihood of prevailing by showing the balance of harms tips *decidedly* in favor of the movant." *Boucher*, 134 F.3d at 826 n.5 (emphasis in original). The court also should consider whether a preliminary injunction would cause harm to the public interest. *Platinum Home Mort. Corp. v. Platinum Fin. Group, Inc*., 149 F.3d 722, 726 (7th Cir. 1998).

As discussed above, the State has a compelling interest in regulating the practice of medicine and protecting the health of its citizens, interests that will be harmed if the Amended Act is enjoined. Moreover, the public may also suffer irreparable harm if the law is enjoined. As discussed above, the Conscience Act was amended to ensure that "conscience-based objections do not cause impairment of patients' health." 745 ILCS 70/6.1. The Amended Act places minimal limitation on the permissible scope of such religious objections. Enjoining the law would permit religiously-affiliated providers to turn patients away without information about their medical circumstances and treatment options and then claim a blanket exemption from liability for any resulting harm to the patient.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Honorable Court grant Defendants' Motion to Dismiss Plaintiffs' Complaint, deny Plaintiffs' Motion for Preliminary Injunction, and order any further just and proper relief.

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois          /s/ *Sarah H. Newman* _____
Attorney No. 99000          By:  Sarah H. Newman
                                 Michael T. Dierkes
                                 Assistant Attorneys General
                                 General Law Bureau
                                 100 W. Randolph St., 13th Fl.
                                 Chicago, Illinois 60601
                                 312-814-6131 / 312-814-3672
                                 snewman@atg.state.il.us
                                 mdierkes@atg.state.il.us

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the aforementioned document was filed through the Court's CM/ECF system on May 19, 2017. Parties of record may obtain a copy through the Court's CM/ECF system. The undersigned certifies that no party of record requires service of documents through any means other than the CM/ECF system.

/s/ *Sarah H. Newman*

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD**

| | | |
|---|---|---|
| DR. RONALD L. SCHROEDER, et al, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 17 C 3076 |
| | ) | |
| v. | ) | Judge Sue E. Myerscough |
| | ) | |
| BRUCE RAUNER, et al., | ) | Magistrate Judge Tom Schanzle-Haskins |
| | ) | |
| Defendants. | ) | |

## STATE DEFENDANTS' EXHIBIT LIST

A.   American Medical Association *Code of Ethics*, Chapter 1 (2016).

B.   American Nurses Association, *Code of Ethics for Nurses with Interpretive Statements* (July 2001).

C.   American Academy of Physician Assistants, *Guidelines for Ethical Conduct for the Physician Assistant Profession* (2013).

D.   American Academy of Pediatricians Committee on Bioethics, *Policy Statement - Physician Refusal to Provide Information or Treatment on the Basis of Claims of Conscience,* PEDIATRICS Vol. 124 No. 6 at 1691 (Dec. 2009).

E.   American College of Obstetricians and Gynecologists, *Code of Professional Ethics* (2011).

F.   World Medical Association, *Medical Ethics Manual* (3d ed. 2015) (excerpted).

G.   Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws, 76 FR 9968-02.

H.   *Pregnancy Care Center of Rockford v. Rauner*, No. 2016-MR-741, Mem. Op. and Order (Ill. Cir. Ct. Dec. 20, 2016).

# Exhibit A

## CHAPTER 1: OPINIONS ON PATIENT-PHYSICIAN RELATIONSHIPS

The Opinions in this chapter are offered as ethics guidance for physicians and are not intended to establish standards of clinical practice or rules of law.

### 1.1 Responsibilities of Physicians & Patients

1.1.1     Patient-Physician Relationships
1.1.2     Prospective Patients
1.1.3     Patient Rights
1.1.4     Patient Responsibilities
1.1.5     Terminating a Patient-Physician Relationship
1.1.6     Quality
1.1.7     Physician Exercise of Conscience

### 1.2 Special Issues in Patient-Physician Relationships

1.2.1     Treating Self or Family
1.2.2     Disruptive Behavior by Patients
1.2.3     Consultation, Referral & Second Opinions
1.2.4     Use of Chaperones
1.2.5     Sports Medicine
1.2.6     Work-Related & Independent Medical Examinations
1.2.7     Use of Restraints
1.2.8     Gifts from Patients
1.2.9     Use of Remote Sensing & Monitoring Devices
1.2.10    Political Action by Physicians
1.2.11    Ethically Sound Innovation in Medical Practice
1.2.12    Ethical Practice in Telemedicine



### 1.1.1 Patient-Physician Relationships

The practice of medicine, and its embodiment in the clinical encounter between a patient and a physician, is fundamentally a moral activity that arises from the imperative to care for patients and to alleviate suffering. The relationship between a patient and a physician is based on trust, which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others, to use sound medical judgment on patients' behalf, and to advocate for their patients' welfare.

A patient-physician relationship exists when a physician serves a patient's medical needs. Generally, the relationship is entered into by mutual consent between physician and patient (or surrogate).

However, in certain circumstances a limited patient-physician relationship may be created without the patient's (or surrogate's) explicit agreement. Such circumstances include:

(a) When a physician provides emergency care or provides care at the request of the patient's treating physician. In these circumstances, the patient's (or surrogate's) agreement to the relationship is implicit.

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

(b) When a physician provides medically appropriate care for a prisoner under court order, in keeping with ethics guidance on court-initiated treatment.

(c) When a physician examines a patient in the context of an independent medical examination, in keeping with ethics guidance. In such situations, a limited patient-physician relationship exists.

*AMA Principles of Medical Ethics: I,II,IV,VIII*

---

### 1.1.2 Prospective Patients

As professionals dedicated to protecting the well-being of patients, physicians have an ethical obligation to provide care in cases of medical emergency. Physicians must also uphold ethical responsibilities not to discriminate against a prospective patient on the basis of race, gender, sexual orientation or gender identity, or other personal or social characteristics that are not clinically relevant to the individual's care. Nor may physicians decline a patient based solely on the individual's infectious disease status. Physicians should not decline patients for whom they have accepted a contractual obligation to provide care.

However, physicians are not ethically required to accept all prospective patients. Physicians should be thoughtful in exercising their right to choose whom to serve.

A physician may decline to establish a patient-physician relationship with a prospective patient, or provide specific care to an existing patient, in certain limited circumstances:

(a) The patient requests care that is beyond the physician's competence or scope of practice; is known to be scientifically invalid, has no medical indication, or cannot reasonably be expected to achieve the intended clinical benefit; or is incompatible with the physician's deeply held personal, religious, or moral beliefs in keeping with ethics guidance on exercise of conscience.

(b) The physician lacks the resources needed to provide safe, competent, respectful care for the individual. Physicians may not decline to accept a patient for reasons that would constitute discrimination against a class or category of patients

(c) Meeting the medical needs of the prospective patient could seriously compromise the physician's ability to provide the care needed by his or her other patients. The greater the prospective patient's medical need, however, the stronger is the physician's obligation to provide care, in keeping with the professional obligation to promote access to care.

(d) The individual is abusive or threatens the physician, staff, or other patients, unless the physician is legally required to provide emergency medical care. Physicians should be aware of the possibility that an underlying medical condition may contribute to this behavior.

*AMA Principles of Medical Ethics: I,VI,VIII,X*

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

### 1.1.3 Patient Rights

The health and well-being of patients depends on a collaborative effort between patient and physician in a mutually respectful alliance. Patients contribute to this alliance when they fulfill responsibilities they have, to seek care and to be candid with their physicians, for example.

Physicians can best contribute to a mutually respectful alliance with patients by serving as their patients' advocates and by respecting patients' rights. These include the right:

(a)  To courtesy, respect, dignity, and timely, responsive attention to his or her needs.

(b)  To receive information from their physicians and to have opportunity to discuss the benefits, risks, and costs of appropriate treatment alternatives, including the risks, benefits and costs of forgoing treatment. Patients should be able to expect that their physicians will provide guidance about what they consider the optimal course of action for the patient based on the physician's objective professional judgment.

(c)  To ask questions about their health status or recommended treatment when they do not fully understand what has been described and to have their questions answered.

(d)  To make decisions about the care the physician recommends and to have those decisions respected. A patient who has decision-making capacity may accept or refuse any recommended medical intervention.

(e)  To have the physician and other staff respect the patient's privacy and confidentiality.

(f)  To obtain copies or summaries of their medical records.

(g)  To obtain a second opinion.

(h)  To be advised of any conflicts of interest their physician may have in respect to their care.

(i)  To continuity of care. Patients should be able to expect that their physician will cooperate in coordinating medically indicated care with other health care professionals, and that the physician will not discontinue treating them when further treatment is medically indicated without giving them sufficient notice and reasonable assistance in making alternative arrangements for care.

*AMA Principles of Medical Ethics: I,IV,V,VIII,IX*

### 1.1.4 Patient Responsibilities

Successful medical care requires ongoing collaboration between patients and physicians. Their partnership requires both individuals to take an active role in the healing process.

Autonomous, competent patients control the decisions that direct their health care. With that exercise of self-governance and choice comes a number of responsibilities. Patients contribute to the collaborative effort when they:

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

(a) Are truthful and forthcoming with their physicians and strive to express their concerns clearly. Physicians likewise should encourage patients to raise questions or concerns.

(b) Provide as complete a medical history as they can, including providing information about past illnesses, medications, hospitalizations, family history of illness, and other matters relating to present health.

(c) Cooperate with agreed-on treatment plans. Since adhering to treatment is often essential to public and individual safety, patients should disclose whether they have or have not followed the agreed-on plan and indicate when they would like to reconsider the plan.

(d) Accept care from medical students, residents, and other trainees under appropriate supervision. Participation in medical education is to the mutual benefit of patients and the health care system; nonetheless, patients' (or surrogates') refusal of care by a trainee should be respected in keeping with ethics guidance.

(e) Meet their financial responsibilities with regard to medical care or discuss financial hardships with their physicians. Patients should be aware of costs associated with using a limited resource like health care and try to use medical resources judiciously.

(f) Recognize that a healthy lifestyle can often prevent or mitigate illness and take responsibility to follow preventive measures and adopt health-enhancing behaviors.

(g) Be aware of and refrain from behavior that unreasonably places the health of others at risk. They should ask about what they can do to prevent transmission of infectious disease.

(h) Refrain from being disruptive in the clinical setting.

(i) Not knowingly initiate or participate in medical fraud.

(j) Report illegal or unethical behavior by physicians or other health care professionals to the appropriate medical societies, licensing boards, or law enforcement authorities.

*AMA Principles of Medical Ethics: I,IV,VI*

---

### 1.1.5 Terminating a Patient-Physician Relationship

Physicians' fiduciary responsibility to patients entails an obligation to support continuity of care for their patients. At the beginning of patient-physician relationship, the physician should alert the patient to any foreseeable impediments to continuity of care.

When considering withdrawing from a case, physicians must :

(a) Notify the patient (or authorized decision maker) long enough in advance to permit the patient to secure another physician.

(b) Facilitate transfer of care when appropriate.

*AMA Principles of Medical Ethics: I,VI*

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

### 1.1.6 Quality

As professionals dedicated to promoting the well-being of patients, physicians individually and collectively share the obligation to ensure that the care patients receive is safe, effective, patient centered, timely, efficient, and equitable.

While responsibility for quality of care does not rest solely with physicians, their role is essential. Individually and collectively, physicians should actively engage in efforts to improve the quality of health care by:

(a) Keeping current with best care practices and maintaining professional competence.

(b) Holding themselves accountable to patients, families, and fellow health care professionals for communicating effectively and coordinating care appropriately.

(c) Monitoring the quality of care they deliver as individual practitioners—e.g., through personal case review and critical self-reflection, peer review, and use of other quality improvement tools.

(d) Demonstrating commitment to develop, implement, and disseminate appropriate, well- defined quality and performance improvement measures in their daily practice.

(e) Participating in educational, certification, and quality improvement activities that are well designed and consistent with the core values of the medical profession.

*AMA Principles of Medical Ethics: I,V,VII,VIII*

### 1.1.7 Physician Exercise of Conscience

Physicians are expected to uphold the ethical norms of their profession, including fidelity to patients and respect for patient self-determination. Yet physicians are not defined solely by their profession. They are moral agents in their own right and, like their patients, are informed by and committed to diverse cultural, religious, and philosophical traditions and beliefs. For some physicians, their professional calling is imbued with their foundational beliefs as persons, and at times the expectation that physicians will put patients' needs and preferences first may be in tension with the need to sustain moral integrity and continuity across both personal and professional life.

Preserving opportunity for physicians to act (or to refrain from acting) in accordance with the dictates of conscience in their professional practice is important for preserving the integrity of the medical profession as well as the integrity of the individual physician, on which patients and the public rely. Thus physicians should have considerable latitude to practice in accord with well-considered, deeply held beliefs that are central to their self-identities.

Physicians' freedom to act according to conscience is not unlimited, however. Physicians are expected to provide care in emergencies, honor patients' informed decisions to refuse life-sustaining treatment, and respect basic civil liberties and not discriminate against individuals in deciding whether to enter into a professional relationship with a new patient.

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

In other circumstances, physicians may be able to act (or refrain from acting) in accordance with the dictates of their conscience without violating their professional obligations. Several factors impinge on the decision to act according to conscience. Physicians have stronger obligations to patients with whom they have a patient-physician relationship, especially one of long standing; when there is imminent risk of foreseeable harm to the patient or delay in access to treatment would significantly adversely affect the patient's physical or emotional well-being; and when the patient is not reasonably able to access needed treatment from another qualified physician.

In following conscience, physicians should:

(a) Thoughtfully consider whether and how significantly an action (or declining to act) will undermine the physician's personal integrity, create emotional or moral distress for the physician, or compromise the physician's ability to provide care for the individual and other patients.

(b) Before entering into a patient-physician relationship, make clear any specific interventions or services the physician cannot in good conscience provide because they are contrary to the physician's deeply held personal beliefs, focusing on interventions or services a patient might otherwise reasonably expect the practice to offer.

(c) Take care that their actions do not discriminate against or unduly burden individual patients or populations of patients and do not adversely affect patient or public trust.

(d) Be mindful of the burden their actions may place on fellow professionals.

(e) Uphold standards of informed consent and inform the patient about all relevant options for treatment, including options to which the physician morally objects.

(f) In general, physicians should refer a patient to another physician or institution to provide treatment the physician declines to offer. When a deeply held, well-considered personal belief leads a physician also to decline to refer, the physician should offer impartial guidance to patients about how to inform themselves regarding access to desired services.

(g) Continue to provide other ongoing care for the patient or formally terminate the patient-physician relationship in keeping with ethics guidance.

*AMA Principles of Medical Ethics: I,II,IV,VI,VIII,IX*

---

### 1.2.1 Treating Self or Family

Treating oneself or a member of one's own family poses several challenges for physicians, including concerns about professional objectivity, patient autonomy, and informed consent.

When the patient is an immediate family member, the physician's personal feelings may unduly influence his or her professional medical judgment. Or the physician may fail to probe sensitive areas when taking the medical history or to perform intimate parts of the physical examination. Physicians may feel obligated to provide care for family members despite feeling uncomfortable doing so. They may also be inclined to treat problems that are beyond their expertise or training.

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

Similarly, patients may feel uncomfortable receiving care from a family member. A patient may be reluctant to disclose sensitive information or undergo an intimate examination when the physician is an immediate family member. This discomfort may particularly be the case when the patient is a minor child, who may not feel free to refuse care from a parent.

In general, physicians should not treat themselves or members of their own families. However, it may be acceptable to do so in limited circumstances:

(a) In emergency settings or isolated settings where there is no other qualified physician available. In such situations, physicians should not hesitate to treat themselves or family members until another physician becomes available.

(b) For short-term, minor problems.

When treating self or family members, physicians have a further responsibility to:

(c) Document treatment or care provided and convey relevant information to the patient's primary care physician.

(d) Recognize that if tensions develop in the professional relationship with a family member, perhaps as a result of a negative medical outcome, such difficulties may be carried over into the family member's personal relationship with the physician.

(e) Avoid providing sensitive or intimate care especially for a minor patient who is uncomfortable being treated by a family member.

(f) Recognize that family members may be reluctant to state their preference for another physician or decline a recommendation for fear of offending the physician.

*AMA Principles of Medical Ethics: I,II,IV*

### 1.2.2 Disruptive Behavior by Patients

The relationship between patients and physicians is based on trust and should serve to promote patients' well-being while respecting their dignity and rights.

Disrespectful or derogatory language or conduct on the part of either physicians or patients can undermine trust and compromise the integrity of the patient-physician relationship. It can make members of targeted groups reluctant to seek care, and create an environment that strains relationships among patients, physicians, and the health care team.

Trust can be established and maintained only when there is mutual respect. Therefore, in their interactions with patients, physicians should:

(a) Recognize that derogatory or disrespectful language or conduct can cause psychological harm to those they target.

(b) Always treat their patients with compassion and respect.

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

(c) Terminate the patient-physician relationship with a patient who uses derogatory language or acts in a prejudicial manner only if the patient will not modify the conduct. In such cases, the physician should arrange to transfer the patient's care.

*AMA Principles of Medical Ethics: I,II,VI,IX*

### 1.2.3 Consultation, Referral & Second Opinions

Physicians' fiduciary obligation to promote patients' best interests and welfare can include consulting other physicians for advice in the care of the patient or referring patients to other professionals to provide care.

When physicians seek or provide consultation about a patient's care or refer a patient for health care services, including diagnostic laboratory services, they should:

(a) Base the decision or recommendation on the patient's medical needs, as they would for any treatment recommendation, and consult or refer the patient to only health care professionals who have appropriate knowledge and skills and are licensed to provide the services needed.

(b) Share patients' health information in keeping with ethics guidance on confidentiality.

(c) Assure the patient that he or she may seek a second opinion or choose someone else to provide a recommended consultation or service. Physicians should urge patients to familiarize themselves with any restrictions associated with their individual health plan that may bear on their decision, such as additional out-of-pocket costs to the patient for referrals or care outside a designated panel of providers.

(d) Explain the rationale for the consultation, opinion, or findings and recommendations clearly to the patient.

(e) Respect the terms of any contractual relationships they may have with health care organizations or payers that affect referrals and consultation.

Physicians may not terminate a patient-physician relationship solely because the patient seeks recommendations or care from a health care professional whom the physician has not recommended.

*AMA Principles of Medical Ethics: IV,V,VI*

### 1.2.4 Use of Chaperones

Efforts to provide a comfortable and considerate atmosphere for the patient and the physician are part of respecting patients' dignity. These efforts may include providing appropriate gowns, private facilities for undressing, sensitive use of draping, and clearly explaining various components of the physical examination. They also include having chaperones available. Having chaperones present can also help prevent misunderstandings between patient and physician.

Physicians should:

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

(a) Adopt a policy that patients are free to request a chaperone and ensure that the policy is communicated to patients.

(b) Always honor a patient's request to have a chaperone.

(c) Have an authorized member of the health care team serve as a chaperone. Physicians should establish clear expectations that chaperones will uphold professional standards of privacy and confidentiality.

(d) In general, use a chaperone even when a patient's trusted companion is present.

(e) Provide opportunity for private conversation with the patient without the chaperone present. Physicians should minimize inquiries or history taking of a sensitive nature during a chaperoned examination.

*AMA Principles of Medical Ethics: I,IV*

---

### 1.2.5 Sports Medicine

Many professional and amateur athletic activities, including contact sports, can put participants at risk of injury. Physicians can provide valuable information to help sports participants, dancers, and others make informed decisions about whether to initiate or continue participating in such activities.

Physicians who serve in a medical capacity at athletic, sporting, or other physically demanding events should protect the health and safety of participants.

In this capacity, physicians should:

(a) Base their judgment about an individual's participation solely on medical considerations.

(b) Not allow the desires of spectators, promoters of the event, or even the injured individual to govern a decision about whether to remove the participant from the event.

*AMA Principles of Medical Ethics: I,VII*

---

### 1.2.6 Work-Related & Independent Medical Examinations

Physicians who are employed by businesses or insurance companies, or who provide medical examinations within their realm of specialty as independent contractors, to assess individuals' health or disability face a conflict of duties. They have responsibilities both to the patient and to the employer or third party.

Such industry-employed physicians or independent medical examiners establish limited patient-physician relationships. Their relationships with patients are confined to the isolated examination; they do not monitor patients' health over time, treat them, or carry out many other duties fulfilled by physicians in the traditional fiduciary role.

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

In keeping with their core obligations as medical professionals, physicians who practice as industry-employed physicians or independent medical examiners should:

(a) Disclose the nature of the relationship with the employer or third party and that the physician is acting as an agent of the employer or third party before gathering health information from the patient.

(b) Explain that the physician's role in this context is to assess the patient's health or disability independently and objectively. The physician should further explain the differences between this practice and the traditional fiduciary role of a physician.

(c) Protect patients' personal health information in keeping with professional standards of confidentiality.

(d) Inform the patient about important incidental findings the physician discovers during the examination. When appropriate, the physician should suggest the patient seek care from a qualified physician and, if requested, provide reasonable assistance in securing follow-up care.

*AMA Principles of Medical Ethics: I*

---

### 1.2.7 Use of Restraints

All individuals have a fundamental right to be free from unreasonable bodily restraint. At times, however, health conditions may result in behavior that puts patients at risk of harming themselves. In such situations, it may be ethically justifiable for physicians to order the use of chemical or physical restraint to protect the patient.

Except in emergencies, patients should be restrained only on a physician's explicit order. Patients should never be restrained punitively, for convenience, or as an alternate to reasonable staffing.

Physicians who order chemical or physical restraints should:

(a) Use best professional judgment to determine whether restraint is clinically indicated for the individual patient.

(b) Obtain the patient's informed consent to the use of restraint, or the consent of the patient's surrogate when the patient lacks decision-making capacity. Physicians should explain to the patient or surrogate:

   (i) why restraint is recommended;

   (ii) what type of restraint will be used;

   (iii) length of time for which restraint is intended to be used.

(c) Regularly review the need for restraint and document the review and resulting decision in the patient's medical record.

In certain limited situations, when a patient poses a significant danger to self or others, it may be

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

appropriate to restrain the patient involuntarily. In such situations, the least restrictive restraint reasonable should be implemented and the restraint should be removed promptly when no longer needed.

*AMA Principles of Medical Ethics: I,IV*

### 1.2.8 Gifts from Patients

Patients offer gifts to a physician for many reasons. Some gifts are offered as an expression of gratitude or a reflection of the patient's cultural tradition. Accepting gifts offered for these reasons can enhance the patient-physician relationship.

Other gifts may signal psychological needs that require the physician's attention. Some patients may offer gifts or cash to secure or influence care or to secure preferential treatment. Such gifts can undermine physicians' obligation to provide services fairly to all patients; accepting them is likely to damage the patient-physician relationship.

The interaction of these factors is complex and physicians should consider them sensitively before accepting or declining a gift.

Physicians to whom a patient offers a gift should:

(a) Be sensitive to the gift's value relative to the patient's or physician's means. Physicians should decline gifts that are disproportionately or inappropriately large, or when the physician would be uncomfortable to have colleagues know the gift had been accepted.

(b) Not allow the gift or offer of a gift to influence the patient's medical care.

(c) Decline a bequest from a patient if the physician has reason to believe accepting the gift would present an emotional or financial hardship to the patient's family.

(d) Physicians may wish to suggest that the patient or family make a charitable contribution in lieu of the bequest, in keeping with ethics guidance.

*AMA Principles of Medical Ethics: I,II*

### 1.2.9 Use of Remote Sensing & Monitoring Devices

Sensing and monitoring devices can benefit patients by allowing physicians and other health care professionals to obtain timely information about the patient's vital signs or health status without requiring an in-person, face-to-face encounter. Implantable devices can also enable physicians to identify patients rapidly and expedite access to patients' medical records. Devices that transmit patient information wirelessly to remote receiving stations can offer convenience for both patients and physicians, enhance the efficiency and quality of care, and promote increased access to care, but also raise concerns about safety and the confidentiality of patient information.

Individually, physicians who employ remote sensing and monitoring devices in providing patient care should:

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

(a) Determine whether using one or more such devices is appropriate in light of individual patients' medical needs and circumstances, including patients' ability to use the chosen device appropriately.

(b) Explain how the device(s) will be used in the patient's care and what will be expected of the patient in using the technology, and disclose any limitations, risks, or medical uncertainties associated with the device(s) and data transmission.

(c) Obtain the patient's or surrogate's informed consent before implementing the device in treatment.

Collectively, physicians should:

(d) Support research into the safety, efficacy, and possible non-medical uses of remote sensing and monitoring devices, including devices intended to transmit biometric data and implantable radio frequency ID devices.

(e) Advocate for appropriate oversight of remote sensing and monitoring devices.

*AMA Principles of Medical Ethics: I,III,V*

---

### 1.2.10 Political Action by Physicians

Like all Americans, physicians enjoy the right to advocate for change in law and policy, in the public arena, and within their institutions. Indeed, physicians have an ethical responsibility to seek change when they believe the requirements of law or policy are contrary to the best interests of patients. However, they have a responsibility to do so in ways that are not disruptive to patient care.

Physicians who participate in advocacy activities should:

(a) Ensure that the health of patients is not jeopardized and that patient care is not compromised.

(b) Avoid using disruptive means to press for reform. Strikes and other collection actions may reduce access to care, eliminate or delay needed care, and interfere with continuity of care and should not be used as a bargaining tactic. In rare circumstances, briefly limiting personal availability may be appropriate as a means of calling attention to the need for changes in patient care. Physicians should be aware that some actions may put them or their organizations at risk of violating antitrust laws or laws pertaining to medical licensure or malpractice.

(c) Avoid forming workplace alliances, such as unions, with workers who do not share physicians' primary and overriding commitment to patients.

(d) Refrain from using undue influence or pressure colleagues to participate in advocacy activities and should not punish colleagues, overtly or covertly, for deciding not to participate.

*AMA Principles of Medical Ethics: I,III,VI*

---

### 1.2.11 Ethically Sound Innovation in Medical Practice

Innovation in medicine can range from improving an existing intervention, to introducing an innovation in one's own clinical practice for the first time, to using an existing intervention in a novel way or translating knowledge from one clinical context into another. Innovation shares features with both research and patient care, but is distinct from both.

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

When physicians participate in developing and disseminating innovative practices, they act in accord with professional responsibilities to advance medical knowledge, improve quality of care, and promote the well-being of individual patients and the larger community. Similarly, these responsibilities are honored when physicians enhance their own practices by expanding the range of techniques and interventions they offer to patients.

Individually, physicians who are involved in designing, developing, disseminating, or adopting innovative modalities should:

(a) Innovate on the basis of sound scientific evidence and appropriate clinical expertise.

(b) Seek input from colleagues or other medical professionals in advance or as early as possible in the course of innovation.

(c) Design innovations so as to minimize risks to individual patients and maximize the likelihood of application and benefit for populations of patients.

(d) Be sensitive to the cost implications of innovation; and

(e) Be aware of influences that may drive the creation and adoption of innovative practices for reasons other than patient or public benefit.

When they offer existing innovative diagnostic or therapeutic services to individual patients, physicians must:

(f) Base recommendations on patients' medical needs.

(g) Refrain from offering such services until they have acquired appropriate knowledge and skills.

(h) Recognize that in this context informed decision making requires the physician to disclose:

   (i) how a recommended diagnostic or therapeutic service differs from the standard therapeutic approach if one exists;

   (ii) why the physician is recommending the innovative modality;

   (iii) what the known or anticipated risks, benefits, and burdens of the recommended therapy and alternatives are;

   (iv) what experience the professional community in general and the physician individually has had to date with the innovative therapy; and

   (v) what conflicts of interest the physician may have with respect to the recommended therapy.

(i) Discontinue any innovative therapies that are not benefiting the patient; and

(j) Be transparent and share findings from their use of innovative therapies with peers in some manner. To promote patient safety and quality, physicians should share both immediate or delayed positive and negative outcomes.

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

To promote responsible innovation, the medical profession should:

(k) Require that physicians who adopt innovative treatment or diagnostic techniques into their practice have appropriate knowledge and skills.

(l) Provide meaningful professional oversight of innovation in patient care; and

(m) Encourage physician-innovators to collect and share information about the resources needed to implement their innovative therapies effectively.

*AMA Principles of Medical Ethics: V,VIII*

### 1.2.12  Ethical Practice in Telemedicine

Innovation in technology, including information technology, is redefining how people perceive time and distance. It is reshaping how individuals interact with and relate to others, including when, where, and how patients and physicians engage with one another.

Telehealth and telemedicine span a continuum of technologies that offer new ways to deliver care. Yet as in any mode of care, patients need to be able to trust that physicians will place patient welfare above other interests, provide competent care, provide the information patients need to make well-considered decisions about care, respect patient privacy and confidentiality, and take steps to ensure continuity of care. Although physicians' fundamental ethical responsibilities do not change, the continuum of possible patient-physician interactions in telehealth/telemedicine give rise to differing levels of accountability for physicians.

All physicians who participate in telehealth/telemedicine have an ethical responsibility to uphold fundamental fiduciary obligations by disclosing any financial or other interests the physician has in the telehealth/telemedicine application or service and taking steps to manage or eliminate conflicts of interests. Whenever they provide health information, including health content for websites or mobile health applications, physicians must ensure that the information they provide or that is attributed to them is objective and accurate.

Similarly, all physicians who participate in telehealth/telemedicine must assure themselves that telemedicine services have appropriate protocols to prevent unauthorized access and to protect the security and integrity of patient information at the patient end of the electronic encounter, during transmission, and among all health care professionals and other personnel who participate in the telehealth/telemedicine service consistent with their individual roles.

Physicians who respond to individual health queries or provide personalized health advice electronically through a telehealth service in addition should:

(a) Inform users about the limitations of the relationship and services provided.

(b) Advise site users about how to arrange for needed care when follow-up care is indicated.

(c) Encourage users who have primary care physicians to inform their primary physicians about the online health consultation, even if in-person care is not immediately needed.

Physicians who provide clinical services through telehealth/telemedicine must uphold the standards of professionalism expected in in-person interactions, follow appropriate ethical guidelines of relevant specialty societies and adhere to applicable law governing the practice of telemedicine. In the context of telehealth/telemedicine they further should:

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

(d) Be proficient in the use of the relevant technologies and comfortable interacting with patients and/or surrogates electronically.

(e) Recognize the limitations of the relevant technologies and take appropriate steps to overcome those limitations. Physicians must ensure that they have the information they need to make well-grounded clinical recommendations when they cannot personally conduct a physical examination, such as by having another health care professional at the patient's site conduct the exam or obtaining vital information through remote technologies.

(f) Be prudent in carrying out a diagnostic evaluation or prescribing medication by:

    (i) establishing the patient's identity;

    (ii) confirming that telehealth/telemedicine services are appropriate for that patient's individual situation and medical needs;

    (iii) evaluating the indication, appropriateness and safety of any prescription in keeping with best practice guidelines and any formulary limitations that apply to the electronic interaction; and

    (iv) documenting the clinical evaluation and prescription.

(g) When the physician would otherwise be expected to obtain informed consent, tailor the informed consent process to provide information patients (or their surrogates) need about the distinctive features of telehealth/telemedicine, in addition to information about medical issues and treatment options. Patients and surrogates should have a basic understanding of how telemedicine technologies will be used in care, the limitations of those technologies, the credentials of health care professionals involved, and what will be expected of patients for using these technologies.

(h) As in any patient-physician interaction, take steps to promote continuity of care, giving consideration to how information can be preserved and accessible for future episodes of care in keeping with patients' preferences (or the decisions of their surrogates) and how follow-up care can be provided when needed. Physicians should assure themselves how information will be conveyed to the patient's primary care physician when the patient has a primary care physician and to other physicians currently caring for the patient.

Collectively, through their professional organizations and health care institutions, physicians should:

(i) Support ongoing refinement of telehealth/telemedicine technologies, and the development and implementation of clinical and technical standards to ensure the safety and quality of care.

(j) Advocate for policies and initiatives to promote access to telehealth/telemedicine services for all patients who could benefit from receiving care electronically.

(k) Routinely monitor the telehealth/telemedicine landscape to:

    (i) identify and address adverse consequences as technologies and activities evolve; and

    (ii) identify and encourage dissemination of both positive and negative outcomes.

*AMA Principles of Medical Ethics: I,IV,VI,IX*

Copyright © 2016 American Medical Association.
Distribution, printing, or copying of this PDF is strictly prohibited without the written permission of the American Medical Association.

# Exhibit B

**American Nurses Association code of Ethics for Nurses with Interpretive Statements**

## Contents

Preface

**Provision 1.** The nurse, in all professional relationships, practices with compassion and respect for the inherent dignity, worth, and uniqueness of every individual, unrestricted by considerations of social or economic status, personal attributes, or the nature of health problems.

1.1 Respect for human dignity
1.2 Relationships to patients
1.3 The nature of health problems
1.4 The right to self-determination
1.5 Relationships with colleagues and others

**Provision 2.** The nurse's primary commitment is to the patient, whether an individual, family, group, or community.

2.1 Primacy of the patient's interests
2.2 Conflict of interest for nurses
2.3 Collaboration
2.4 Professional boundaries

**Provision 3.** The nurse promotes, advocates for, and strives to protect the health, safety, and rights of the patient.

3.1 Privacy
3.2 Confidentiality
3.3 Protection of participants in research
3.4 Standards and review mechanisms
3.5 Acting on questionable practice
3.6 Addressing impaired practice

**Provision 4.** The nurse is responsible and accountable for individual nursing practice and determines the appropriate delegation of tasks consistent with the nurse's obligation to provide optimum patient care.

4.1 Acceptance of accountability and responsibility
4.2 Accountability for nursing judgment and action
4.3 Responsibility for nursing judgment and action
4.4 Delegation of nursing activities

**Provision 5.** The nurse owes the same duties to self as to others, including the responsibility to preserve integrity and safety, to maintain competence, and to continue personal and professional growth.

5.1 Moral self-respect
5.2 Professional growth and maintenance of competence
5.3 Wholeness of character
5.4 Preservation of integrity

**Provision 6.** The nurse participates in establishing, maintaining, and improving health care environments and conditions of employment conducive to the provision of quality health care and consistent with the values of the profession through individual and collective action.

6.1 Influence of the environment on moral virtues and values
6.2 Influence of the environment on ethical obligations
6.3 Responsibility for the health care environment

**Provision 7.** The nurse participates in the advancement of the profession through contributions to practice, education, administration, and knowledge development.

7.1 Advancing the profession through active involvement in nursing and in health care policy

7.2 Advancing the profession by developing, maintaining, and implementing professional standards in clinical, administrative, and educational practice

7.3 Advancing the profession through knowledge development, dissemination, and application to practice

**Provision 8.** The nurse collaborates with other health professionals and the public in promoting community, national, and international efforts to meet health needs.

8.1 Health needs and concerns

8.2 Responsibilities to the public

**Provision 9.** The profession of nursing, as represented by associations and their members, is responsible for articulating nursing values, for maintaining the integrity of the profession and its practice, and for shaping social policy.

9.1 Assertion of values

9.2 The profession carries out its collective responsibility through professional associations

9.3 Intraprofessional integrity

9.4 Social reform

### Preface

Ethics is an integral part of the foundation of nursing. Nursing has a distinguished history of concern for the welfare of the sick, injured, and vulnerable and for social justice. This concern is embodied in the provision of nursing care to individuals and the community. Nursing encompasses the prevention of illness, the alleviation of suffering, and the protection, promotion, and restoration of health in the care of individuals, families, groups, and communities. Nurses act to change those aspects of social structures that detract from health and well-being. Individuals who become nurses are expected not only to adhere to the ideals and moral norms of the profession but also to embrace them as a part of what it means to be a nurse. The ethical tradition of nursing is self-reflective, enduring, and distinctive. A code of ethics makes explicit the primary goals, values, and obligations of the profession.

The Code of Ethics for Nurses serves the following purposes:

- It is a succinct statement of the ethical obligations and duties of every individual who enters the nursing profession.

- It is the profession's nonnegotiable ethical standard.

- It is an expression of nursing's own understanding of its commitment to society.

There are numerous approaches for addressing ethics; these include adopting or subscribing to ethical theories, including humanist, feminist, and social ethics, adhering to ethical principles, and cultivating virtues. The Code of Ethics for Nurses reflects all of these approaches. The words "ethical" and "moral" are used throughout the Code of Ethics. "Ethical" is used to refer to reasons for decisions about how one ought to act, using the above mentioned approaches. In general, the word "moral" overlaps with "ethical" but is more aligned with personal belief and cultural values. Statements that describe activities and attributes of nurses in this Code of Ethics are to be understood as normative or prescriptive statements expressing expectations of ethical behavior.

The Code of Ethics for Nurses uses the term *patient* to refer to recipients of nursing care. The derivation of this word refers to "one who suffers," reflecting a universal aspect of human existence. Nonetheless, it is recognized that nurses also provide services to those seeking health as well as those responding to illness, to students and to staff, in health care facilities as well as in communities. Similarly, the term *practice* refers to the actions of the nurse in whatever role the nurse fulfills, including direct patient care provider, educator, administrator, researcher, policy developer, or other. Thus, the values and obligations expressed in this Code of Ethics apply to nurses in all roles and settings.

The Code of Ethics for Nurses is a dynamic document. As nursing and its social context change, changes to the Code of Ethics are also necessary. The Code of Ethics consists of two components: the provisions and the accompanying interpretive statements. There are nine provisions. The first three describe the most fundamental values and commitments of the nurse; the next three address boundaries of duty and loyalty, and the last three aspects of duties beyond individual patient encounters. For each provision, there are interpretive statements that provide greater specificity for practice and are responsive to the contemporary context of nursing. Consequently, the interpretive statements are subject to more frequent revision than are the provisions. Additional ethical guidance and detail can be found in ANA or constituent member association position statements that address clinical, research, administrative, educational, or public policy issues.

*The Code of Ethics for Nurses with Interpretive Statements* provides a framework for nurses to use in ethical analysis and decision-making. The Code of Ethics establishes the ethical standard for the profession. It is not negotiable in any setting nor is it subject to revision or amendment except by formal process of the House of Delegates of the ANA. The Code of Ethics for Nurses is a reflection of the proud ethical heritage of nursing, a guide for nurses now and in the future.

**Provision 1.**

The nurse, in all professional relationships, practices with compassion and respect for the inherent dignity, worth, and uniqueness of every individual, unrestricted by considerations of social or economic status, personal attributes, or the nature of health problems.

**1.1 Respect for human dignity -** A fundamental principle that underlies all nursing practice is respect for the inherent worth, dignity, and human rights of every individual. Nurses take into account the needs and values of all persons in all professional relationships.

**1.2 Relationships to patients -** The need for health care is universal, transcending all individual differences. The nurse establishes relationships and delivers nursing services with respect for human needs and values, and without prejudice. An individual's lifestyle, value system and religious beliefs should be considered in planning health care with and for each patient. Such consideration does not suggest that the nurse necessarily agrees with or condones certain individual choices, but that the nurse respects the patient as a person.

**1.3 The nature of health problems -**The nurse respects the worth, dignity and rights of all human beings irrespective of the nature of the health problem. The worth of the person is not affected by disease, disability, functional status, or proximity to death. This respect extends to all who require the services of the nurse for the promotion of health, the prevention of illness, the restoration of health, the alleviation of suffering, and the provision of supportive care to those who are dying.

The measures nurses take to care for the patient enable the patient to live with as much physical, emotional, social, and spiritual well-being as possible. Nursing care aims to maximize the values that the patient has treasured in life and extends supportive care to the family and significant others. Nursing care is directed toward meeting the comprehensive needs of patients and their families across the continuum of care. This is particularly vital in the care of patients and their families at the end of life to prevent and relieve the cascade of symptoms and suffering that are commonly associated with dying.

Nurses are leaders and vigilant advocates for the delivery of dignified and humane care. Nurses actively participate in assessing and assuring the responsible and appropriate use of interventions in order to minimize unwarranted or unwanted treatment and patient suffering. The acceptability and importance of carefully considered decisions regarding resuscitation status, withholding and withdrawing life-sustaining therapies, forgoing medically provided nutrition and hydration, aggressive pain and symptom management and advance directives are increasingly evident. The nurse should provide interventions to relieve pain and other symptoms in the dying patient even when those interventions entail risks of hastening death. However, nurses may not act with the sole intent of ending a patient's life even though such action may be motivated by compassion, respect for patient autonomy and quality of life considerations. Nurses have invaluable experience,

knowledge, and insight into care at the end of life and should be actively involved in related research, education, practice, and policy development.

**1.4 The right to self-determination -** Respect for human dignity requires the recognition of specific patient rights, particularly, the right of self-determination. Self-determination, also known as autonomy, is the philosophical basis for informed consent in health care. Patients have the moral and legal right to determine what will be done with their own person; to be given accurate, complete, and understandable information in a manner that facilitates an informed judgment; to be assisted with weighing the benefits, burdens, and available options in their treatment, including the choice of no treatment; to accept, refuse, or terminate treatment without deceit, undue influence, duress, coercion, or penalty; and to be given necessary support throughout the decision-making and treatment process. Such support would include the opportunity to make decisions with family and significant others and the provision of advice and support from knowledgeable nurses and other health professionals. Patients should be involved in planning their own health care to the extent they are able and choose to participate.

Each nurse has an obligation to be knowledgeable about the moral and legal rights of all patients to self-determination. The nurse preserves, protects, and supports those interests by assessing the patient's comprehension of both the information presented and the implications of decisions. In situations in which the patient lacks the capacity to make a decision, a designated surrogate decision-maker should be consulted. The role of the surrogate is to make decisions as the patient would, based upon the patient's previously expressed wishes and known values. In the absence of a designated surrogate decision-maker, decisions should be made in the best interests of the patient, considering the patient's personal values to the extent that they are known. The nurse supports patient self-determination by participating in discussions with surrogates, providing guidance and referral to other resources as necessary, and identifying and addressing problems in the decision-making process. Support of autonomy in the broadest sense also includes recognition that people of some cultures place less weight on individualism and choose to defer to family or community values in decision-making. Respect not just for the specific decision but also for the patient's method of decision-making is consistent with the principle of autonomy.

Individuals are interdependent members of the community. The nurse recognizes that there are situations in which the right to individual self-determination may be outweighed or limited by the rights, health and welfare of others, particularly in relation to public health considerations. Nonetheless, limitation of individual rights must always be considered a serious deviation from the standard of care, justified only when there are no less restrictive means available to preserve the rights of others and the demands of justice.

**1.5 Relationships with colleagues and others -** The principle of respect for persons extends to all individuals with whom the nurse interacts. The nurse maintains compassionate and caring relationships with colleagues and others with a commitment to the fair treatment of individuals, to integrity-preserving compromise, and to resolving conflict. Nurses function in many roles, including direct care provider, administrator, educator, researcher, and consultant. In each of these roles, the nurse treats colleagues, employees, assistants, and students with respect and compassion. This standard of conduct precludes any and all prejudicial actions, any form of harassment or threatening behavior, or disregard for the effect of one's actions on others. The nurse values the distinctive contribution of individuals or groups, and collaborates to meet the shared goal of providing quality health services.

**Provision 2 The nurse's primary commitment is to the patient, whether an individual, family, group, or community.**

**2.1 Primacy of the patient's interests -** The nurse's primary commitment is to the recipient of nursing and health care services --the patient--whether the recipient is an individual, a family, a group, or a community. Nursing holds a fundamental commitment to the uniqueness of the individual patient; therefore, any plan of care must reflect that uniqueness. The nurse strives to provide patients with opportunities to participate in planning care, assures that patients find the

plans acceptable and supports the implementation of the plan. Addressing patient interests requires recognition of the patient's place in the family or other networks of relationship. When the patient's wishes are in conflict with others, the nurse seeks to help resolve the conflict. Where conflict persists, the nurse's commitment remains to the identified patient.

**2.2 Conflict of interest for nurses -** Nurses are frequently put in situations of conflict arising from competing loyalties in the workplace, including situations of conflicting expectations from patients, families, physicians, colleagues, and in many cases, health care organizations and health plans. Nurses must examine the conflicts arising between their own personal and professional values, the values and interests of others who are also responsible for patient care and health care decisions, as well as those of patients. Nurses strive to resolve such conflicts in ways that ensure patient safety, guard the patient's best interests and preserve the professional integrity of the nurse.

Situations created by changes in health care financing and delivery systems, such as incentive systems to decrease spending, pose new possibilities of conflict between economic self-interest and professional integrity. The use of bonuses, sanctions, and incentives tied to financial targets are examples of features of health care systems that may present such conflict. Conflicts of interest may arise in any domain of nursing activity including clinical practice, administration, education, or research. Advanced practice nurses who bill directly for services and nursing executives with budgetary responsibilities must be especially cognizant of the potential for conflicts of interest. Nurses should disclose to all relevant parties (e.g., patients, employers, colleagues) any perceived or actual conflict of interest and in some situations should withdraw from further participation. Nurses in all roles must seek to ensure that employment arrangements are just and fair and do not create an unreasonable conflict between patient care and direct personal gain.

**2.3 Collaboration -** Collaboration is not just cooperation, but it is the concerted effort of individuals and groups to attain a shared goal. In health care, that goal is to address the health needs of the patient and the public. The complexity of health care delivery systems requires a multi-disciplinary approach to the delivery of services that has the strong support and active participation of all the health professions. Within this context, nursing's unique contribution, scope of practice, and relationship with other health professions needs to be clearly articulated, represented and preserved. By its very nature, collaboration requires mutual trust, recognition, and respect among the health care team, shared decision-making about patient care, and open dialogue among all parties who have an interest in and a concern for health outcomes. Nurses should work to assure that the relevant parties are involved and have a voice in decision-making about patient care issues. Nurses should see that the questions that need to be addressed are asked and that the information needed for informed decision-making is available and provided. Nurses should actively promote the collaborative multi-disciplinary planning required to ensure the availability and accessibility of quality health services to all persons who have needs for health care.

Intra-professional collaboration within nursing is fundamental to effectively addressing the health needs of patients and the public. Nurses engaged in non-clinical roles, such as administration or research, while not providing direct care, nonetheless are collaborating in the provision of care through their influence and direction of those who do. Effective nursing care is accomplished through the interdependence of nurses in differing roles--those who teach the needed skills, set standards, manage the environment of care, or expand the boundaries of knowledge used by the profession. In this sense, nurses in all roles share a responsibility for the outcomes of nursing care.

**2.4 Professional boundaries -** When acting within one's role as a professional, the nurse recognizes and maintains boundaries that establish appropriate limits to relationships. While the nature of nursing work has an inherently personal component, nurse-patient relationships and nurse-colleague relationships have, as their foundation, the purpose of preventing illness, alleviating suffering, and protecting, promoting, and restoring the health of patients. In this way, nurse-patient and nurse-colleague relationships differ from those that are purely personal and unstructured, such as friendship. The intimate nature of nursing care, the involvement of nurses is important and sometimes highly stressful life events, and the mutual dependence of colleagues working in close concert all present the potential for blurring of limits to professional relationships. Maintaining

authenticity and expressing oneself as an individual, while remaining within the bounds established by the purpose of the relationship can be especially difficult in prolonged or long-term relationships. In all encounters, nurses are responsible for retaining their professional boundaries. When those professional boundaries are jeopardized, the nurse should seek assistance from peers or supervisors or take appropriate steps to remove her/himself from the situation.

**Provision 3 The nurse promotes, advocates for, and strives to protect the health, safety, and rights of the patient.**

**3.1 Privacy -** The nurse safeguards the patient's right to privacy. The need for health care does not justify unwanted intrusion into the patient's life. The nurse advocates for an environment that provides for sufficient physical privacy, including auditory privacy for discussions of a personal nature and policies and practices that protect the confidentiality of information.

**3.2 Confidentiality -** Associated with the right to privacy, the nurse has a duty to maintain confidentiality of all patient information. The patient's well-being could be jeopardized and the fundamental trust between patient and nurse destroyed by unnecessary access to data or by the inappropriate disclosure of identifiable patient information. The rights, well-being, and safety of the individual patient should be the primary factors in arriving at any professional judgment concerning the disposition of confidential information received from or about the patient, whether oral, written or electronic. The standard of nursing practice and the nurse's responsibility to provide quality care require that relevant data be shared with those members of the health care team who have a need to know. Only information pertinent to a patient's treatment and welfare is disclosed, and only to those directly involved with the patient's care. Duties of confidentiality, however, are not absolute and may need to be modified in order to protect the patient, other innocent parties and in circumstances of mandatory disclosure for public health reasons.

Information used for purposes of peer review, third-party payments, and other quality improvement or risk management mechanisms may be disclosed only under defined policies, mandates, or protocols. These written guidelines must assure that the rights, well-being, and safety of the patient are protected. In general, only that information directly relevant to a task or specific responsibility should be disclosed. When using electronic communications, special effort should be made to maintain data security.

**3.3 Protection of participants in research -** Stemming from the right to self-determination, each individual has the right to choose whether or not to participate in research. It is imperative that the patient or legally authorized surrogate receive sufficient information that is material to an informed decision, to comprehend that information, and to know how to discontinue participation in research without penalty. Necessary information to achieve an adequately informed consent includes the nature of participation, potential harms and benefits, and available alternatives to taking part in the research. Additionally, the patient should be informed of how the data will be protected. The patient has the right to refuse to participate in research or to withdraw at any time without fear of adverse consequences or reprisal.

Research should be conducted and directed only by qualified persons. Prior to implementation, all research should be approved by a qualified review board to ensure patient protection and the ethical integrity of the research. Nurses should be cognizant of the special concerns raised by research involving vulnerable groups, including children, prisoners, students, the elderly, and the poor. The nurse who participates in research in any capacity should be fully informed about both the subject's and the nurse's rights and obligations in the particular research study and in research in general. Nurses have the duty to question and, if necessary, to report and to refuse to participate in research they deem morally objectionable.

**3.4 Standards and review mechanisms -** Nursing is responsible and accountable for assuring that only those individuals who have demonstrated the knowledge, skill, practice experiences, commitment, and integrity essential to professional practice are allowed to enter into and continue to practice within the profession. Nurse educators have a responsibility to ensure that basic competencies are achieved and to promote a commitment to professional practice prior to entry of

an individual into practice. Nurse administrators are responsible for assuring that the knowledge and skills of each nurse in the workplace are assessed prior to the assignment of responsibilities requiring preparation beyond basic academic programs.

The nurse has a responsibility to implement and maintain standards of professional nursing practice. The nurse should participate in planning, establishing, implementing, and evaluating review mechanisms designed to safeguard patients and nurses, such as peer review processes or committees, credentialing processes, quality improvement initiatives, and ethics committees. Nurse administrators must ensure that nurses have access to and inclusion on institutional ethics committees. Nurses must bring forward difficult issues related to patient care and/or institutional constraints upon ethical practice for discussion and review. The nurse acts to promote inclusion of appropriate others in all deliberations related to patient care.

Nurses should also be active participants in the development of policies and review mechanisms designed to promote patient safety, reduce the likelihood of errors, and address both environmental system factors and human factors that present increased risk to patients. In addition, when errors do occur, nurses are expected to follow institutional guidelines in reporting errors committed or observed to the appropriate supervisory personnel and for assuring responsible disclosure of errors to patients. Under no circumstances should the nurse participate in, or condone through silence, either an attempt to hide an error or a punitive response that serves only to fix blame rather than correct the conditions that led to the error.

**3.5 Acting on questionable practice -** The nurse's primary commitment is to the health, well-being, and safety of the patient across the life span and in all settings in which health care needs are addressed. As an advocate for the patient, the nurse must be alert to and take appropriate action regarding any instances of incompetent, unethical, illegal, or impaired practice by any member of the health care team or the health care system or any action on the part of others that places the rights or best interests of the patient in jeopardy. To function effectively in this role, nurses must be knowledgeable about the Code of Ethics, standards of practice of the profession, relevant federal, state and local laws and regulations, and the employing organization's policies and procedures.

When the nurse is aware of inappropriate or questionable practice in the provision or denial of health care, concern should be expressed to the person carrying out the questionable practice. Attention should be called to the possible detrimental affect upon the patient's well-being or best interests as well as the integrity of nursing practice. When factors in the health care delivery system or health care organization threaten the welfare of the patient, similar action should be directed to the responsible administrator. If indicated, the problem should be reported to an appropriate higher authority within the institution or agency, or to an appropriate external authority.

There should be established processes for reporting and handling incompetent, unethical, illegal, or impaired practice within the employment setting so that such reporting can go through official channels, thereby reducing the risk of reprisal against the reporting nurse. All nurses have a responsibility to assist those who identify potentially questionable practice. State nurses associations should be prepared to provide assistance and support in the development and evaluation of such processes and reporting procedures.When incompetent, unethical, illegal, or impaired practice is not corrected within the employment setting and continues to jeopardize patient well-being and safety, the problem should be reported to other appropriate authorities such as practice committees of the pertinent professional organizations, the legally constituted bodies concerned with licensing of specific categories of health workers and professional practitioners, or the regulatory agencies concerned with evaluating standards or practice. Some situations may warrant the concern and involvement of all such groups. Accurate reporting and factual documentation, and not merely opinion, undergird all such responsible actions. When a nurse chooses to engage in the act of responsible reporting about situations that are perceived as unethical, incompetent, illegal, or impaired, the professional organization has a responsibility to provide the nurse with support and assistance and to protect the practice of those nurses who choose to voice their concerns. Reporting unethical, illegal, incompetent, or impaired practices,

even when done appropriately, may present substantial risks to the nurse; nevertheless, such risks do not eliminate the obligation to address serious threats to patient safety.

**3.6 Addressing impaired practice -** Nurses must be vigilant to protect the patient, the public and the profession from potential harm when a colleague's practice, in any setting, appears to be impaired. The nurse extends compassion and caring to colleagues who are in recovery from illness or when illness interferes with job performance. In a situation where a nurse suspects another's practice may be impaired, the nurse's duty is to take action designed both to protect patients and to assure that the impaired individual receives assistance in regaining optimal function. Such action should usually begin with consulting supervisory personnel and may also include confronting the individual in a supportive manner and with the assistance of others or helping the individual to access appropriate resources. Nurses are encouraged to follow guidelines outlined by the profession and policies of the employing organization to assist colleagues whose job performance may be adversely affected by mental or physical illness or by personal circumstances. Nurses in all roles should advocate for colleagues whose job performance may be impaired to ensure that they receive appropriate assistance, treatment and access to fair institutional and legal processes. This includes supporting the return to practice of the individual who has sought assistance and is ready to resume professional duties.

If impaired practice poses a threat or danger to self or others, regardless of whether the individual has sought help, the nurse must take action to report the individual to persons authorized to address the problem. Nurses who advocate for others whose job performance creates a risk for harm should be protected from negative consequences. Advocacy may be a difficult process and the nurse is advised to follow workplace policies. If workplace policies do not exist or are inappropriate--that is, they deny the nurse in question access to due legal process or demand resignation--the reporting nurse may obtain guidance from the professional association, state peer assistance programs, employee assistance program or a similar resource.

**Provision 4** The nurse is responsible and accountable for individual nursing practice and determines the appropriate delegation of tasks consistent with the nurse's obligation to provide optimum patient care.

**4.1 Acceptance of accountability and responsibility -** Individual registered nurses bear primary responsibility for the nursing care that their patients receive and are individually accountable for their own practice. Nursing practice includes direct care activities, acts of delegation, and other responsibilities such as teaching, research, and administration. In each instance, the nurse retains accountability and responsibility for the quality of practice and for conformity with standards of care.

Nurses are faced with decisions in the context of the increased complexity and changing patterns in the delivery of health care. As the scope of nursing practice changes, the nurse must exercise judgment in accepting responsibilities, seeking consultation, and assigning activities to others who carry out nursing care. For example, some advanced practice nurses have the authority to issue prescription and treatment orders to be carried out by other nurses. These acts are not acts of delegation. Both the advanced practice nurse issuing the order and the nurse accepting the order are responsible for the judgments made and accountable for the actions taken.

**4.2 Accountability for nursing judgment and action -** Accountability means to be answerable to oneself and others for one's own actions. In order to be accountable, nurses act under a code of ethical conduct that is grounded in the moral principles of fidelity and respect for the dignity, worth, and self-determination of patients. Nurses are accountable for judgments made and actions taken in the course of nursing practice, irrespective of health care organizations' policies or providers' directives.

**4.3 Responsibility for nursing judgment and action -** Responsibility refers to the specific accountability or liability associated with the performance of duties of a particular role. Nurses accept or reject specific role demands based upon their education, knowledge, competence, and extent of experience. Nurses in administration, education, and research also have obligations to the recipients of nursing care. Although nurses in administration, education, and research have

relationships with patients that are less direct, in assuming the responsibilities of a particular role, they share responsibility for the care provided by those whom they supervise and instruct. The nurse must not engage in practices prohibited by law or delegate activities to others that are prohibited by the practice acts of other health care providers.

Individual nurses are responsible for assessing their own competence. When the needs of the patient are beyond the qualifications and competencies of the nurse, consultation and collaboration must be sought from qualified nurses, other health professionals, or other appropriate sources. Educational resources should be sought by nurses and provided by institutions to maintain and advance the competence of nurses. Nurse educators act in collaboration with their students to assess the learning needs of the student, the effectiveness of the teaching program, the identification and utilization of appropriate resources, and the support needed for the learning process.

**4.4 Delegation of nursing activities -** Since the nurse is accountable for the quality of nursing care given to patients, nurses are accountable for the assignment of nursing responsibilities to other nurses and the delegation of nursing care activities to other health care workers. While delegation and assignment are used here in a generic moral sense, it is understood that individual states may have a particular legal definition of these terms.

The nurse must make reasonable efforts to assess individual competence when assigning selected components of nursing care to other health care workers. This assessment involves evaluating the knowledge, skills, and experience of the individual to whom the care is assigned, the complexity of the assigned tasks, and the health status of the patient. The nurse is also responsible for monitoring the activities of these individuals and evaluating the quality of the care provided. Nurses may not delegate responsibilities such as assessment and evaluation; they may delegate tasks. The nurse must not knowingly assign or delegate to any member of the nursing team a task for which that person is not prepared or qualified. Employer policies or directives do not relieve the nurse of responsibility for making judgments about the delegation and assignment of nursing care tasks.

Nurses functioning in management or administrative roles have a particular responsibility to provide an environment that supports and facilitates appropriate assignment and delegation. This includes providing appropriate orientation to staff, assisting less experienced nurses in developing necessary skills and competencies, and establishing policies and procedures that protect both the patient and nurse from the inappropriate assignment or delegation of nursing responsibilities, activities, or tasks.

Nurses functioning in educator or preceptor roles may have less direct relationships with patients. However, through assignment of nursing care activities to learners they share responsibility and accountability for the care provided. It is imperative that the knowledge and skills of the learner be sufficient to provide the assigned nursing care and that appropriate supervision be provided to protect both the patient and the learner.

**Provision 5** The nurse owes the same duties to self as to others, including the responsibility to preserve integrity and safety, to maintain competence, and to continue personal and professional growth.

**5.1 Moral self-respect -** Moral respect accords moral worth and dignity to all human beings irrespective of their personal attributes or life situation. Such respect extends to oneself as well; the same duties that we owe to others we owe to ourselves. Self-regarding duties refer to a realm of duties that primarily concern oneself and include professional growth and maintenance of competence, preservation of wholeness of character, and personal integrity.

**5.2 Professional growth and maintenance of competence -** Though it has consequences for others, maintenance of competence and ongoing professional growth involves the control of one's own conduct in a way that is primarily self-regarding. Competence affects one's self-respect, self-esteem, professional status, and the meaningfulness of work. In all nursing roles, evaluation of one's own performance, coupled with peer review, is a means by which nursing practice can be held to the highest standards. Each nurse is responsible for participating in the development of

criteria for evaluation of practice and for using those criteria in peer and self-assessment.

Continual professional growth, particularly in knowledge and skill, requires a commitment to lifelong learning. Such learning includes, but is not limited to, continuing education, networking with professional colleagues, self-study, professional reading, certification, and seeking advanced degrees. Nurses are required to have knowledge relevant to the current scope and standards of nursing practice, changing issues, concerns, controversies, and ethics. Where the care required is outside the competencies of the individual nurse, consultation should be sought or the patient should be referred to others for appropriate care.

**5.3 Wholeness of character -** Nurses have both personal and professional identities that are neither entirely separate, nor entirely merged, but are integrated. In the process of becoming a professional, the nurse embraces the values of the profession, integrating them with personal values. Duties to self involve an authentic expression of one's own moral point-of-view in practice. Sound ethical decision-making requires the respectful and open exchange of views between and among all individuals with relevant interests. In a community of moral discourse, no one person's view should automatically take precedence over that of another. Thus the nurse has a responsibility to express moral perspectives, even when they differ from those of others, and even when they might not prevail.

This wholeness of character encompasses relationships with patients. In situations where the patient requests a personal opinion from the nurse, the nurse is generally free to express an informed personal opinion as long as this preserves the voluntariness of the patient and maintains appropriate professional and moral boundaries. It is essential to be aware of the potential for undue influence attached to the nurse's professional role. Assisting patients to clarify their own values in reaching informed decisions may be helpful in avoiding unintended persuasion. In situations where nurses' responsibilities include care for those whose personal attributes, condition, lifestyle or situation is stigmatized by the community and are personally unacceptable, the nurse still renders respectful and skilled care.

**5.4 Preservation of integrity -** Integrity is an aspect of wholeness of character and is primarily a self-concern of the individual nurse. An economically constrained health care environment presents the nurse with particularly troubling threats to integrity. Threats to integrity may include a request to deceive a patient, to withhold information, or to falsify records, as well as verbal abuse from patients or coworkers. Threats to integrity also may include an expectation that the nurse will act in a way that is inconsistent with the values or ethics of the profession, or more specifically a request that is in direct violation of the Code of Ethics. Nurses have a duty to remain consistent with both their personal and professional values and to accept compromise only to the degree that it remains an integrity-preserving compromise. An integrity-preserving compromise does not jeopardize the dignity or well-being of the nurse or others. Integrity-preserving compromise can be difficult to achieve, but is more likely to be accomplished in situations where there is an open forum for moral discourse and an atmosphere of mutual respect and regard.

Where nurses are placed in situations of compromise that exceed acceptable moral limits or involve violations of the moral standards of the profession, whether in direct patient care or in any other forms of nursing practice, they may express their conscientious objection to participation. Where a particular treatment, intervention, activity, or practice is morally objectionable to the nurse, whether intrinsically so or because it is inappropriate for the specific patient, or where it may jeopardize both patients and nursing practice, the nurse is justified in refusing to participate on moral grounds. Such grounds exclude personal preference, prejudice, convenience, or arbitrariness. Conscientious objection may not insulate the nurse against formal or informal penalty. The nurse who decides not to take part on the grounds of conscientious objection must communicate this decision in appropriate ways. Whenever possible, such a refusal should be made known in advance and in time for alternate arrangements to be made for patient care. The nurse is obliged to provide for the patient's safety, to avoid patient abandonment, and to withdraw only when assured that alternative sources of nursing care are available to the patient.

Where patterns of institutional behavior or professional practice compromise the integrity of all its nurses, nurses should express their concern or conscientious objection collectively to the appropriate body or committee. In addition, they should express their concern, resist, and seek to bring about a change in those persistent activities or expectations in the practice setting that are morally objectionable to nurses and jeopardize either patient or nurse well-being.

**Provision 6**

The nurse participates in establishing, maintaining, and improving health care environments and conditions of employment conducive to the provision of quality health care and consistent with the values of the profession through individual and collective action.

**6.1 Influence of the environment on moral virtues and values -** Virtues are habits of character that predispose persons to meet their moral obligations; that is, to do what is right. Excellences are habits of character that predispose a person to do a particular job or task well. Virtues such as wisdom, honesty, and courage are habits or attributes of the morally good person. Excellences such as compassion, patience, and skill are habits of character of the morally good nurse. For the nurse, virtues and excellences are those habits that affirm and promote the values of human dignity, well-being, respect, health, independence, and other values central to nursing. Both virtues and excellences, as aspects of moral character, can be either nurtured by the environment in which the nurse practices or they can be diminished or thwarted. All nurses have a responsibility to create, maintain, and contribute to environments that support the growth of virtues and excellences and enable nurses to fulfill their ethical obligations.

**6.2 Influence of the environment on ethical obligations -** All nurses, regardless of role, have a responsibility to create, maintain, and contribute to environments of practice that support nurses in fulfilling their ethical obligations. Environments of practice include observable features, such as working conditions, and written policies and procedures setting out expectations for nurses, as well as less tangible characteristics such as informal peer norms. Organizational structures, role descriptions, health and safety initiatives, grievance mechanisms, ethics committees, compensation systems, and disciplinary procedures all contribute to environments that can either present barriers or foster ethical practice and professional fulfillment. Environments in which employees are provided fair hearing of grievances, are supported in practicing according to standards of care, and are justly treatedallow for the realization of the values of the profession and are consistent with sound nursing practice.

**6.3 Responsibility for the health care environment -** The nurse is responsible for contributing to a moral environment that encourages respectful interactions with colleagues, support of peers, and identification of issues that need to be addressed. Nurse administrators have a particular responsibility to assure that employees are treated fairly and that nurses are involved in decisions related to their practice and working conditions. Acquiescing and accepting unsafe or inappropriate practices, even if the individual does not participate in the specific practice, is equivalent to condoning unsafe practice. Nurses should not remain employed in facilities that routinely violate patient rights or require nurses to severely and repeatedly compromise standards of practice or personal morality.

As with concerns about patient care, nurses should address concerns about the health care environment through appropriate channels. Organizational changes are difficult to accomplish and may require persistent efforts over time. Toward this end, nurses may participate in collective action such as collective bargaining or workplace advocacy, preferably through a professional association such as the state nurses association, in order to address the terms and conditions of employment. Agreements reached through such action must be consistent with the profession's standards of practice, the state law regulating practice and the Code of Ethics for Nursing. Conditions of employment must contribute to the moral environment, the provision of quality patient care and professional satisfaction for nurses.

The professional association also serves as an advocate for the nurse by seeking to secure just

compensation and humane working conditions for nurses. To accomplish this, the professional association may engage in collective bargaining on behalf of nurses. While seeking to assure just economic and general welfare for nurses, collective bargaining, nonetheless, seeks to keep the interests of both nurses and patients in balance.

**Provision 7** The nurse participates in the advancement of the profession through contributions to practice, education, administration, and knowledge development.

**7.1 Advancing the profession through active involvement in nursing and in health care policy -** Nurses should advance their profession by contributing in some way to the leadership, activities, and the viability of their professional organizations. Nurses can also advance the profession by serving in leadership or mentorship roles or on committees within their places of employment. Nurses who are self-employed can advance the profession by serving as role models for professional integrity. Nurses can also advance the profession through participation in civic activities related to health care or through local, state, national, or international initiatives. Nurse educators have a specific responsibility to enhance students' commitment to professional and civic values. Nurse administrators have a responsibility to foster an employment environment that facilitates nurses' ethical integrity and professionalism, and nurse researchers are responsible for active contribution to the body of knowledge supporting and advancing nursing practice.

**7.2 Advancing the profession by developing, maintaining, and implementing professional standards in clinical, administrative, and educational practice -** Standards and guidelines reflect the practice of nursing grounded in ethical commitments and a body of knowledge. Professional standards and guidelines for nurses must be developed by nurses and reflect nursing's responsibility to society. It is the responsibility of nurses to identify their own scope of practice as permitted by professional practice standards and guidelines, by state and federal laws, by relevant societal values, and by the Code of Ethics.

The nurse as administrator or manager must establish, maintain, and promote conditions of employment that enable nurses within that organization or community setting to practice in accord with accepted standards of nursing practice and provide a nursing and health care work environment that meets the standards and guidelines of nursing practice. Professional autonomy and self regulation in the control of conditions of practice are necessary for implementing nursing standards and guidelines and assuring quality care for those whom nursing serves.

The nurse educator is responsible for promoting and maintaining optimum standards of both nursing education and of nursing practice in any settings where planned learning activities occur. Nurse educators must also ensure that only those students who possess the knowledge, skills, and competencies that are essential to nursing graduate from their nursing programs.

**7.3 Advancing the profession through knowledge development, dissemination, and application to practice -** The nursing profession should engage in scholarly inquiry to identify, evaluate, refine, and expand the body of knowledge that forms the foundation of its discipline and practice. In addition, nursing knowledge is derived from the sciences and from the humanities. Ongoing scholarly activities are essential to fulfilling a profession's obligations to society. All nurses working alone or in collaboration with others can participate in the advancement of the profession through the development, evaluation, dissemination, and application of knowledge in practice. However, an organizational climate and infrastructure conducive to scholarly inquiry must be valued and implemented for this to occur.

**Provision 8** The nurse collaborates with other health professionals and the public in promoting community, national, and international efforts to meet health needs.

**8.1 Health needs and concerns -** The nursing profession is committed to promoting the health, welfare, and safety of all people. The nurse has a responsibility to be aware not only of specific health needs of individual patients but also of broader health concerns such as world hunger, environmental pollution, lack of access to health care, violation of human rights, and inequitable distribution of nursing and health care resources. The availability and accessibility of high quality

health services to all people require both interdisciplinary planning and collaborative partnerships among health professionals and others at the community, national, and international levels.

**8.2 Responsibilities to the public -** Nurses, individually and collectively, have a responsibility to be knowledgeable about the health status of the community and existing threats to health and safety. Through support of and participation in community organizations and groups, the nurse assists in efforts to educate the public, facilitates informed choice, identifies conditions and circumstances that contribute to illness, injury and disease, fosters healthy life styles, and participation in institutional and legislative efforts to promote health and meet national health objectives. In addition, the nurse supports initiatives to address barriers to health, such as poverty, homelessness, unsafe living conditions, abuse and violence, and lack of access to health services.

The nurse also recognizes that health care is provided to culturally diverse populations in this country and in all parts of the world. In providing care, the nurse should avoid imposition of the nurse's own cultural values upon others. The nurse should affirm human dignity and show respect for the values and practices associated with different cultures and use approaches to care that reflect awareness and sensitivity.

**Provision 9** The profession of nursing, as represented by associations and their members, is responsible for articulating nursing values, for maintaining the integrity of the profession and its practice, and for shaping social policy.

**9.1 Assertion of values -** It is the responsibility of a professional association to communicate and affirm the values of the profession to its members. It is essential that the professional organization encourages discourse that supports critical self-reflection and evaluation within the profession. The organization also communicates to the public the values that nursing considers central to social change that will enhance health.

**9.2 The profession carries out its collective responsibility through professional associations -** The nursing profession continues to develop ways to clarify nursing's accountability to society. The contract between the profession and society is made explicit through such mechanisms as

      (a) The Code of Ethics for Nurses
      (b) the standards of nursing practice
      (c) the ongoing development of nursing knowledge derived from nursing theory, scholarship, and research in order to guide nursing actions
      (d) educational requirements for practice
      (e) certification, and
      (f) mechanisms for evaluating the effectiveness of professional nursing actions.

**9.3 Intraprofessional integrity** A professional association is responsible for expressing the values and ethics of the profession and also for encouraging the professional organization and its members to function in accord with those values and ethics. Thus, one of its fundamental responsibilities is to promote awareness of and adherence to the Code of Ethics and to critique the activities and ends of the professional association itself. Values and ethics influence the power structures of the association in guiding, correcting, and directing its activities. Legitimate concerns for the self-interest of the association and the profession are balanced by a commitment to the social goods that are sought. Through critical self-reflection and self-evaluation, associations must foster change within themselves, seeking to move the professional community toward its stated ideals.

**9.4 Social reform -** Nurses can work individually as citizens or collectively through political action to bring about social change. It is the responsibility of a professional nursing association to speak for nurses collectively in shaping and reshaping health care within our nation, specifically in areas of health care policy and legislation that affect accessibility, quality, and the cost of health care. Here, the professional association maintains vigilance and takes action to influence legislators, reimbursement agencies, nursing organizations, and other health professions. In these activities, health is understood as being broader than delivery and reimbursement systems, but extending to health-related sociocultural issues such as violation of human rights, homelessness, hunger,

violence, and the stigma of illness.

American Nurses Association, *Code of Ethics for Nurses with Interpretive Statements*, Washington, D.C.: American Nurses Publishing, 2001

# Exhibit C



## Guidelines for Ethical Conduct for the Physician Assistant Profession
(Adopted 2000, amended 2004, 2006, 2007, 2008, reaffirmed 2013)

**Introduction** .................................................................. 3

**Statement of Values of the Physician Assistant Profession** ......... 4

**The PA and Patient** ........................................................ 4

PA Role and Responsibilities ..................................... 4

The PA and Diversity .................................................. 5

Nondiscrimination ...................................................... 5

Initiation and Discontinuation of Care........................... 5

Informed Consent....................................................... 6

Confidentiality ........................................................... 6

The Patient and the Medical Record............................. 7

Disclosure ................................................................. 7

Care of Family Members and Co-workers...................... 7

Genetic Testing .......................................................... 8

Reproductive Decision Making ..................................... 8

End of Life ................................................................. 8

**The PA and Individual Professionalism** ......................... 9

Conflict of Interest ..................................................... 9

Professional Identity .................................................. 9

Competency .............................................................. 9

Sexual Relationships.................................................. 9

Gender Discrimination and Sexual Harassment ........... 10

**The PA and Other Professionals** ................................. 10

Team Practice........................................................... 10

Illegal and Unethical Conduct .................................... 10

Impairment ............................................................... 10

Guidelines for Ethical Conduct for the Physician Assistant Profession

PA-Physician Relationship ........................................................... 11

Complementary and Alternative Medicine .................................. 11

**The PA and the Health Care System** ........................................ 11

Workplace Actions ....................................................................... 11

PAs as Educators ......................................................................... 11

PAs and Research ........................................................................ 11

PAs as Expert Witnesses ............................................................. 12

**The PA and Society** ...................................................................... 12

Lawfulness ................................................................................... 12

Executions ................................................................................... 12

Access to Care / Resource Allocation ......................................... 12

Community Well Being ............................................................... 12

**Conclusion** ..................................................................................... 12

## <u>Introduction</u>

Guidelines for Ethical Conduct for the Physician Assistant Profession

The physician assistant profession has revised its code of ethics several times since the profession began. Although the fundamental principles underlying the ethical care of patients have not changed, the societal framework in which those principles are applied has. Economic pressures of the health care system, social pressures of church and state, technological advances, and changing patient demographics continually transform the landscape in which PAs practice.

Previous codes of the profession were brief lists of tenets for PAs to live by in their professional lives. This document departs from that format by attempting to describe ways in which those tenets apply. Each situation is unique. Individual PAs must use their best judgment in a given situation while considering the preferences of the patient and the supervising physician, clinical information, ethical concepts, and legal obligations.

Four main bioethical principles broadly guided the development of these guidelines: autonomy, beneficence, nonmaleficence, and justice.

Autonomy, strictly speaking, means self-rule. Patients have the right to make autonomous decisions and choices, and physician assistants should respect these decisions and choices.

Beneficence means that PAs should act in the patient's best interest. In certain cases, respecting the patient's autonomy and acting in their best interests may be difficult to balance.

Nonmaleficence means to do no harm, to impose no unnecessary or unacceptable burden upon the patient.

Justice means that patients in similar circumstances should receive similar care. Justice also applies to norms for the fair distribution of resources, risks, and costs.

Physician assistants are expected to behave both legally and morally. They should know and understand the laws governing their practice. Likewise, they should understand the ethical responsibilities of being a health care professional. Legal requirements and ethical expectations will not always be in agreement. Generally speaking, the law describes minimum standards of acceptable behavior, and ethical principles delineate the highest moral standards of behavior.

When faced with an ethical dilemma, PAs may find the guidance they need in this document. If not, they may wish to seek guidance elsewhere – possibly from a supervising physician, a hospital ethics committee, an ethicist, trusted colleagues, or other AAPA policies. PAs should seek legal counsel when they are concerned about the potential legal consequences of their decisions.

The following sections discuss ethical conduct of PAs in their professional interactions with patients, physicians, colleagues, other health professionals, and the public. The "Statement of Values" within this document defines the fundamental values that the PA profession strives to uphold. These values provide the foundation upon which the guidelines rest. The guidelines were written with the understanding that no document can encompass all actual and potential ethical responsibilities, and PAs should not regard them as comprehensive.

Guidelines for Ethical Conduct for the Physician Assistant Profession

## Statement of Values of the Physician Assistant Profession

- Physician assistants hold as their primary responsibility the health, safety, welfare, and dignity of all human beings.

- Physician assistants uphold the tenets of patient autonomy, beneficence, nonmaleficence, and justice.

- Physician assistants recognize and promote the value of diversity.

- Physician assistants treat equally all persons who seek their care.

- Physician assistants hold in confidence the information shared in the course of practicing medicine.

- Physician assistants assess their personal capabilities and limitations, striving always to improve their medical practice.

- Physician assistants actively seek to expand their knowledge and skills, keeping abreast of advances in medicine.

- Physician assistants work with other members of the health care team to provide compassionate and effective care of patients.

- Physician assistants use their knowledge and experience to contribute to an improved community.

- Physician assistants respect their professional relationship with physicians.

- Physician assistants share and expand knowledge within the profession.

<u>The PA and Patient</u>

## PA Role and Responsibilities

Physician assistant practice flows out of a unique relationship that involves the PA, the physician, and the patient. The individual patient–PA relationship is based on mutual respect and an agreement to work together regarding medical care. In addition, PAs practice medicine with physician supervision; therefore, the care that a PA provides is an extension of the care of the supervising physician. The patient–PA relationship is also a patient–PA–physician relationship.

The principal value of the physician assistant profession is to respect the health, safety, welfare, and dignity of all human beings. This concept is the foundation of the patient–PA relationship. Physician assistants have an ethical obligation to see that each of their patients receives appropriate care. PAs should be sensitive to the beliefs and expectations of the patient. PAs should recognize that each patient is unique and has an ethical right to self-determination

Physician assistants are professionally and ethically committed to providing nondiscriminatory care to all patients. While PAs are not expected to ignore their own personal values, scientific or ethical standards, or the law, they should not allow their personal beliefs to restrict patient access to care. A PA has an ethical duty to offer each patient the full range of information on relevant options for their health care. If personal moral, religious, or ethical beliefs prevent a PA from

- 4 -

Guidelines for Ethical Conduct for the Physician Assistant Profession

offering the full range of treatments available or care the patient desires, the PA has an ethical duty to refer a patient to another qualified provider. That referral should not restrict a patient's access to care. PAs are obligated to care for patients in emergency situations and to responsibly transfer patients if they cannot care for them.

Physician assistants should always act in the best interests of their patients and as advocates when necessary. PAs should actively resist policies that restrict free exchange of medical information. For example, a PA should not withhold information about treatment options simply because the option is not covered by insurance. PAs should inform patients of financial incentives to limit care, use resources in a fair and efficient way, and avoid arrangements or financial incentives that conflict with the patient's best interests.

**The PA and Diversity**
The physician assistant should respect the culture, values, beliefs, and expectations of the patient.

**Nondiscrimination**
Physician assistants should not discriminate against classes or categories of patients in the delivery of needed health care. Such classes and categories include gender, color, creed, race, religion, age, ethnic or national origin, political beliefs, nature of illness, disability, socioeconomic status, physical stature, body size, gender identity, marital status, or sexual orientation.

**Initiation and Discontinuation of Care**
In the absence of a preexisting patient–PA relationship, the physician assistant is under no ethical obligation to care for a person unless no other provider is available. A PA is morally bound to provide care in emergency situations and to arrange proper follow-up. PAs should keep in mind that contracts with health insurance plans might define a legal obligation to provide care to certain patients.

A physician assistant and supervising physician may discontinue their professional relationship with an established patient as long as proper procedures are followed. The PA and physician should provide the patient with adequate notice, offer to transfer records, and arrange for continuity of care if the patient has an ongoing medical condition. Discontinuation of the professional relationship should be undertaken only after a serious attempt has been made to clarify and understand the expectations and concerns of all involved parties.

If the patient decides to terminate the relationship, they are entitled to access appropriate information contained within their medical record.

**Informed Consent**
Physician assistants have a duty to protect and foster an individual patient's free and informed choices. The doctrine of informed consent means that a PA provides adequate information that is comprehendible to a competent patient or patient surrogate. At a minimum, this should include the nature of the medical condition, the objectives of the proposed treatment, treatment options, possible outcomes, and the risks involved. PAs should be committed to the concept of shared

Guidelines for Ethical Conduct for the Physician Assistant Profession

decision making, which involves assisting patients in making decisions that account for medical, situational, and personal factors.

In caring for adolescents, the PA should understand all of the laws and regulations in his or her jurisdiction that are related to the ability of minors to consent to or refuse health care. Adolescents should be encouraged to involve their families in health care decision making. The PA should also understand consent laws pertaining to emancipated or mature minors. (See the section on *Confidentiality*.)

When the person giving consent is a patient's surrogate, a family member, or other legally authorized representative, the PA should take reasonable care to assure that the decisions made are consistent with the patient's best interests and personal preferences, if known. If the PA believes the surrogate's choices do not reflect the patient's wishes or best interests, the PA should work to resolve the conflict. This may require the use of additional resources, such as an ethics committee.

**Confidentiality**

Physician assistants should maintain confidentiality. By maintaining confidentiality, PAs respect patient privacy and help to prevent discrimination based on medical conditions. If patients are confident that their privacy is protected, they are more likely to seek medical care and more likely to discuss their problems candidly.

In cases of adolescent patients, family support is important but should be balanced with the patient's need for confidentiality and the PA's obligation to respect their emerging autonomy. Adolescents may not be of age to make independent decisions about their health, but providers should respect that they soon will be. To the extent they can, PAs should allow these emerging adults to participate as fully as possible in decisions about their care. It is important that PAs be familiar with and understand the laws and regulations in their jurisdictions that relate to the confidentiality rights of adolescent patients. (See the section on *Informed Consent*.)

Any communication about a patient conducted in a manner that violates confidentiality is unethical. Because written, electronic, and verbal information may be intercepted or overheard, the PA should always be aware of anyone who might be monitoring communication about a patient.
PAs should choose methods of storage and transmission of patient information that minimize the likelihood of data becoming available to unauthorized persons or organizations. Computerized record keeping and electronic data transmission present unique challenges that can make the maintenance of patient confidentiality difficult. PAs should advocate for policies and procedures that secure the confidentiality of patient information.

**The Patient and the Medical Record**

Physician assistants have an obligation to keep information in the patient's medical record confidential. Information should be released only with the written permission of the patient or the patient's legally authorized representative. Specific exceptions to this general rule may exist (e.g., workers compensation, communicable disease, HIV, knife/gunshot wounds, abuse, substance abuse). It is important that a PA be familiar with and understand the laws and

Guidelines for Ethical Conduct for the Physician Assistant Profession

regulations in his or her jurisdiction that relate to the release of information. For example, stringent legal restrictions on release of genetic test results and mental health records often exist.

Both ethically and legally, a patient has certain rights to know the information contained in his or her medical record. While the chart is legally the property of the practice or the institution, the information in the chart is the property of the patient. Most states have laws that provide patients access to their medical records. The PA should know the laws and facilitate patient access to the information.

**Disclosure**
A physician assistant should disclose to his or her supervising physician information about errors made in the course of caring for a patient. The supervising physician and PA should disclose the error to the patient if such information is significant to the patient's interests and well being. Errors do not always constitute improper, negligent, or unethical behavior, but failure to disclose them may.

**Care of Family Members and Co-workers**
Treating oneself, co-workers, close friends, family members, or students whom the physician assistant supervises or teaches may be unethical or create conflicts of interest. For example, it might be ethically acceptable to treat one's own child for a case of otitis media but it probably is not acceptable to treat one's spouse for depression. PAs should be aware that their judgment might be less than objective in cases involving friends, family members, students, and colleagues and that providing "curbside" care might sway the individual from establishing an ongoing relationship with a provider. If it becomes necessary to treat a family member or close associate, a formal patient-provider relationship should be established, and the PA should consider transferring the patient's care to another provider as soon as it is practical. If a close associate requests care, the PA may wish to assist by helping them find an appropriate provider.

There may be exceptions to this guideline, for example, when a PA runs an employee health center or works in occupational medicine. Even in those situations, the PA should be sure they do not provide informal treatment, but provide appropriate medical care in a formally established patient-provider relationship.

**Genetic Testing**
Evaluating the risk of disease and performing diagnostic genetic tests raise significant ethical concerns. Physician assistants should be informed about the benefits and risks of genetic tests. Testing should be undertaken only after proper informed consent is obtained. If PAs order or conduct the tests, they should assure that appropriate pre- and post-test counseling is provided.

PAs should be sure that patients understands the potential consequences of undergoing genetic tests – from impact on patients themselves, possible implications for other family members, and potential use of the information by insurance companies or others who might have access to the information. Because of the potential for discrimination by insurers, employers, or others, PAs should be particularly aware of the need for confidentiality concerning genetic test results.

**Reproductive Decision Making**

Guidelines for Ethical Conduct for the Physician Assistant Profession

Patients have a right to access the full range of reproductive health care services, including fertility treatments, contraception, sterilization, and abortion. Physician assistants have an ethical obligation to provide balanced and unbiased clinical information about reproductive health care.

When the PA's personal values conflict with providing full disclosure or providing certain services such as sterilization or abortion, the PA need not become involved in that aspect of the patient's care. By referring the patient to a qualified provider who is willing to discuss and facilitate all treatment options, the PA fulfills their ethical obligation to ensure the patient's access to all legal options.

**End of Life**
Among the ethical principles that are fundamental to providing compassionate care at the end of life, the most essential is recognizing that dying is a personal experience and part of the life cycle.

Physician Assistants should provide patients with the opportunity to plan for end of life care. Advance directives, living wills, durable power of attorney, and organ donation should be discussed during routine patient visits.

PAs should assure terminally-ill patients that their dignity is a priority and that relief of physical and mental suffering is paramount. PAs should exhibit non-judgmental attitudes and should assure their terminally-ill patients that they will not be abandoned. To the extent possible, patient or surrogate preferences should be honored, using the most appropriate measures consistent with their choices, including alternative and non-traditional treatments. PAs should explain palliative and hospice care and facilitate patient access to those services. End of life care should include assessment and management of psychological, social, and spiritual or religious needs.

While respecting patients' wishes for particular treatments when possible, PAs also must weigh their ethical responsibility, in consultation with supervising physicians, to withhold futile treatments and to help patients understand such medical decisions.

PAs should involve the physician in all near-death planning. The PA should only withdraw life support with the supervising physician's agreement and in accordance with the policies of the health care institution.

The PA and Individual Professionalism

**Conflict of Interest**
Physician assistants should place service to patients before personal material gain and should avoid undue influence on their clinical judgment. Trust can be undermined by even the appearance of improper influence. Examples of excessive or undue influence on clinical judgment can take several forms. These may include financial incentives, pharmaceutical or other industry gifts, and business arrangements involving referrals. PAs should disclose any actual or potential conflict of interest to their patients.

Acceptance of gifts, trips, hospitality, or other items is discouraged. Before accepting a gift or

Guidelines for Ethical Conduct for the Physician Assistant Profession

financial arrangement, PAs might consider the guidelines of the Royal College of Physicians, "Would I be willing to have this arrangement generally known?" or of the American College of Physicians, "What would the public or my patients think of this arrangement?"

**Professional Identity**
Physician assistants should not misrepresent directly or indirectly, their skills, training, professional credentials, or identity. Physician assistants should uphold the dignity of the PA profession and accept its ethical values.

**Competency**
Physician assistants should commit themselves to providing competent medical care and extend to each patient the full measure of their professional ability as dedicated, empathetic health care providers. PAs should also strive to maintain and increase the quality of their health care knowledge, cultural sensitivity, and cultural competence through individual study and continuing education.

**Sexual Relationships**
It is unethical for physician assistants to become sexually involved with patients. It also may be unethical for PAs to become sexually involved with former patients or key third parties. Key third parties are individuals who have influence over the patient. These might include spouses or partners, parents, guardians, or surrogates.

Such relationships generally are unethical because of the PA's position of authority and the inherent imbalance of knowledge, expertise, and status. Issues such as dependence, trust, transference, and inequalities of power may lead to increased vulnerability on the part of the current or former patients or key third parties.

**Gender Discrimination and Sexual Harassment**
It is unethical for physician assistants to engage in or condone any form of gender discrimination. Gender discrimination is defined as any behavior, action, or policy that adversely affects an individual or group of individuals due to disparate treatment, disparate impact, or the creation of a hostile or intimidating work or learning environment.

It is unethical for PAs to engage in or condone any form of sexual harassment. Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when:

- Such conduct has the purpose or effect of interfering with an individual's work or academic performance or creating an intimidating, hostile or offensive work or academic environment, or

- Accepting or rejecting such conduct affects or may be perceived to affect professional decisions concerning an individual, or

- Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's training or professional position.

Guidelines for Ethical Conduct for the Physician Assistant Profession

The PA and Other Professionals

**Team Practice**
Physician assistants should be committed to working collegially with other members of the health care team to assure integrated, well-managed, and effective care of patients. PAs should strive to maintain a spirit of cooperation with other health care professionals, their organizations, and the general public.

**Illegal and Unethical Conduct**
Physician assistants should not participate in or conceal any activity that will bring discredit or dishonor to the PA profession. They should report illegal or unethical conduct by health care professionals to the appropriate authorities.

**Impairment**
Physician assistants have an ethical responsibility to protect patients and the public by identifying and assisting impaired colleagues. "Impaired" means being unable to practice medicine with reasonable skill and safety because of physical or mental illness, loss of motor skills, or excessive use or abuse of drugs and alcohol.

PAs should be able to recognize impairment in physician supervisors, PAs, and other health care providers and should seek assistance from appropriate resources to encourage these individuals to obtain treatment.

**PA–Physician Relationship**
Supervision should include ongoing communication between the physician and the physician assistant regarding patient care. The PA should consult the supervising physician whenever it will safeguard or advance the welfare of the patient. This includes seeking assistance in situations of conflict with a patient or another health care professional.

**Complementary and Alternative Medicine**
When a patient asks about an alternative therapy, the PA has an ethical obligation to gain a basic understanding of the alternative therapy being considered or being used and how the treatment will affect the patient. If the treatment would harm the patient, the PA should work diligently to dissuade the patient from using it, advise other treatment, and perhaps consider transferring the patient to another provider.

The PA and the Health Care System

**Workplace Actions**
Physician assistants may face difficult personal decisions to withhold medical services when workplace actions (e.g., strikes, sick-outs, slowdowns, etc.) occur. The potential harm to patients should be carefully weighed against the potential improvements to working conditions and, ultimately, patient care that could result. In general, PAs should individually and collectively work to find alternatives to such actions in addressing workplace concerns.

**PAs as Educators**

Guidelines for Ethical Conduct for the Physician Assistant Profession

All physician assistants have a responsibility to share knowledge and information with patients, other health professionals, students, and the public. The ethical duty to teach includes effective communication with patients so that they will have the information necessary to participate in their health care and wellness.

**PAs and Research**
The most important ethical principle in research is honesty. This includes assuring subjects' informed consent, following treatment protocols, and accurately reporting findings. Fraud and dishonesty in research should be reported so that the appropriate authorities can take action.

Physician assistants involved in research must be aware of potential conflicts of interest. The patient's welfare takes precedence over the desired research outcome. Any conflict of interest should be disclosed.

In scientific writing, PAs should report information honestly and accurately. Sources of funding for the research must be included in the published reports.

Plagiarism is unethical. Incorporating the words of others, either verbatim or by paraphrasing, without appropriate attribution is unethical and may have legal consequences. When submitting a document for publication, any previous publication of any portion of the document must be fully disclosed.

**PAs as Expert Witnesses**
The physician assistant expert witness should testify to what he or she believes to be the truth. The PA's review of medical facts should be thorough, fair, and impartial.

The PA expert witness should be fairly compensated for time spent preparing, appearing, and testifying. The PA should not accept a contingency fee based on the outcome of a case in which testimony is given or derive personal, financial, or professional favor in addition to compensation.

The PA and Society

**Lawfulness**
Physician assistants have the dual duty to respect the law and to work for positive change to laws that will enhance the health and well being of the community.

**Executions**
Physician assistants, as health care professionals, should not participate in executions because to do so would violate the ethical principle of beneficence.

**Access to Care / Resource Allocation**
Physician assistants have a responsibility to use health care resources in an appropriate and efficient manner so that all patients have access to needed health care. Resource allocation should be based on societal needs and policies, not the circumstances of an individual patient–PA encounter. PAs participating in policy decisions about resource allocation should consider

- 11 -

Guidelines for Ethical Conduct for the Physician Assistant Profession

medical need, cost-effectiveness, efficacy, and equitable distribution of benefits and burdens in society.

**Community Well Being**

Physician assistants should work for the health, well being, and the best interest of both the patient and the community. Sometimes there is a dynamic moral tension between the well being of the community in general and the individual patient. Conflict between an individual patient's best interest and the common good is not always easily resolved. In general, PAs should be committed to upholding and enhancing community values, be aware of the needs of the community, and use the knowledge and experience acquired as professionals to contribute to an improved community.

**Conclusion**

The American Academy of Physician Assistants recognizes its responsibility to aid the PA profession as it strives to provide high quality, accessible health care. Physician assistants wrote these guidelines for themselves and other physician assistants. The ultimate goal is to honor patients and earn their trust while providing the best and most appropriate care possible. At the same time, PAs must understand their personal values and beliefs and recognize the ways in which those values and beliefs can impact the care they provide.

# Exhibit D

Case: 1:17-cv-04663 Document #: 21 Filed: 05/31/17 Page 86 of 133 PageID #:818

American Academy
of Pediatrics
DEDICATED TO THE HEALTH OF ALL CHILDREN™

# Policy Statement—Physician Refusal to Provide Information or Treatment on the Basis of Claims of Conscience

COMMITTEE ON BIOETHICS

**KEY WORDS**
conscience, conscientious objection, cooperation

This document is copyrighted and is property of the American Academy of Pediatrics and its Board of Directors. All authors have filed conflict of interest statements with the American Academy of Pediatrics. Any conflicts have been resolved through a process approved by the Board of Directors. The American Academy of Pediatrics has neither solicited nor accepted any commercial involvement in the development of the content of this publication.

www.pediatrics.org/cgi/doi/10.1542/peds.2009-2222

doi:10.1542/peds.2009-2222

All policy statements from the American Academy of Pediatrics automatically expire 5 years after publication unless reaffirmed, revised, or retired at or before that time.

PEDIATRICS (ISSN Numbers: Print, 0031-4005; Online, 1098-4275).

Copyright © 2009 by the American Academy of Pediatrics

## abstract

Health care professionals may have moral objections to particular medical interventions. They may refuse to provide or cooperate in the provision of these interventions. Such objections are referred to as conscientious objections. Although it may be difficult to characterize or validate claims of conscience, respecting the individual physician's moral integrity is important. Conflicts arise when claims of conscience impede a patient's access to medical information or care. A physician's conscientious objection to certain interventions or treatments may be constrained in some situations. Physicians have a duty to disclose to prospective patients treatments they refuse to perform. As part of informed consent, physicians also have a duty to inform their patients of all relevant and legally available treatment options, including options to which they object. They have a moral obligation to refer patients to other health care professionals who are willing to provide those services when failing to do so would cause harm to the patient, and they have a duty to treat patients in emergencies when referral would significantly increase the probability of mortality or serious morbidity. Conversely, the health care system should make reasonable accommodations for physicians with conscientious objections. *Pediatrics* 2009;124: 1689–1693

## INTRODUCTION

Health care professionals may morally object to particular treatments and refuse to provide them. This practice is referred to as "conscientious objection."[1–3] This statement will not address claims of conscience on behalf of institutions. Possible examples of conscientious objection in pediatric practice include refusals to prescribe contraception, specifically emergency contraception[4]; perform routine neonatal male circumcision[5]; or administer vaccines developed with virus strains or cell lines derived from voluntarily aborted human fetuses.[6] Such objections may limit patients' access to information or treatment. Given this ethical dilemma, the legitimacy of such objections has become an important issue. Legislation has been proposed both to protect health care providers' ability to conscientiously object and to ensure patients' access to health care.[7]

### Conscience

There are morally important reasons to protect the individual's exercise of conscience even if one disagrees with the content of the consci-

Downloaded from by guest on November 18, 2016

entious belief. Conscience is closely related to integrity. Performing an action that violates one's conscience undermines one's sense of integrity and self-respect and produces guilt, remorse, or shame.[8,9] Integrity is valuable, and harms associated with the loss of self-respect should be avoided. This view of conscience provides a justification for respecting conscience independent of particular religious beliefs about conscience or morality. Claims of conscience are generally negative (the right to not perform an action) rather than positive (the right to perform an action).[10]

There are potential social benefits to protecting individuals' ability to act according to their consciences. These benefits include empowering individuals to think and act morally, encouraging the use of reason rather than force, exemplifying and encouraging tolerance, and encouraging moral action. For example, people are more likely to act morally if they are permitted to act on their own decisions.[11]

What constitutes a violation of conscience may be difficult to identify or validate. In some situations, claims of conscientious objection may hide self-serving motives.[12] For example, a potential military recruit may illegitimately assert conscientious objection not because of moral objections to killing but because of a concern for his or her personal safety. Personal affiliation with an organization that publicly proscribes certain actions makes it easier to identify true claims of conscience. Confirmation may also be difficult regarding actions that are not intrinsically immoral but only immoral under certain conditions. Whereas some traditions view war as intrinsically immoral, others view the use of lethal force as morally appropriate if certain criteria are fulfilled. Whether the criteria are fulfilled may depend on empirical claims about which there is

controversy. Objectors have an obligation to explain and defend their position and may be required to demonstrate the sincerity and importance of their belief.[11]

There are, however, a number of difficulties in characterizing and validating claims of conscience. The boundary between legitimate conscientious objection and unjust discrimination is particularly problematic. For example, the medical profession would not tolerate a physician's refusal to treat patients of a particular racial group because the physician considered members of this group inferior. Discrimination is an affront to the dignity of the individual discriminated against and may impose significant practical burdens on the individual. Alternatively, clinicians might claim that an action is not intrinsically immoral but only immoral when performed by certain categories of persons. For example, a clinician might object to prescribing contraception to unmarried people because the clinician believes it facilitates immoral sexual activity. In such situations, clinicians should be careful not to violate patients' privacy by asking personal questions only to satisfy their own interests.[13] Legally, when claims of conscience conflict with claims of nondiscrimination in public accommodations, such as hotels and restaurants, nondiscrimination claims take precedence. Whether private physician practices should be considered public accommodations, and which groups of individuals should be protected against discrimination, are subjects of continuing societal debate.[14] The American Academy of Pediatrics opposes discrimination in the care of any patient or against any physician.[15]

Evaluating claims of conscience is also difficult, because some individuals object not only to performing an

action themselves but also to assisting someone else to perform the action. Physicians who object to emergency contraception do not use it themselves and also refuse to prescribe it to others. They argue that assisting others to do something they themselves consider immoral makes them morally culpable. For example, a physician whose patient makes a credible threat against a third party would be morally culpable if he or she refused to warn the third party or to notify the police and the patient harmed the other individual.

Whether assisting someone else to perform an act that you consider immoral is wrong depends on a number of factors including intention. It would be wrong if you intend for the wrong to be committed and share the intention of the person you are helping. In other cases you might cooperate in the act but not share the other person's intention, and your assistance might be appropriate. Using a bank robbery as a nonmedical example, the getaway driver shares the robber's intention, but the bank manager who is forced to open the vault does not. The getaway driver's actions are wrong, whereas those of the manager may be excusable. The moral evaluation of assisting another without sharing his or her intention depends on a variety of practical considerations including the seriousness of the wrong, the causal relationship between the assistance and the act, the necessity of the assistance for completing the act, and the reason for providing the assistance. There is also the concern that cooperation may be misinterpreted as approval and might cause another to act wrongly.[16] Often, these relative determinations do not permit clear lines to be drawn between morally acceptable and immoral assistance. Questions regarding cooperation can become issues of conscience.

Downloaded from by guest on November 18, 2016

Case: 1:17-cv-04863 Document #: 21 Filed: 05/31/17 Page 88 of 133 PageID #:620

## Conscientious Objection in Health Care

Claims regarding conscientious objection in medicine should be evaluated on the health care system rather than the individual level, because neither the clinicians' nor the patients' claims clearly trump the others' in all situations. Conflicts are often framed in terms of an individual provider and a single patient. Both of these individuals have morally significant interests.[17] Consider a pediatrician who refuses to prescribe emergency contraception for a patient whose partner's condom broke during intercourse. A health care professional might choose to leave medicine rather than violate his or her conscience. This decision could have secondary effects not only for the professional and his or her family but also for patients. It might limit their access to other services. Alternatively, the health care professional might violate his or her conscience and experience significant guilt and shame and their secondary effects. Constrained access to health care may also have significant effects for patients, such as an unintended but possibly preventable pregnancy. Benefits and harms to patients should be evaluated from the patients' points of view. The frequency of particular outcomes is difficult to predict, and the type and magnitude of these outcomes do not lend themselves to weighing and balancing. Therefore, it is not possible to state in the abstract that either the health care professional's claim to conscientious objection or the patient's claim to access should always prevail.

Some refusals constitute an imposition of the physician's moral beliefs on the patient. Refusing to transfer a patient's medical records, for example, unfairly constrains a patient's subsequent action and is morally unacceptable.[9] More egregious actions, such as berating or humiliating patients, violate the respect that objectors themselves are seeking and are clearly morally wrong. It is not clear, however, that refusing to cooperate is morally equivalent to imposing one's views. Physicians, except in emergencies, have significant latitude in selecting patients, and pharmacies may not stock dedicated emergency contraceptives for reasons unrelated to conscience. Those who refuse on the basis of conscience should not be held to higher standards than those who refuse treatment on the basis of other accepted grounds.

Constraints on claims of conscience can, nonetheless, be justified on the basis of health care professionals' role responsibilities and the power differential created by licensure. Health care professionals fulfill a particular societal role with associated expectations and responsibilities. For example, physicians' primary focus should be on their patients' rather than their own benefit. These role expectations are based in part on the power differential between physicians and patients, which is the result of physicians' knowledge and patients' conditions.

Role obligations are generally voluntarily accepted; therefore, health care professionals' claims of conscientious objection may justifiably be limited. It is unreasonable for an individual to enter a profession or specialty with primary activities that conflict with his or her central values.[18] Individuals, however, may change their moral points of view after having accepted a role, or the role may be redefined during the course of their professional practice. The debate over physician-assisted suicide, for example, has evolved during many practicing physicians' careers.[8] The boundaries of medical practice, both in terms of what constitutes disease and the scope of available treatments, may also evolve over time. Although individuals should not knowingly enter a specialty with core activities that they are unwilling to perform, changes in medical practice over time should also be acknowledged.

Some have argued that the exercise of conscience is integral to being a professional, but this claim confuses professional and nonprofessional commitments. Physicians generally can refuse to perform actions that they consider medically inappropriate. A pediatrician may, for example, refuse to prescribe antibiotics for a viral respiratory infection or perform a surgery that has an unacceptable mortality rate. In contrast, conscientious objections are typically based not on medical knowledge but on moral, religious, or political beliefs.[9,11] The ability to refuse to provide a service or treatment on these other bases is not part of being a physician.

One responsibility of the physician's role is providing medical information, including risks, benefits, and alternatives, during the informed-consent process. This role responsibility is supported by the value of autonomy and patients' need for information to make autonomous decisions.[12] Permitting physicians, on the basis of a claim of conscience, not to disclose a legally available treatment option of which the patient is unaware but might otherwise choose would significantly undermine the practice of medicine. For example, it would be unfair for a victim of sexual assault who was unfamiliar with emergency contraception not to be informed of its existence. Acknowledging that language is not value neutral, the information disclosed should be accurate, complete, easily understood, and focused on the patients' decision-making needs. Physicians should document the informed-consent process in the patient's medical record.

As previously mentioned, clinical information should be provided in a respectful manner.[19] Physicians can ex-

Downloaded from by guest on November 18, 2016

plain the reasons why they do not provide certain treatments or services while respecting patients' autonomy. The power differential between physicians and patients may, however, create unintended coercion. Patients should be able to refuse to listen to physicians' reasons.

Similar considerations require clinicians to provide prospective disclosure and referral. Physicians who, on the basis of conscience, refuse to provide particular treatments or services within the usual scope of practice for their specialty have an obligation to disclose this to potential patients. This knowledge may be important to patients in selecting physicians. In some situations, it may be feasible to transfer care. Although some clinicians object that referring makes them morally complicit,[8] patients may be harmed by the lack of referral. Patients, particularly adolescents, may not know how to identify a willing health care professional. Patients may also face a significant delay in obtaining a new-patient appointment. The power differential in the physician-patient relationship is based not only on physicians' greater medical knowledge but also on their greater knowledge about the health care system. In situations of potential harm to patients, physicians have a duty to refer in a timely manner. This duty may be fulfilled by informing patients about referral services such as those provided by hospitals or insurance companies. Physicians should provide other, ongoing care while transferring patient care responsibilities. For example, a physician who decides not to see unimmunized patients should continue to treat an established, unimmunized patient's asthma until a new primary care provider can be established.

Special obligations on the part of health care professionals also result

from the system of licensure.[17,20] Licensure requirements constrain others from providing similar services and limit patients' access. Physicians' relative monopoly on health care services and their fiduciary obligations to patients create an obligation to treat, irrespective of conscientious objection, in emergencies. Health care providers have a duty to perform procedures within the scope of their training when the patient's health is at significant risk and an alternative health care professional is unavailable.[11,13]

Protection of physicians' conscience and provision of legal health care services are both goods that the health care system should protect. A variety of accommodations are feasible. For example, alternative modes of providing emergency contraception include advance prescription, pharmacist provision, and over-the-counter sales.[21] Employers have important legal obligations and can provide an essential coordinating function within the health care system. They should provide reasonable accommodations, such as job restructuring or modified work schedules.[18] Referral services may also be created to provide resources for patients seeking care.[21] Accommodation efforts should recognize a wide variety of potential barriers for patients, including education level, income, and geography. Local variation in circumstance makes broad policy recommendations difficult.[17]

Conversely, physicians have obligations to their patients. These obligations include disclosure, provision of informed consent, referral, and emergency treatment.[22] Physicians have a moral obligation to disclose their beliefs to employers and to accept reasonable accommodations from them.[18] Physicians should avoid placing undue burdens on their colleagues. Self-employed physicians should avoid creating situations that inordinately

constrain patients' access to legal treatments. For example, a physician with a conscientious objection to a particular procedure should avoid intentionally displacing the only willing provider of that procedure for a large geographic area.

## RECOMMENDATIONS

1. The American Academy of Pediatrics supports a balance between the individual physician's moral integrity and his or her fiduciary obligations to patients. A physician's duty to perform a procedure within the scope of his or her training increases as the availability of alternative providers decreases and the risk to the patient increases.

2. Physicians should work to ensure that health care–delivery systems enable physicians to act according to their consciences and patients to obtain desired health care.

3. Physicians have a duty to prospective patients to disclose standard treatments and procedures that they refuse to provide but are normally provided by other health care professionals.

4. Physicians have a moral obligation to inform their patients of relevant alternatives as part of the informed-consent process. Physicians should convey information relevant to the patient's decision-making in a timely manner, using widely accepted and easily understood medical terminology, and should document this process in the patient's medical record.

5. Physicians who consider certain treatments immoral have a duty to refer patients who desire these treatments in a timely manner when failing to do so would harm the patients. Such physicians must also provide appropriate ongoing care in the interim.

Downloaded from by guest on November 18, 2016

Case: 1:17-cv-04663 Document #: 21 Filed: 05/31/17 Page 90 of 133 PageID #:622

6. Physicians should work to ensure that employers make reasonable accommodations for employees' conscientiously held views and that responsibilities are equitably distributed among colleagues.

7. In emergencies, when referral would significantly increase the probability of mortality or serious morbidity, physicians have a moral obligation to provide treatment.

## REFERENCES

1. American College of Obstetricians and Gynecologists. ACOG committee opinion No. 385: the limits of conscientious refusal in reproductive medicine. *Obstet Gynecol.* 2007;110(5):1203–1208

2. American Medical Association, Council on Ethical and Judicial Affairs. *CEJA Report 6-A-07: Physician Objection to Treatment and Individual Patient Discrimination.* Chicago, IL: American Medical Association; 2007. Available at: www.ama-assn.org/ama1/pub/upload/mm/369/ceja_6a07.pdf. Accessed December 2, 2008

3. General Medical Council. *Personal Beliefs and Medical Practice.* London, England: General Medical Council; 2008. Available at: www.gmc-uk.org/guidance/ethical_guidance/personal_beliefs/personal_beliefs.asp. Accessed December 2, 2008

4. Stein R. Pharmacists' rights at front of new debate; because of beliefs, some refuse to fill birth control prescriptions. *Washington Post.* 2005:A1, A10

5. British Medical Association. The law and ethics of male circumcision: guidance for doctors. *J Med Ethics.* 2004;30(3):259–263

6. Pontifical Academy for Life. Moral reflections on vaccines prepared from cells derived from aborted human fetuses. *Natl Cathol Bioeth Q.* 2006;6(3):541–537

7. National Conference of State Legislatures. *Pharmacist Conscience Clauses: Laws and Legislation.* Denver, CO: National Conference of State Legislatures; 2007

8. Wicclair MR. Conscientious objection in medicine. *Bioethics.* 2000;14(3):205–227

9. Wicclair MR. Pharmacies, pharmacists, and conscientious objection. *Kennedy Inst Ethics J.* 2006;16(3):225–250

10. Allen WL, Brushwood DB. Pharmaceutically assisted death and the pharmacist's right of conscience. *J Pharm Law.* 1996;5(1):1–18

11. LaFollette E, LaFollette H. Private conscience, public acts. *J Med Ethics.* 2007;33(5):249–254

12. Dresser R. Professionals, conformity, and conscience. *Hastings Cent Rep.* 2005;35(6):9–10

13. Cantor J, Baum K. The limits of conscientious objection: may pharmacists refuse to fill prescriptions for emergency contraception? *N Engl J Med.* 2004;351(19):2008–2012

14. Appel JM. May doctors refuse infertility treatments to gay patients? *Hastings Cent Rep.* 2006;36(4):20–21

15. American Academy of Pediatrics, Committee on Pediatric Workforce. Nondiscrimination in pediatric health care. *Pediatrics.* 2001;108(5):1215

16. Griese ON. *Catholic Identity in Health Care: Principles and Practice.* Braintree, MA: The Pope John Center; 1987

17. Fenton E, Lomasky L. Dispensing with liberty: conscientious refusal and the "morning-after pill." *J Med Philos.* 2005;30(6):579–592

18. White M. Conscience clauses for pharmacists: the struggle to balance conscience rights with the rights of patients and institutions. *Wis L Rev.* 2005;(6):1611–1648

19. Chervenak FA, McCullough LB. Clinical guides to preventing ethical conflicts between pregnant women and their physicians. *Am J Obstet Gynecol.* 1990;162(2):303–307

20. Charo RA. The celestial fire of conscience: refusing to deliver medical care. *N Engl J Med.* 2005;352(24):2471–2473

21. American Academy of Pediatrics, Committee on Adolescence. Emergency contraception. *Pediatrics.* 2005;116(4):1026–1035

22. Asch A. Two cheers for conscience exceptions. *Hastings Cent Rep.* 2006;36(6):11–12

## COMMITTEE ON BIOETHICS, 2008–2009

Douglas S. Diekema, MD, MPH, Chairperson
Mary Fallat, MD, Chairperson-Appoint
*Armand H. Matheny Antommaria, MD, PhD
Ian R. Holzman, MD
Aviva L. Katz, MD
Steven R. Leuthner, MD, MA
Lainie F. Ross, MD, PhD
Sally A. Webb, MD

### LIAISONS

Philip L. Baese, MD — *American Academy of Child and Adolescent Psychiatry*

Marcia Levetown, MD — *American Board of Pediatrics*
Anne D. Lyerly, MD, MA — *American College of Obstetricians and Gynecologists*
Ellen Tsai, MD, MHSc — *Canadian Paediatric Society*

### CONSULTANTS

Jessica Wilen Berg, MPH, JD

### STAFF

Alison Baker, MS

*Lead author

Downloaded from by guest on November 18, 2016

**Physician Refusal to Provide Information or Treatment on the Basis of Claims of Conscience**
Committee on Bioethics

*Pediatrics* 2009;124;1689
DOI: 10.1542/peds.2009-2222

| | |
|---|---|
| **Updated Information & Services** | including high resolution figures, can be found at: /content/124/6/1689.full.html |
| **References** | This article cites 15 articles, 4 of which can be accessed free at: /content/124/6/1689.full.html#ref-list-1 |
| **Citations** | This article has been cited by 13 HighWire-hosted articles: /content/124/6/1689.full.html#related-urls |
| **Post-Publication Peer Reviews (P³Rs)** | One P³R has been posted to this article: /cgi/eletters/124/6/1689 |
| **Subspecialty Collections** | This article, along with others on similar topics, appears in the following collection(s): **Committee on Bioethics** /cgi/collection/committee_on_bioethics **Ethics/Bioethics** /cgi/collection/ethics:bioethics_sub |
| **Permissions & Licensing** | Information about reproducing this article in parts (figures, tables) or in its entirety can be found online at: /site/misc/Permissions.xhtml |
| **Reprints** | Information about ordering reprints can be found online: /site/misc/reprints.xhtml |

PEDIATRICS is the official journal of the American Academy of Pediatrics. A monthly publication, it has been published continuously since 1948. PEDIATRICS is owned, published, and trademarked by the American Academy of Pediatrics, 141 Northwest Point Boulevard, Elk Grove Village, Illinois, 60007. Copyright © 2009 by the American Academy of Pediatrics. All rights reserved. Print ISSN: 0031-4005. Online ISSN: 1098-4275.



Downloaded from by guest on November 18, 2016

# P E D I A T R I C S ®

## OFFICIAL JOURNAL OF THE AMERICAN ACADEMY OF PEDIATRICS

**Physician Refusal to Provide Information or Treatment on the Basis of Claims of Conscience**
Committee on Bioethics
*Pediatrics* 2009;124;1689
DOI: 10.1542/peds.2009-2222

The online version of this article, along with updated information and services, is located on the World Wide Web at:
**/content/124/6/1689.full.html**

PEDIATRICS is the official journal of the American Academy of Pediatrics. A monthly publication, it has been published continuously since 1948. PEDIATRICS is owned, published, and trademarked by the American Academy of Pediatrics, 141 Northwest Point Boulevard, Elk Grove Village, Illinois, 60007. Copyright © 2009 by the American Academy of Pediatrics. All rights reserved. Print ISSN: 0031-4005. Online ISSN: 1098-4275.



American Academy of Pediatrics
DEDICATED TO THE HEALTH OF ALL CHILDREN™

Downloaded from by guest on November 18, 2016

# Exhibit E

# Code *of* Professional Ethics

## of the American College of Obstetricians and Gynecologists

Obstetrician–gynecologists, as members of the medical profession, have ethical responsibilities not only to patients, but also to society, to other health professionals and to themselves. The following ethical foundations for professional activities in the field of obstetrics and gynecology are the supporting structures for the Code of Conduct. The Code implements many of these foundations in the form of rules of ethical conduct. Certain documents of the American College of Obstetricians and Gynecologists also provide additional ethical rules, including documents addressing the following issues: seeking and giving consultation, informed consent, sexual misconduct, patient testing, human immunodeficiency virus, relationships with industry, commercial enterprises in medical practice, and expert testimony. Noncompliance with the Code, including the above-referenced documents, may affect an individual's initial or continuing Fellowship in the American College of Obstetricians and Gynecologists. These documents may be revised or replaced periodically, and Fellows should be knowledgeable about current information.

### Ethical Foundations

I. The patient–physician relationship: The welfare of the patient *(beneficence)* is central to all considerations in the patient–physician relationship. Included in this relationship is the obligation of physicians to respect the rights of patients, colleagues, and other health professionals. The respect for the right of individual patients to make their own choices about their health care *(autonomy)* is fundamental. The principle of justice requires strict avoidance of discrimination on the basis of race, color, religion, national origin, sexual orientation, perceived gender, and any basis that would constitute illegal discrimination *(justice)*.

II. Physician conduct and practice: The obstetrician–gynecologist must deal honestly with patients and colleagues *(veracity)*. This includes not misrepresenting himself or herself through any form of communication in an untruthful, misleading, or deceptive manner. Furthermore, maintenance of medical competence through study, application, and enhancement of medical knowledge and skills is an obligation of practicing physicians. Any behavior that diminishes a physician's capability to practice, such as substance abuse, must be immediately addressed and rehabilitative services instituted. The physician should modify his or her practice until the diminished capacity has been restored to an acceptable standard to avoid harm to patients *(nonmaleficence)*. All physicians are obligated to respond to evidence of questionable



409 12th Street, SW
PO Box 96920
Washington, DC 20090-6920

conduct or unethical behavior by other physicians through appropriate procedures established by the relevant organization.

III.  Avoiding conflicts of interest: Potential conflicts of interest are inherent in the practice of medicine. Physicians are expected to recognize such situations and deal with them through public disclosure. Conflicts of interest should be resolved in accordance with the best interest of the patient, respecting a woman's autonomy to make health care decisions. The physician should be an advocate for the patient through public disclosure of conflicts of interest raised by health payer policies or hospital policies.

IV.  Professional relations: The obstetrician–gynecologist should respect and cooperate with other physicians, nurses, and health care professionals.

V.  Societal responsibilities: The obstetrician–gynecologist has a continuing responsibility to society as a whole and should support and participate in activities that enhance the community. As a member of society, the obstetrician–gynecologist should respect the laws of that society. As professionals and members of medical societies, physicians are required to uphold the dignity and honor of the profession.

## Code of Conduct

### I.  Patient–Physician Relationship

1.  The patient–physician relationship is the central focus of all ethical concerns, and the welfare of the patient must form the basis of all medical judgments.

2.  The obstetrician–gynecologist should serve as the patient's advocate and exercise all reasonable means to ensure that the most appropriate care is provided to the patient.

3.  The patient–physician relationship has an ethical basis and is built on confidentiality, trust, and honesty. If no patient–physician relationship exists, a physician may refuse to provide care, except in emergencies. Once the patient–physician relationship exists, the obstetrician–gynecologist must adhere to all applicable legal or contractual constraints in dissolving the patient–physician relationship.

4.  Sexual misconduct on the part of the obstetrician–gynecologist is an abuse of professional power and a violation of patient trust. Sexual contact or a romantic relationship between a physician and a current patient is always unethical.

5.  The obstetrician–gynecologist has an obligation to obtain the informed consent of each patient. In obtaining informed consent for any course of medical or surgical treatment, the obstetrician–gynecologist must present to the patient, or to the person legally responsible for the patient, pertinent medical facts and recommendations consistent with good medical practice. Such information should be presented in reasonably understandable terms and include alternative modes of treatment and the objectives, risks, benefits, possible complications, and anticipated results of such treatment.

6.  It is unethical to prescribe, provide, or seek compensation for therapies that are of no benefit to the patient.

7.  The obstetrician–gynecologist must respect the rights and privacy of patients, colleagues, and others and safeguard patient information and confidences within the limits of the law. If during the process of providing information for consent it is known that results of a particular test or other information must be given to governmental authorities or other third parties, that must be explained to the patient.

8.  The obstetrician–gynecologist must not discriminate against patients on the basis of race, color, religion, national origin, sexual orientation, perceived gender, and any basis that would constitute illegal discrimination.

## II.   Physician Conduct and Practice

1. The obstetrician–gynecologist should recognize the boundaries of his or her particular competencies and expertise and must provide only those services and use only those techniques for which he or she is qualified by education, training, and experience.

2. The obstetrician–gynecologist should participate in continuing medical education activities to maintain current scientific and professional knowledge relevant to the medical services he or she renders. The obstetrician–gynecologist should provide medical care involving new therapies or techniques only after undertaking appropriate training and study.

3. In emerging areas of medical treatment where recognized medical guidelines do not exist, the obstetrician–gynecologist should exercise careful judgment and take appropriate precautions to protect patient welfare.

4. The obstetrician–gynecologist must not publicize or represent himself or herself in any untruthful, misleading, or deceptive manner to patients, colleagues, other health care professionals, or the public.

5. The obstetrician–gynecologist who has reason to believe that he or she is infected with the human immunodeficiency virus (HIV) or other serious infectious agents that might be communicated to patients should voluntarily be tested for the protection of his or her patients. In making decisions about patient-care activities, a physician infected with such an agent should adhere to the fundamental professional obligation to avoid harm to patients.

6. The obstetrician–gynecologist should not practice medicine while impaired by alcohol, drugs, or physical or mental disability. The obstetrician–gynecologist who experiences substance abuse problems or who is physically or emotionally impaired should seek appropriate assistance to address these problems and must limit his or her practice until the impairment no longer affects the quality of patient care.

## III.  Conflicts of Interest

1. Potential conflicts of interest are inherent in the practice of medicine. Conflicts of interest should be resolved in accordance with the best interest of the patient, respecting a woman's autonomy to make health care decisions. If there is an actual or potential conflict of interest that could be reasonably construed to affect significantly the patient's care, the physician must disclose the conflict to the patient. The physician should seek consultation with colleagues or an institutional ethics committee to determine whether there is an actual or potential conflict of interest and how to address it.

2. Commercial promotions of medical products and services may generate bias unrelated to product merit, creating or appearing to create inappropriate undue influence. The obstetrician–gynecologist should be aware of this potential conflict of interest and offer medical advice that is as accurate, balanced, complete, and devoid of bias as possible.

3. The obstetrician–gynecologist should prescribe drugs, devices, and other treatments solely on the basis of medical considerations and patient needs, regardless of any direct or indirect interests in or benefit from a pharmaceutical firm or other supplier.

4. When the obstetrician–gynecologist receives anything of substantial value, including royalties, from companies in the health care industry, such as a manufacturer of pharmaceuticals and medical devices, this fact should be disclosed to patients and colleagues when material.

5. Financial and administrative constraints may create disincentives to treatment otherwise recommended by the obstetrician–gynecologist. Any pertinent constraints should be disclosed to the patient.

## IV.  Professional Relations

1. The obstetrician–gynecologist's relationships with other physicians, nurses, and health care professionals should reflect fairness, honesty, and integrity, sharing a mutual respect and concern for the patient.

4    Code *of* Professional Ethics

2. The obstetrician–gynecologist should consult, refer, or cooperate with other physicians, health care professionals, and institutions to the extent necessary to serve the best interests of their patients.

## V.    Societal Responsibilities

1. The obstetrician–gynecologist should support and participate in those health care programs, practices, and activities that contribute positively, in a meaningful and cost-effective way, to the welfare of individual patients, the health care system, or the public good.

2. The obstetrician–gynecologist should respect all laws, uphold the dignity and honor of the profession, and accept the profession's self-imposed discipline. The professional competence and conduct of obstetrician–gynecologists are best examined by professional associations, hospital peer-review committees, and state medical and licensing boards. These groups deserve the full participation and cooperation of the obstetrician–gynecologist.

3. The obstetrician–gynecologist should strive to address through the appropriate procedures the status of those physicians who demonstrate questionable competence, impairment, or unethical or illegal behavior. In addition, the obstetrician–gynecologist should cooperate with appropriate authorities to prevent the continuation of such behavior.

4. The obstetrician–gynecologist must not knowingly offer testimony that is false. The obstetrician–gynecologist must testify only on matters about which he or she has knowledge and experience. The obstetrician–gynecologist must not knowingly misrepresent his or her credentials.

5. The obstetrician–gynecologist testifying as an expert witness must have knowledge and experience about the range of the standard of care and the available scientific evidence for the condition in question during the relevant time and must respond accurately to questions about the range of the standard of care and the available scientific evidence.

6. Before offering testimony, the obstetrician–gynecologist must thoroughly review the medical facts of the case and all available relevant information.

7. The obstetrician–gynecologist serving as an expert witness must accept neither disproportionate compensation nor compensation that is contingent upon the outcome of the litigation.

Copyright July 2011, The American College of Obstetricians and Gynecologists, 409 12th Street, SW, PO Box 96920, Washington, DC 20090-6920. This document provides rules for ethical conduct for obstetricians and gynecologists.

# Exhibit F



**Medical student holding a newborn**
© Roger Ball/CORBIS

World Medical Association

# Medical Ethics Manual

3rd edition 2015

orvosi etika
médicale    ética médica    медицинская этика    الأخلاقيات الطبية
ιατρική ηθική    medisinsk etikk    lékařský etika
édica    medizinische Ethik    medische e
he ethiek    medical ethics
ιατρική ηθική    Læknisfræðileg siðfræði
ethics  醫學倫理    Medyczna etyka    éthiqu
医の倫理    אתיקה רפואית
orvosi etika    Læknisfr
medisinsk etikk    Med
Medyczna etyka
medizinische Ethik
ética médica    الأخلاقيات الطبية    medizinische Et
medical ethics
lääketieteen etiikka    醫學倫理

The intimate nature of the physician-patient relationship can give rise to sexual attraction. A fundamental rule of traditional medical ethics is that such attraction must be resisted. The Oath of Hippocrates includes the following promise: "Whatever houses I may visit, I will come for the benefit of the sick, remaining free of all intentional injustice, of all mischief and in particular of sexual relations with both female and male persons…." In recent years many medical association have restated this prohibition of sexual relations between physicians and their patients. The reasons for this are as valid today as they were in Hippocrates' time, 2500 years ago. Patients are vulnerable and put their trust in physicians to treat them well. They may feel unable to resist sexual advances of physicians for fear that their treatment will be jeopardized. Moreover, the clinical judgment of a physician can be adversely affected by emotional involvement with a patient.

This latter reason applies as well to physicians treating their family members, which is strongly discouraged in many medical codes of ethics. However, as with some other statements in codes of ethics, its application can vary according to circumstances. For example, solo practitioners working in remote areas may have to provide medical care for their family members, especially in emergency situations.

### COMMUNICATION AND CONSENT

Informed consent is one of the central concepts of present-day medical ethics. The right of patients to make decisions about their healthcare has been enshrined in legal and ethical statements throughout the world. The WMA **Declaration on the Rights of the Patient** states:

> The patient has the right to self-determination, to make free decisions regarding himself/herself. The physician will inform the patient of the consequences of his/her decisions. A mentally competent adult patient has the right to give or withhold consent to any diagnostic procedure or therapy. The patient has the right to the information necessary to make his/her decisions. The patient should understand clearly what is the purpose of any test or treatment, what the results would imply, and what would be the implications of withholding consent.

A necessary condition for informed consent is good communication between physician and patient. When medical paternalism was normal, communication was relatively simple; it consisted of the physician's orders to the patient to comply with such and such a treatment. Nowadays communication requires much more of physicians. They must provide patients with all the information the patients need to make their decisions. This involves explaining complex medical diagnoses, prognoses and treatment regimes in simple language, ensuring that patients understand the treatment options, including the advantages and disadvantages of each, answering any questions they may have, and understanding whatever decision the patient has reached and, if possible, the reasons for it. Good communication skills do not come naturally to most people; they must be developed and maintained with conscious effort and periodic review.

Two major obstacles to good physician-patient communication are differences of language and culture. If the physician and the patient do not speak the same language, an interpreter will be required. Unfortunately, in many settings there are no qualified interpreters and the physician must seek out the best available person for the task. Culture, which includes but is much broader than language, raises additional communication issues. Because of different cultural understandings of the nature and causes of illness, patients may not understand the diagnosis and treatment options provided by their physician. In such circumstances physicians should make

Medical Ethics Manual – Physicians and Patients

every reasonable effort to probe their patients' understanding of health and healing and communicate their recommendations to the patients as best they can.

If the physician has successfully communicated to the patient all the information the patient needs and wants to know about his or her diagnosis, prognosis and treatment options, the patient will then be in a position to make an informed decision about how to proceed. Although the term 'consent' implies acceptance of treatment, the concept of informed consent applies equally to refusal of treatment or to choice among alternative treatments. Competent patients have the right to refuse treatment, even when the refusal will result in disability or death.

> **"Competent patients have the right to refuse treatment, even when the refusal will result in disability or death."**

Evidence of consent can be explicit or implicit (implied). Explicit consent is given orally or in writing. Consent is implied when the patient indicates a willingness to undergo a certain procedure or treatment by his or her behaviour. For example, consent for venipuncture is implied by the action of presenting one's arm. For treatments that entail risk or involve more than mild discomfort, it is preferable to obtain explicit rather than implied consent.

There are two exceptions to the requirement for informed consent by competent patients:

- Situations where patients voluntarily give over their decision-making authority to the physician or to a third party. Because of the complexity of the matter or because the patient has complete confidence in the physician's judgement, the patient may tell the physician, "Do what you think is best." Physicians should not be eager to act on such requests but should provide patients with basic information about the treatment options and encourage them to make their own decisions. However, if after such encouragement the patient still wants the physician to decide, the physician should do so according to the best interests of the patient.

- Instances where the disclosure of information would cause harm to the patient. The traditional concept of 'therapeutic privilege' is invoked in such cases; it allows physicians to withhold medical information if disclosure would be likely to result in serious physical, psychological or emotional harm to the patient, for example, if the patient would be likely to commit suicide if the diagnosis indicates a terminal illness. This privilege is open to great abuse, and physicians should make use of it only in extreme circumstances. They should start with the expectation that all patients are able to cope with the facts and reserve nondisclosure for cases in which they are convinced that more harm will result from telling the truth than from not telling it.

In some cultures, it is widely held that the physician's obligation to provide information to the patient does not apply when the diagnosis is a terminal illness. It is felt that such information would cause the patient to despair and would make the remaining days of life much more miserable than if there were hope of recovery. Throughout the world it is not uncommon for family members of patients to plead with physicians not to tell the patients that they are dying. Physicians do have to be sensitive to cultural as well as personal factors when communicating bad news, especially of impending death. Nevertheless, the patient's right to informed consent is becoming more and more widely accepted, and the physician has a primary duty to help patients exercise this right.

In keeping with the growing trend towards considering healthcare as a consumer product and patients as consumers, patients and

their families not infrequently demand access to medical services that, in the considered opinion of physicians, are not appropriate. Examples of such services range from antibiotics for viral conditions to intensive care for brain-dead patients to promising but unproven drugs or surgical procedures. Some patients claim a 'right' to any medical service that they feel can benefit them, and often physicians are only too willing to oblige, even when they are convinced that the service can offer no medical benefit for the patient's condition. This problem is especially serious in situations where resources are limited and providing 'futile' or 'nonbeneficial' treatments to some patients means that other patients are left untreated.

**Futile** and **nonbeneficial** can be understood as follows. In some situations a physician can determine that a treatment is 'medically' futile or nonbeneficial because it offers no reasonable hope of recovery or improvement or because the patient is permanently unable to experience any benefit. In other cases the utility and benefit of a treatment can only be determined with reference to the patient's subjective judgement about his or her overall well-being.

As a general rule a patient should be involved in determining futility in his or her case. In exceptional circumstances such discussions may not be in the patient's best interests. The physician has no obligation to offer a patient futile or nonbeneficial treatment.

> **"The physician has no obligation to offer a patient futile or nonbeneficial treatment."**

medical ethics

The principle of informed consent incorporates the patient's right to choose from among the options presented by the physician. To what extent patients and their families have a right to services not recommended by physicians is becoming a major topic of controversy in ethics, law and public policy. Until this matter is decided by governments, medical insurance providers and/or professional organisations, individual physicians will have to decide for themselves whether they should accede to requests for inappropriate treatments. They should refuse such

> **Do patients have a right to services not recommended by physicians?**

Læknisfræðileg siðfræði

requests if they are convinced that the treatment would produce more harm than benefit. They should also feel free to refuse if the treatment is unlikely to be beneficial, even if it is not harmful, although the possibility of a placebo effect should not be discounted. If limited resources are an issue, they should bring this to the attention of whoever is responsible for allocating resources.

## DECISION-MAKING FOR INCOMPETENT PATIENTS

Many patients are not competent to make decisions for themselves. Examples include young children, individuals affected by certain psychiatric or neurological conditions, and those who are temporarily unconscious or comatose. These patients require substitute decision-makers, either the physician or another person. Ethical issues arise in the determination of the appropriate substitute decision-maker and in the choice of criteria for decisions on behalf of incompetent patients.

When medical paternalism prevailed, the physician was considered to be the appropriate decision-maker for incompetent patients. Physicians might consult with family members about treatment options, but the final decisions were theirs to make. Physicians have been gradually losing this authority in many countries as patients are given the opportunity to name their own substitute decision-makers to act for them when they become incompetent. In addition,

# Exhibit G

**9968** Federal Register / Vol. 76, No. 36 / Wednesday, February 23, 2011 / Rules and Regulations

## PART 71—DESIGNATION OF CLASS A, B, C, D, AND CLASS E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

■ 1. The authority citation for part 71 continues to read as follows:

Authority: 49 U.S.C. 106(g); 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

### § 71.1 [Amended]

■ 2. The incorporation by reference in 14 CFR 71.1 of Federal Aviation Administration Order 7400.9U, Airspace Designations and Reporting Points, signed August 18, 2010, effective September 15, 2010, is amended as follows:

*Paragraph 6004 Class E Airspace Areas Designated as an Extension to a Class D Surface Area*

\* \* \* \* \*

### ANE CT E4 Oxford, CT [REMOVED]

\* \* \* \* \*

*Paragraph 6005 Class E Airspace Areas Extending Upward from 700 Feet or More Above the Surface of the Earth.*

\* \* \* \* \*

### ANE CT E5 Oxford, CT [AMENDED]

Waterbury-Oxford Airport, CT
(Lat. 41°28′43″ N., long. 73°08′07″ W.)
That airspace extending upward from 700 feet above the surface within an 8-mile radius of the Waterbury-Oxford Airport.

Issued in College Park, Georgia, on February 11, 2011.

**Mark D. Ward,**
*Manager, Operations Support Group, Eastern Service Center, Air Traffic Organization.*

[FR Doc. 2011–3943 Filed 2–22–11; 8:45 am]

**BILLING CODE 4910–13–P**

## DEPARTMENT OF HOMELAND SECURITY

### Coast Guard

### 33 CFR Part 117

[Docket No. USCG–2011–0084]

### Drawbridge Operation Regulation; Chickasaw Creek, AL

**AGENCY:** Coast Guard, DHS.
**ACTION:** Notice of temporary deviation from regulations.

**SUMMARY:** The Commander, Eighth Coast Guard District, issued a temporary deviation from the regulation governing the operation of the CSX Railroad Swing Span Bridge across Chickasaw Creek, mile 0.0, in Mobile, Alabama. The deviation is necessary to replace railroad ties on the bridge. This

deviation allows the bridge to remain closed for eight hours on March 8, 2011.
**DATES:** This deviation is effective from 7 a.m. until 3 p.m. on Tuesday, March 8, 2011.
**ADDRESSES:** Documents mentioned in this preamble as being available in the docket are part of docket USCG–2011–0084 and are available online by going to *http://www.regulations.gov,* inserting USCG–2011–0084 in the "Keyword" box and then clicking "Search." They are also available for inspection or copying at the Docket Management Facility (M–30), U.S. Department of Transportation, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE., Washington, DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this rule, call or e-mail David Frank, Bridge Administration Branch; telephone 504–671–2128, e-mail David.m.frank@uscg.mil. If you have questions on viewing the docket, call Renee V. Wright, Program Manager, Docket Operations, telephone 202–366–9826.

**SUPPLEMENTARY INFORMATION:** CSX Transportation requested a temporary deviation from the operating schedule for the Swing Span Bridge across Chickasaw Creek, mile 0.0, in Mobile, Alabama. The bridge has a vertical clearance of 6 feet above mean high water in the closed-to-navigation position and unlimited in the open-to-navigation position.

In accordance with 33 CFR 117.5, the bridge currently opens on signal for the passage of vessels. This deviation allows the bridge to remain closed to navigation from 7 a.m. until 3 p.m. on Tuesday, March 8, 2011. At all other times, the bridge will open on signal for the passage of vessels.

The closure is necessary in order to change out railroad lift rails on the bridge. This maintenance is essential for the continued operation of the bridge. Notices will be published in the Eighth Coast Guard District Local Notice to Mariners and will be broadcast via the Coast Guard Broadcast Notice to Mariners System.

Navigation on the waterway consists mainly of tugs with tows and ships. Coordination between the Coast Guard and the waterway users determined that there should not be any significant effects on these vessels. There are no alternate routes available to vessel traffic. The bridge will not be able to open for emergencies.

In accordance with 33 CFR 117.35(e), the drawbridge must return to its regular

operating schedule immediately at the end of the designated time period. This deviation from the operating regulations is authorized under 33 CFR 117.35.

Dated: February 9, 2011.

**David M. Frank,**
*Bridge Administrator.*

[FR Doc. 2011–3955 Filed 2–22–11; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### 45 CFR Part 88

RIN 0991–AB76

### Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws

**AGENCY:** Office of the Secretary, HHS.
**ACTION:** Final rule.

**SUMMARY:** The Department of Health and Human Services issues this final rule which provides that enforcement of the federal statutory health care provider conscience protections will be handled by the Department's Office for Civil Rights, in conjunction with the Department's funding components. This Final Rule rescinds, in part, and revises, the December 19, 2008 Final Rule entitled "Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law" (the "2008 Final Rule"). Neither the 2008 final rule, nor this final rule, alters the statutory protections for individuals and health care entities under the federal health care provider conscience protection statutes, including the Church Amendments, Section 245 of the Public Health Service Act, and the Weldon Amendment. These federal statutory health care provider conscience protections remain in effect.

**DATES:** This rule is effective March 25, 2011.

**FOR FURTHER INFORMATION CONTACT:** Georgina Verdugo, Director, Office for Civil Rights, Department of Health and Human Services, 202–619–0403, Room F515, Hubert E. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Introduction
II. Background
III. Proposed Rule
IV. Comments on the Proposed Rule
  A. Scope of Comments
  B. Comments Addressing Awareness and Enforcement

C. Comments Addressing the Underlying Statutes and Other Law
D. Comments Addressing Whether the 2008 Final Rule Clarified the Provider Conscience Statutes
E. Comments Addressing Access to Health Care
F. Comments Addressing Costs to Providers
V. Statutory Authority
VI. Overview and Section-by-Section Description of the Final Rule
VII. Impact Statement and Other Required Analyses
VIII. Paperwork Reduction Act Information Collection

## I. Introduction

The Department supports clear and strong conscience protections for health care providers who are opposed to performing abortions. While Federal health care provider conscience statutes have been in effect for decades, the Department has received comments suggesting that the 2008 final rule attempting to clarify the Federal health care provider conscience statutes has instead led to greater confusion. The comments received suggested that there is a need to increase outreach efforts to make sure providers and grantees are aware of these statutory protections. It is also clear that the Department needs to have a defined process for health care providers to seek enforcement of these protections.

The Department seeks to strengthen existing health care provider conscience statutes by retaining that part of the 2008 Final Rule that established an enforcement process. At the same time, this Rule rescinds those parts of the 2008 Final Rule that were unclear and potentially overbroad in scope. This partial rescission of the 2008 Final Rule does not alter or affect the federal statutory health care provider conscience protections.

Finally, the Department is beginning an initiative designed to increase the awareness of health care providers about the protections provided by the health care provider conscience statutes, and the resources available to providers who believe their rights have been violated. The Department's Office for Civil Rights will lead this initiative, and will collaborate with the funding components of the Department to determine how best to inform health care providers and grantees about health care conscience protections, and the new process for enforcing those protections.

## II. Background

### Statutory Background

The Church Amendments, Section 245 of the Public Health Service Act, and the Weldon Amendment, collectively known as the "federal health care provider conscience protection statutes," prohibit recipients of certain federal funds from discriminating against certain health care providers based on their refusal to participate in health care services they find religiously or morally objectionable. Most of these statutory protections have existed for decades. Additionally, the Patient Protection and Affordable Care Act, Public Law 111–148, 124 Stat. 119 (2010), as amended by Health Care and Education Reconciliation Act of 2010, Public Law 111–152, 124 Stat. 1029 (2010) (collectively referred to as the "Affordable Care Act") includes new health care provider conscience protections within the health insurance exchange system.

### Conscience Clauses/Church Amendments [42 U.S.C. 300a–7]

The conscience provisions contained in 42 U.S.C. 300a–7 (collectively known as the "Church Amendments") were enacted at various times during the 1970s to make clear that receipt of Federal funds did not require the recipients of such funds to perform abortions or sterilizations. The first conscience provision in the Church Amendments, 42 U.S.C. 300a–7(b), provides that the receipt by an individual or entity of any grant, contract, loan, or loan guarantee under certain statutes implemented by the Department of Health and Human Services does not authorize a court, public official, or other public authority to require:

1. The individual to perform or assist in a sterilization procedure or an abortion, if it would be contrary to the individual's religious beliefs or moral convictions;

2. The entity to make its facilities available for sterilization procedures or abortions, if the performance of sterilization procedures or abortions in the facilities is prohibited by the entity on the basis of religious beliefs or moral convictions; or

3. The entity to provide personnel for the performance or assistance in the performance of sterilization procedures or abortions, if it would be contrary to the religious beliefs or moral convictions of such personnel.

The second conscience provision in the Church Amendments, 42 U.S.C. 300a–7(c)(1), extends protections to personnel decisions and prohibits any entity that receives a grant, contract, loan, or loan guarantee under certain Department-implemented statutes from discriminating against any physician or other health care personnel in employment, promotion, termination of employment, or the extension of staff or other privileges because the individual "performed or assisted in the performance of a lawful sterilization procedure or abortion, because he refused to perform or assist in the performance of such a procedure or abortion on the grounds that his performance or assistance in the performance of the procedure or abortion would be contrary to his religious beliefs or moral convictions, or because of his religious beliefs or moral convictions respecting sterilization procedures or abortions."

The third conscience provision, contained in 42 U.S.C. 300a–7(c)(2), goes beyond abortion and sterilization and prohibits any entity that receives a grant or contract for biomedical or behavioral research under any program administered by the Department from discriminating against any physician or other health care personnel in employment, promotion, termination of employment, or extension of staff or other privileges "because he performed or assisted in the performance of any lawful health service or research activity, because he refused to perform or assist in the performance of any such service or activity on the grounds that his performance or assistance in the performance of such service or activity would be contrary to his religious beliefs or moral convictions, or because of his religious beliefs or moral convictions respecting any such service or activity."

The fourth conscience provision, 42 U.S.C. 300a–7(d), provides that "[n]o individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by [the Department] if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions."

The final conscience provision contained in the Church Amendments, 42 U.S.C. 300a–7(e), prohibits any entity that receives a grant, contract, loan, loan guarantee, or interest subsidy under certain Departmentally implemented statutes from denying admission to, or otherwise discriminating against, "any applicant (including applicants for internships and residencies) for training or study because of the applicant's reluctance, or willingness, to counsel, suggest, recommend, assist, or in any way participate in the performance of abortions or sterilizations contrary to or

consistent with the applicant's religious beliefs or moral convictions."

*Public Health Service Act Sec. 245 [42 U.S.C. 238n]*

Enacted in 1996, section 245 of the Public Health Service Act (PHS Act) prohibits the federal government and any state or local government receiving federal financial assistance from discriminating against any health care entity on the basis that the entity:

1. Refuses to undergo training in the performance of induced abortions, to require or provide such training, to perform such abortions, or to provide referrals for such training or such abortions;

2. Refuses to make arrangements for such activities; or

3. Attends (or attended) a post-graduate physician training program, or any other program of training in the health professions, that does not (or did not) perform induced abortions or require, provide, or refer for training in the performance of induced abortions, or make arrangements for the provision of such training.

For the purposes of this protection, the statute defines "financial assistance" as including, "with respect to a government program," "governmental payments provided as reimbursement for carrying out health-related activities." In addition, PHS Act sec. 245 requires that, in determining whether to grant legal status to a health care entity (including a state's determination of whether to issue a license or certificate), the federal government and any state or local government receiving federal financial assistance shall deem accredited any postgraduate physician training program that would be accredited, but for the reliance on an accrediting standard that, regardless of whether such standard provides exceptions or exemptions, requires an entity:

1. To perform induced abortions; or

2. To require, provide, or refer for training in the performance of induced abortions, or make arrangements for such training.

*Weldon Amendment*

The Weldon Amendment, originally adopted as section 508(d) of the Labor-HHS Division (Division F) of the 2005 Consolidated Appropriations Act, Public Law 108–447, 118 Stat. 2809, 3163 (Dec. 8, 2004), has been readopted (or incorporated by reference) in each subsequent HHS appropriations act. Title V of the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2006, Public Law

109–149, Sec. 508(d), 119 Stat. 2833, 2879–80 (Dec. 30, 2005); Revised Continuing Appropriations Resolution of 2007, Public Law 110–5, Sec. 2, 121 Stat. 8, 9 (Feb. 15, 2007); Consolidated Appropriations Act, 2008, Public Law 110–161, Div. G, Sec. 508(d), 121 Stat. 1844, 2209 (Dec. 26, 2007); Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Public Law 110–329, Div. A, Sec. 101, 122 Stat. 3574, 3575 (Sept. 30, 2008); Consolidated Appropriations Act, 2010, Public Law 111–117, Div. D, Sec. 508(d), 123 Stat. 3034, 3279–80 (Dec. 16, 2009). The Weldon Amendment provides that "[n]one of the funds made available in this Act [making appropriations for the Departments of Labor, Health and Human Services, and Education] may be made available to a Federal agency or program, or to a state or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." It also defines "health care entity" to include "an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan."

*Affordable Care Act*

The Affordable Care Act includes new health care provider conscience protections within the health insurance Exchanges. Section 1303(b)(4) of the Act provides that "No qualified health plan offered through an Exchange may discriminate against any individual health care provider or health care facility because of its unwillingness to provide, pay for, provide coverage of, or refer for abortions." Like the other statutory health care provider conscience protections, this provision of law does not require rulemaking to take effect, and continues to apply notwithstanding this partial rescission of the 2008 Final Rule.

A recent Executive Order affirms that under the Affordable Care Act, longstanding federal health care provider conscience laws remain intact, and new protections prohibit discrimination against health care facilities and health care providers based on their unwillingness to provide, pay for, provide coverage of, or refer for abortions. Executive Order 13535, "Ensuring Enforcement and Implementation of Abortion Restrictions

in the Patient Protection and Affordable Care Act" (March 24, 2010).

*Regulatory Background*

No regulations were required or necessary for the conscience protections contained in the Church Amendments, PHS Act, sec. 245, and the Weldon Amendment to take effect. Nevertheless, on August 26, 2008, nearly forty years after enactment of the Church Amendments, the Department issued a proposed interpretive rule entitled "Ensuring that Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law" (73 FR 50274).

In the preamble to the 2008 Final Rule, the Department concluded that regulations were necessary in order to:

1. Educate the public and health care providers on the obligations imposed, and protections afforded, by Federal law;

2. Work with state and local governments and other recipients of funds from the Department to ensure compliance with the nondiscrimination requirements embodied in the Federal health care provider conscience protection statutes;

3. When such compliance efforts prove unsuccessful, enforce these nondiscrimination laws through the various Department mechanisms, to ensure that Department funds do not support coercive or discriminatory practices, or policies in violation of federal law; and

4. Otherwise take an active role in promoting open communication within the health care industry, and between providers and patients, fostering a more inclusive, tolerant environment in the health care industry than may currently exist.

("Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law," 73 FR 78072, 78074, 45 CFR part 88 (Dec. 19, 2008)).

The 2008 Final Rule was published in the **Federal Register** on December 19, 2008. The Rule contained definitions of terms used in the federal health care provider conscience statutes, discussed their applicability, noted the prohibitions and requirements of the statutes, and created an enforcement mechanism. The 2008 Final Rule also imposed a new requirement that all recipients and subrecipients of Departmental funds had to submit written certification that they would operate in compliance with the provider conscience statutes. This new

requirement was based on a concern that there was a lack of knowledge in the health care community regarding the rights and obligations created by the federal health care provider conscience protection statutes. The Department received a number of comments expressing concern that this new certification would impose a substantial burden. The 2008 Final Rule went into effect on January 20, 2009 except that its certification requirement never took effect, as it was subject to the information collection approval process under the Paperwork Reduction Act, which was never completed.

*Pending Litigation*

In a consolidated action filed in the U.S. District Court for the District of Connecticut, eight states and several organizations challenged and sought to enjoin enforcement of the 2008 Final Rule by the Department. According to plaintiffs, in promulgating the 2008 Final Rule, HHS exceeded its statutory authority, violated the Administrative Procedure Act (APA) by failing to respond adequately to public comments, and conditioned the receipt of federal funds on compliance with vague and overly broad regulations. The Court granted a stay of all proceedings in this litigation pending the issuance of this Final Rule. *Connecticut* v. *United States,* No. 3:09–CV–054–RNC (D. Conn).

## III. Proposed Rule

On March 10, 2009, the Department proposed rescinding, in its entirety, the 2008 Final Rule entitled "Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law" (74 FR 10207). The Department sought public comment in order to determine whether or not to rescind the 2008 Final Rule in part or in its entirety. In particular, the Department sought comment addressing the following:

1. Information, including specific examples where feasible, addressing the scope and nature of the problems giving rise to the need for federal rulemaking and how the current rule would resolve those problems;

2. Information, including specific examples where feasible, supporting or refuting allegations that the 2008 Final Rule reduces access to information and health care services, particularly by low-income women;

3. Comment on whether the 2008 Final Rule provides sufficient clarity to minimize the potential for harm resulting from any ambiguity and

confusion that may exist because of the rule; and

4. Comment on whether the objectives of the 2008 Final Rule might also be accomplished through non-regulatory means, such as outreach and education.

## IV. Comments on the Proposed Rule

### A. Scope of Comments

The Department received more than 300,000 comments addressing its notice of proposed rulemaking proposing to rescind in its entirety the 2008 Final Rule. A wide range of individuals and organizations, including private citizens, health care workers, health care providers, religious organizations, patient advocacy groups, professional organizations, universities and research institutions, consumer organizations, state and local governments, and members of Congress, submitted comments regarding the notice of proposed rulemaking. The large number of comments received covered a wide variety of issues and points of view responding to the Department's request for comments on the four issues mentioned above, and the Department reviewed and analyzed all of the comments. The overwhelming majority of comments, both in support of and against rescission of the 2008 Final Rule, were form letters organized by various groups. In this section, which provides an overview of the comments received, and in the following sections, which provide a more detailed response to these comments, we respond to comments by issue, rather than by individual comment, as necessitated by the number of comments received and by the issues posed by them.

More than 97,000 individuals and entities submitted comments generally supportive of the proposal to rescind the 2008 Final Rule. Approximately one-fifth of the comments in favor of rescinding the 2008 Final Rule indicated that the 2008 Final Rule was not necessary, because existing law, including Title VII of the Civil Rights Act of 1964 and the federal health care provider conscience protection statutes, already provided protections to individuals and health care entities. An overwhelming number of these commenters expressed concern that the 2008 Final Rule unacceptably impacted patient rights and restricted access to health care and conflicted with federal law, state law, and other guidelines addressing informed consent. Additionally, commenters in support of rescinding the 2008 Final Rule contended that this new regulation imposed additional costs and administrative burdens, through the

certification requirement, on health care providers when there are already sufficient laws on the books to protect their rights.

A large number of commenters also expressed concern that the 2008 Final Rule created ambiguities regarding the rights of patients, providers, and employers. Specifically, a number of commenters noted that the 2008 Final Rule created ambiguities that could expand the provider conscience protections beyond those established in existing federal statutes. Several groups commented that during rulemaking for the 2008 Final Rule, proponents failed to provide evidence that the long-standing statutory protections were insufficiently clear or that a problem currently exists for providers.

Nearly 187,000 comments expressed opposition to the Department's proposal to rescind the 2008 Final Rule. Nearly 112,000 of these comments stated that health care workers should not be required to perform procedures that violate their religious or moral convictions. Nearly 82,000 of the comments in opposition expressed concern that without the 2008 Final Rule, health care providers would be forced to perform abortions in violation of their religious or moral convictions. Many of these commenters also speculated that eliminating provider conscience protections would cause health care providers to leave the profession, which would reduce access to health care services.

Additionally, thousands of commenters suggested that rescinding the 2008 Final Rule would violate the First Amendment religious freedom rights of providers or the tenets of the Hippocratic Oath, and would impact the ethical integrity of the medical profession. While the Department carefully considered these comments, we do not specifically address them because this partial rescission does not alter or affect the existing federal statutory health care provider conscience protections.

Finally, numerous commenters opposing rescission of the 2008 Final Rule expressed concern that if the 2008 Final Rule was rescinded in its entirety, there would be no regulatory enforcement scheme to protect the rights afforded to health care providers, including medical students, under the federal health care provider conscience protection statutes.

*B. Comments Addressing Awareness and Enforcement*

Need for Enforcement Mechanism

*Comment:* The Department received numerous comments against rescission of the 2008 Final Rule expressing concern that if the 2008 Final Rule were rescinded in its entirety, there would be no regulatory enforcement scheme to protect the rights afforded to health care providers, including medical students, under the Federal health care provider conscience protection statutes.

*Response:* The Department shares the concerns expressed in these comments, and agrees there must be a clear process for enforcement of the health care provider conscience protection statutes. While the longstanding Federal health care provider conscience protection statutes have provided protections for health care providers, there was no clear mechanism for a health care provider who believed his or her rights were violated to seek enforcement of those rights. To address these comments, this final rule retains the provision in the 2008 Final Rule that designates the Office for Civil Rights (OCR) of the Department of Health and Human Services to receive complaints of discrimination and coercion based on the Federal health care provider conscience protection statutes.

OCR will lead an initiative across the Department that will include staff from the Departmental programs that fund grants, in order to develop a coordinated investigative and enforcement process. OCR is revising its complaint forms to make it easier for health care providers to understand how to utilize the complaint process, and will coordinate the handling of complaints with the staff of the Departmental programs from which the entity, with respect to whom a complaint has been filed, receives funding (*i.e.,* Department funding component).

Enforcement of the statutory conscience protections will be conducted by staff of the Department funding component, in conjunction with the Office for Civil Rights, through normal program compliance mechanisms. If the Department becomes aware that a state or local government or an entity may have undertaken activities that may violate the statutory conscience protections, the Department will work with such government or entity to assist such government or entity to comply or come into compliance with such requirements or prohibitions. If, despite the Department's assistance, compliance is not achieved, the Department will consider all legal options, including

termination of funding, return of funds paid out in violation of health care provider conscience protection provisions under 45 CFR parts 74, 92, and 96, as applicable.

Need for Education and Outreach

*Comment:* The Department's notice of proposed rulemaking for this final rule requested comment on the need for an education and outreach program in addition to the promulgation of a regulatory enforcement scheme. 74 FR 10207, 10210. The Department received many comments expressing concern about the lack of knowledge about the federal health care provider conscience protection statutes in the health care industry. Many commenters opposed to rescission related anecdotes of hospitals and other health care entities failing to respect the conscience rights of health care providers. The commenters opined that if the 2008 Final Rule was rescinded in its entirety, health care entities receiving federal funding would not honor the rights provided health care providers under the Federal health care provider conscience protection statutes.

*Response:* The Department is concerned about the number of comments it received that were opposed to rescission of the 2008 Final Rule based on a belief that rescission of the rule would abolish the long-standing statutory provider conscience protections as these comments reflect a lack of understanding that the statutory protections are in effect irrespective of Department regulations or the 2008 final rule. The Department believes it is important to provide outreach to the health care community about the Federal health care provider conscience protection statutes. To address this need, the Department's Office for Civil Rights will work with the funding components of the Department to determine how best to raise grantee and provider awareness of these longstanding statutory protections, and the newly created enforcement process.

The Department's Office for Civil Rights currently engages in outreach and education efforts and works closely with health care entities to educate them about all of the Federal authorities that the Office for Civil Rights enforces. The Office for Civil Rights will include information on the Federal health care provider conscience protection statutes in such outreach, and will also include information so that health care entities understand the new process for enforcement of the Federal health care provider conscience protection statutes. The Office for Civil Rights provides a Web portal for the receipt of complaints

on its Web site. *See* Office for Civil Rights, U.S. Department of Health and Human Services, *How to File a Complaint* (2010) (*http://www.hhs.gov/ ocr/civilrights/complaints/index.html*). Combining the above education and outreach programs with the enforcement provision in this final rule should ensure that providers can take advantage of these protections.

The Department is also amending its grant documents to make clear that recipients are required to comply with the federal health care provider conscience protection laws.

*C. Comments Addressing the Underlying Statutes and Other Laws*

Status of Underlying Statutory Conscience Protections

*Comment:* The Department received a large number of comments, both in favor of and in opposition to rescinding the 2008 Final Rule, which expressed concern regarding the effect of the 2008 Final Rule on protections for providers. Many commenters advocated leaving the final rule in place, stating that rescinding the 2008 Final Rule would eliminate the protections for providers established under the Federal health care provider conscience protection statutes. On the other hand, many commenters advocated rescission of the 2008 Final Rule based on the mistaken belief that its rescission would eliminate the ability of certain providers to refuse to provide requested medical services that were contrary to their moral or religious beliefs.

*Response:* These comments underscore the misconceptions that exist regarding the proposed partial rescission of the 2008 Final Rule, and highlight the need for continued education and training of health care providers regarding the longstanding statutory protections. The Federal health care provider conscience protection statutes, including the Church Amendments, the Section 245 of the PHS Act, and the Weldon Amendment, have long provided statutory protections for providers. Neither the 2008 Final Rule, nor this Final Rule, which rescinds, in part, and revises the 2008 Final Rule, alters the statutory protections for individuals and health care entities under the Federal health care provider conscience protection statutes. Departmental funding recipients must continue to comply with the Federal health care provider conscience protection statutes.

Interaction Between Provider Conscience Statutes and Other Federal Statutes

*Comment:* Several other comments raised questions and identified ambiguities with respect to the interaction between the 2008 Final Rule and statutes governing other Department programs, including: the Medicaid program, pursuant to Title XIX of the Social Security Act, 42 U.S.C. 1396–1396v (2006); the Community Health Centers program, pursuant to section 330 of the PHS Act, 42 U.S.C. 264(b)(2008); the Title X Family Planning program, pursuant to Title X of the Public Health Service Act, 42 U.S.C. 300–300a–6 (2006); and the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. 1395dd (2003), as well as the federal civil rights statutes enforced by the Department in its programmatic settings, which include Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d (1964); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794 (2002); Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. 12131–12134 (1990); and the Age Discrimination Act of 1975, 42 U.S.C. 6101–6107 (1998). Specifically, commenters expressed concern that the 2008 Final Rule conflicts with the requirements of these other Federal statutes.

*Response:* Health care entities must continue to comply with the long-established requirements of the statutes above governing Departmental programs. These statutes strike a careful balance between the rights of patients to access needed health care, and the conscience rights of health care providers. The conscience laws and the other federal statues have operated side by side often for many decades. As repeals by implication are disfavored and laws are meant to be read in harmony, the Department fully intends to continue to enforce all the laws it has been charged with administering. The Department is partially rescinding the 2008 final rule in an attempt to address ambiguities that may have been caused in this area. The approach of a case by case investigation and, if necessary, enforcement will best enable the Department to deal with any perceived conflicts within concrete situations.

Interaction With Title VII of the Civil Rights Act of 1964

*Comment:* Several comments raise questions about the overlap between the federal health care provider conscience protection statutes and the protections afforded under Title VII of the Civil Rights Act of 1964, as amended (Title VII), 42 U.S.C. 2000e *et seq.*.

*Response:* The relationship between the protections contained under the federal health care provider conscience protection statutes and the protections afforded under Title VII fall outside the scope of this final rule. Under the final rule, the Department's Office for Civil Rights (OCR) will continue to receive complaints alleging violations of the federal health care provider conscience protection statutes. The Equal Employment Opportunity Commission (EEOC) enforces Title VII, which prohibits employers—including health care providers—from discriminating against any applicant or employee in hiring, discipline, promotion, termination, or other terms and conditions of employment based on religious beliefs.

Guidance for handling complaints involving Title VII issues can be found in *Procedures for Complaints of Employment Discrimination Filed Against Recipients of Federal Financial Assistance,* 29 CFR part 1691 (Aug. 4, 1989). The Procedures provide for coordination between the EEOC and other Federal departments for review, investigation, and resolution of employment discrimination complaints, including those based on religion.

Informed Consent

*Comment:* Many comments expressed concern that the 2008 Final Rule would prevent a patient from being able to give informed consent, because the health care provider might not advise the patient of all health care options.

*Response:* The doctrine of informed consent requires that a health care provider inform an individual patient of the risks and benefits of any health care treatment or procedure. In order to give informed consent, the patient must be able to understand and weigh the treatment or procedure's risks and benefits, and must understand available alternatives. Additionally, a patient must communicate his or her informed consent to the provider, which is most commonly done through a written document. State laws generally treat lack of informed consent as a matter of negligence on the part of the health care provider failing to disclose necessary information to the patient. Provider association and accreditation association guidelines set forth additional requirements on members and member entities.

We recognize that informed consent is crucial to the provision of quality health care services. The provider-patient relationship is best served by open communication of conscience issues surrounding the provision of health care services. The Department emphasizes the importance of and strongly encourages early, open, and respectful communication between providers and patients surrounding sensitive issues of health care, including the exercise of provider conscience rights, and alternatives that are not being recommended as a result.

Partial rescission of the 2008 Final Rule should clarify any mistaken belief that it altered the scope of information that must be provided to a patient by their provider in order to fulfill informed consent requirements.

*D. Comments Addressing Whether the 2008 Final Rule Clarified the Provider Conscience Statutes*

*Comment:* The Department sought information regarding whether the 2008 Final Rule provided the clarity that it intended to provide. The comments received in response to this question tended to focus on whether or not the definitions contained in the 2008 Final Rule were too broad. Commenters supporting rescission of the 2008 Final Rule indicated that the definitions were far broader than the scope of the federal provider conscience statutes. Commenters opposing rescission of the 2008 Final Rule did not believe the definitions were too broad. Many comments indicated that the 2008 Final Rule created confusion that the federal provider conscience protections authorized refusal to treat certain kinds of patients rather than to perform certain medical procedures. Numerous comments on both sides questioned whether the 2008 Final Rule expanded the scope of the provider conscience statutes by suggesting that the term "abortion" included contraception.

*Response:* The comments reflected a range of views regarding whether the 2008 Final Rule added clarity to the federal health care conscience statutes. The comments received illustrated that there is significant division over whether the definitions provided by the 2008 Final Rule are in line with the longstanding Federal health care provider conscience protection statutes.

The Department agrees with concerns that the 2008 Final Rule may have caused confusion as to whether the Federal statutory conscience protections allow providers to refuse to treat entire groups of people based on religious or moral beliefs. The Federal provider conscience statutes were intended to protect health care providers from being forced to participate in medical procedures that violated their moral and religious beliefs. They were never intended to allow providers to refuse to

provide medical care to an individual because the individual engaged in behavior the health care provider found objectionable.

The 2008 Final Rule did not provide that the term "abortion," as contained in the Federal health care provider conscience protection statutes, includes contraception. However, the comments reflect that the 2008 Final Rule caused significant confusion as to whether abortion also includes contraception. The provision of contraceptive services has never been defined as abortion in federal statute. There is no indication that the federal health care provider conscience statutes intended that the term "abortion" included contraception.

The Department rescinds the definitions contained in the 2008 Final Rule because of concerns that they may have caused confusion regarding the scope of the federal health care provider conscience protection statutes. The Department is not formulating new definitions because it believes that individual investigations will provide the best means of answering questions about the application of the statutes in particular circumstances.

*E. Comments Addressing Access to Health Care*

Concerns the 2008 Final Rule Would Limit Access

*Comment:* The Department received several comments suggesting that the 2008 Final Rule could limit access to reproductive health services and information, including contraception, and could impact a wide range of medical services, including care for sexual assault victims, provision of HIV/AIDS treatment, and emergency services. Additionally, a number of commenters expressed concern that the 2008 Final Rule could disproportionately affect access to health care by certain sub-populations, including low-income patients, minorities, the uninsured, patients in rural areas, Medicaid beneficiaries, or other medically-underserved populations.

*Response:* The Department agrees with comments that the 2008 Final Rule may negatively affect the ability of patients to access care if interpreted broadly. As noted above, in the litigation filed shortly after issuance of the 2008 Final Rule, eight states sought to enjoin implementation of the Rule, arguing that it would prevent them from enforcing their state laws concerning access to contraception. *Connecticut* v. *United* States, No. 3:09–CV–054–RNC (D. Conn). Additionally, while there are no Federal laws compelling hospitals to

provide contraceptive services, the Medicaid Program does require that States provide contraceptive services to Medicaid beneficiaries. The Department is concerned that the breadth of the 2008 Final Rule may undermine the ability of patients to access these services, especially in areas where there are few health care providers for the patient to choose from. As we state above, entities must continue to comply with their Title X, Section 330, EMTALA, and Medicaid obligations, as well as the federal health care provider conscience protection statutes. Accordingly, the Department partially rescinds the 2008 Final Rule based on concerns expressed that it had the potential to negatively impact patient access to contraception and certain other medical services without a basis in federal conscience protection statutes.

Concerns That Rescission of the 2008 Final Rule Would Limit Access

*Comment:* A substantial number of comments in opposition to rescinding the 2008 Final Rule maintained that Roman Catholic hospitals would have to close, that rescission of the rule would limit access to pro-life counseling, and that providers would either leave the health care industry or choose not to enter it, because they believed that they would be forced to perform abortions. As such, these commenters concluded that rescinding the 2008 Final Rule would limit access to health care services or information.

*Response:* Under this partial rescission of the 2008 Final Rule, Roman Catholic hospitals will still have the same statutory protections afforded to them as have been for decades. The Department supports the longstanding Federal health care provider conscience laws, and with this Final Rule provides a clear process to enforce those laws. As discussed above, the Federal health care provider conscience statutes have provided protections for decades, and will continue to protect health care providers after partial rescission of the 2008 Final Rule. Entities must continue to comply with the Federal health care provider conscience protection statutes. Moreover, under this Final Rule, health care providers who believe their rights were violated will now be able to file a complaint with the Department's Office for Civil Rights in order to seek enforcement of those rights.

*F. Comments Addressing Costs to Providers*

*Comment:* The Department received several comments addressing the costs to providers of the 2008 Final Rule.

Commenters stated that the new certification requirement imposed substantial additional responsibilities on health care entities, and that the burden analysis did not sufficiently account for the cost of collecting information for, submitting, and maintaining the written certifications required by the 2008 Final Rule. Additionally, the Department received several comments outlining various estimates regarding the burdens, including time and cost, on health care entities to comply with certification requirements of the 2008 Final Rule.

*Response:* The Federal health care provider conscience protection statutes mandating requirements for protecting health care providers have been in effect for decades. The stated reason for enacting the certification requirement was a concern that there is a lack of knowledge on the part of states, local governments, and the health care industry of the federal health care provider conscience protections. The Department believes it can raise awareness of these protections by amending existing grant documents to specifically require that grantees acknowledge they must comply with the laws.

The Department estimated that 571,947 health care entities would be required to comply with the certification requirements. The Department also stated in the preamble to the 2008 Final Rule that it estimated the total quantifiable costs of the regulation, including direct and indirect costs, as $43.6 million each year. See 73 FR 98095, Dec. 18, 2009.

The Department agrees with these commenters, and believes that the certification requirements in the 2008 Final Rule are unnecessary to ensure compliance with the federal health care provider conscience protection statutes, and that the certification requirements created unnecessary additional financial and administrative burdens on health care entities. The Department believes that amending existing grant documents to require grantees to acknowledge that they will comply with the provider conscience laws will accomplish the same result with far less administrative burden. While proposed, the certification requirements were never finalized under the previous rule, and they are deleted in this rule. The Department emphasizes, however, that health care entities remain responsible for costs associated with complying with the Federal health care provider conscience protection statutes, in the same way that health care entities were before the promulgation of the 2008 Final Rule. Additionally, health care

providers can now seek enforcement of their conscience protections through the Department's Office for Civil Rights.

## V. Statutory Authority

The Secretary hereby rescinds, in part, redesignates, and revises the 2008 Final Rule entitled "Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law," in accordance with the following statutory authority. As discussed above, the federal health care provider conscience protection statutes, including the Church Amendments, the PHS Act Sec. 245, and the Weldon Amendment, require, among other things, that the Department and recipients of Department funds (including state and local governments) refrain from discriminating against institutional and individual health care entities for their participation in certain medical procedures or services, including certain health services, or research activities funded in whole or in part by the Federal government. However, none of these statutory provisions require promulgation of regulations for their interpretation or implementation. The provision of the 2008 Final Rule establishing that the Office for Civil Rights is authorized to receive and investigate complaints regarding violations of the federal health care provider conscience statutes is being retained. This Final Rule is being issued pursuant to the authority of 5 U.S.C. 301, which empowers the head of an Executive department to prescribe regulations "for the government of his department, the conduct of his employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property."

## VI. Overview and Section-by-Section Description of the Final Rule

Section 88.1 describes the purpose of the Final Rule. The language is revised slightly from the 2008 Final Rule, and states that the purpose of Part 88 is to provide for the enforcement of the Church Amendments, 42 U.S.C. 300a–7, section 245 of the Public Health Service Act, 42 U.S.C. 238n, and the Weldon Amendment, Consolidated Appropriations Act, 2010, Public Law 111–117, Div. D, Sec. 508(d), 123 Stat. 3034, 3279–80, referred to collectively as the "federal health care conscience protection statutes."

Sections 88.2 through 88.5 of the 2008 Final Rule have been removed. Section 88.2 contains definitions of terms used in the Federal health care provider

conscience statutes. Section 88.3 describes the applicability of the 2008 Final Rule. Section 88.4 describes the requirements and prohibitions under the 2008 Final Rule. Section 88.5 contains the certification requirement. The preamble to the August 26, 2008 Notice of Proposed Rulemaking (73 FR 50274) and the preamble to the December 19, 2008 Final Rule (73 FR 78072) addressing these sections are neither the position of the Department, nor guidance that should be relied upon for purposes of interpreting the Federal health care provider conscience protection statutes.

Section 88.6 has been re-designated as Section 88.2. Section 88.2 provides that the Department's Office for Civil Rights (OCR) is designated to receive complaints of discrimination and coercion based on the health care provider conscience protection statutes, and that OCR will coordinate the handling of complaints with the HHS Departmental funding component(s) from which the entity complained about receives funding. This language is revised slightly from the 2008 Final Rule to clarify that "Department funding component" is not a defined term.

## VII. Impact Statement and Other Required Analyses

We have examined the impacts of this final rule as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993, as further amended), the Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*), section 202 of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1532), Executive Order 13132 on Federalism (August 4, 1999), and the Congressional Review Act (5 U.S.C. 804(2)). Executive Order 12866 directs agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). A regulatory impact analysis (RIA) must be prepared for major rules with economically significant effects ($100 million or more in any one year). The 2008 Final Rule estimated the quantifiable costs associated with the certification requirements of the proposed regulation to be $43.6 million each year. Rescinding the certification requirements of the final rule would therefore result in a cost savings of $43.6 million each year to the health care industry.

The RFA requires agencies to analyze options for regulatory relief of small

businesses if a rule has a significant impact on a substantial number of small entities. With this final rule the Department is rescinding the certification requirements which will reduce the potential burden to small businesses. We have examined the implications of this proposed rule as required by Executive Order 12866. Executive Order 12866 directs agencies to assess all costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity). Executive Order 12866 classifies a rule as significant if it meets any one of a number of specified conditions, including: having an annual effect on the economy of $100 million, adversely affecting a single sector of the economy in a material way, adversely affecting competition, or adversely affecting jobs. This final rule is not economically significant under these standards.

Executive Order 13132 establishes certain requirements that an agency must meet when it promulgates a proposed rule (and subsequent final rule) that imposes substantial direct requirement costs on state and local governments, preempts State law, or otherwise has federalism implications. This final rule would not require additional steps to meet the requirements of Executive Order 13132.

Title II of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4) requires cost-benefit and other analysis before any rulemaking if the rule includes a "Federal mandate that may result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any 1 year." The current inflation-adjusted statutory threshold is approximately $130 million. We have determined that this final rule does not create an unfunded mandate under the Unfunded Mandates Reform Act, because it does not impose any new requirements resulting in expenditures by state, local, and tribal governments, or by the private sector.

Section 654 of the Treasury and General Government Appropriations Act of 1999 requires Federal departments and agencies to determine whether a proposed policy or regulation could affect family well-being. If the determination is affirmative, then the Department or agency must prepare an impact assessment to address criteria specified in the law. This final rule will not have an impact on family wellbeing,

**9976** **Federal Register** / Vol. 76, No. 36 / Wednesday, February 23, 2011 / Rules and Regulations

as defined in the Act, because it affects only regulated entities and eliminates costs that would otherwise be imposed on those entities.

## VIII. Paperwork Reduction Act Information Collection

This final rule eliminates requirements that would be imposed by the 2008 Final Rule. The 60-day comment period on the information collection requirements of the 2008 Final Rule expired on February 27, 2009, and OMB approval for the information collection requirements will not be sought.

### New Paperwork Collection Act Information for Complaints

Under the Paperwork Reduction Act of 1995, we are required to provide 60-day notice in the **Federal Register** and to solicit public comment before a collection of information requirement is submitted to the Office of Management and Budget (OMB) for review and approval. To fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 requires that we solicit comment on the following issues:

1. The need for the information collection and its usefulness in carrying out the proper functions of our agency.

2. The accuracy of our estimate of the information collection burden.

3. The quality, utility, and clarity of the information to be collected.

4. Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

Under the PRA, the time, effort, and financial resources necessary to meet the information collection requirements referenced in this section are to be considered. We explicitly seek, and will consider, public comment on our assumptions as they relate to the PRA requirements summarized in this section. To comment on this collection of information or to obtain copies of the supporting statement and any related forms for the proposed paperwork collections referenced above, e-mail your comment or request, including your address and phone number to *sherette.funncoleman@hhs.gov,* or call the Reports Clearance Office on (202) 690–6162. Written comments and recommendations for the proposed information collections must be directed to the OS Paperwork Clearance Officer at the above e-mail address within 60 days.

45 CFR part 88, § 88.2 provides that individuals or entities may file written complaints with the Department's Office for Civil Rights if they believe they have been discriminated against under the

federal health care provider conscience protection statutes by programs or entities that receive Federal financial assistance from the Department. The new information collection provisions associated with this final rule will not go into effect until approved by OMB. HHS will separately post a notice in the **Federal Register** at that time.

The table below reflects the Office for Civil Rights current complaint receipts under its other civil rights enforcement authorities. HHS does not expect the burden to increase measurably as a result of this provision.

Estimated Annualized Burden Table

Individuals may file written complaints with the Office for Civil Rights when they believe they have been discriminated against on the basis of race, color, national origin, age, disability, and, in certain circumstances, sex and religion by programs or entities that receive Federal financial assistance from the Department of Health and Human Services. The table below includes: The annual number of respondents to the Office for Civil Rights regarding all the authorities that it enforces; the frequency of submission, including recordkeeping and reporting on occasion; and the affected public, including not-for-profit entities and individuals.

| Forms (if necessary) | Type of respondent | Number of respondents | Number of responses per respondent | Average burden hours per response | Total burden hours |
|---|---|---|---|---|---|
| Civil Rights Complaint Form .............. | Individuals or Not-for-profit entities .. | 3037 | 1 | 45/60 | 2278 |
| Total ........................................... | ........................................... | 3037 | ...................... | ...................... | 2278 |

## List of Subjects in 45 CFR Part 88

Abortion, Civil rights, Colleges and universities, Employment, Government contracts, Government employees, Grant programs, Grants administration, Health care, Health insurance, Health professions, Hospitals, Insurance companies, Laboratories, Medicaid, Medical and dental schools, Medical research, Medicare, Mental health programs, Nursing homes, Public health, Religious discrimination, Religious liberties, Reporting and recordkeeping requirements, Rights of conscience, Scientists, State and local governments, Sterilization, Students.

Dated: February 17, 2011.

**Kathleen Sebelius,**
*Secretary.*

For the reasons set forth in the preamble, the Department amends 45 CFR part 88, as set forth below:

## PART 88—ENSURING THAT DEPARTMENT OF HEALTH AND HUMAN SERVICES FUNDS DO NOT SUPPORT COERCIVE OR DISCRIMINARY POLICIES OR PRACTICES IN VIOLATION OF FEDERAL LAW

■ 1. The authority citation for part 88 is revised to read as follows:

**Authority:** 5 U.S.C. 301.

■ 2. The heading of part 88 is revised to read as set forth above.

■ 3. Revise § 88.1 to read as follows:

### § 88.1 Purpose.

The purpose of this part is to provide for the enforcement of the Church Amendments, 42 U.S.C. 300a–7, section 245 of the Public Health Service Act, 42 U.S.C. 238n, and the Weldon Amendment, Consolidated Appropriations Act, 2010, Public Law

111–117, Div. D, Sec. 508(d), 123 Stat. 3034, 3279–80, referred to collectively as the "federal health care provider conscience protection statutes."

■ 4. Remove §§ 88.2 through 88.5.

■ 5. Redesignate § 88.6 as § 88.2.

■ 6. Revise newly designated § 88.2 to read as follows:

### § 88.2 Complaint handling and investigating.

The Office for Civil Rights (OCR) of the Department of Health and Human Services is designated to receive complaints based on the Federal health care provider conscience protection statutes. OCR will coordinate the handling of complaints with the Departmental funding component(s) from which the entity, to which a

complaint has been filed, receives funding.

[FR Doc. 2011–3993 Filed 2–18–11; 11:15 am]

**BILLING CODE P**

# Exhibit H

**STATE OF ILLINOIS**
**IN THE CIRCUIT COURT OF THE 17ᵀᴴ JUDICIAL CIRCUIT**
**COUNTY OF WINNEBAGO**

| | |
|---|---|
| THE PREGNANCY CARE CENTER OF ROCKFORD, )<br>Incorporated as ROCKFORD AREA PREGNANCY )<br>CARE CENTER, an Illinois not-for-profit corporation; )<br>ANTHONY CARUSO, MD; A BELLA BABY OBGYN, )<br>INC., incorporated as BEST CARE FOR WOMEN, INC., )<br>An Illinois domestic corporation; and AID FOR WOMEN, )<br>INC., an Illinois not-for-profit corporation, )<br>      )<br>    Plaintiffs, )<br>      )<br>  vs. ) No. 2016-MR-741<br>      )<br>BRUCE RAUNER, in his official capacity as Governor of )<br>Illinois; and BRYAN A. SCHNEIDER, in his official )<br>Capacity as Secretary of the Illinois Department of )<br>Financial & Professional Regulation, )<br>      )<br>    Defendant. ) | |

---

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on Plaintiff's motion for entry of a preliminary injunction to prevent Defendant from enforcing a recently enacted statute against them. The statute in question, Public Act 99-690, also known as SB 1564, makes certain amendments to the Illinois Healthcare Right of Conscience Act, 745 ILCS 70/1 *et seq.* ("Conscience Act"). Signed into law by the Governor on July 29, 2016, it has a future effective date of January 1, 2017.

While the Conscience Act allows medical care providers to decline to participate in medical procedures to which they have moral objections, the amendments to the Act created by SB 1564 require providers to provide information and referral assistance with respect to a patient's "legal treatment options" as a precondition to invoking the Act's protections. It also requires immediate development of protocols to ensure compliance.

Plaintiffs are medical care providers with moral objection to the practice of abortion who contend that requiring them to give their patients information about or assistance in connection with abortion violates their statutory and constitutional rights. The issue here is neither the merits of the State's goal of informing patients nor the propriety of Plaintiffs' moral objections; the issue is whether the State may compel Plaintiffs to speak a message to which they object. Because Plaintiffs have raised a 'fair question' as to whether SB 1564 impermissibly compels speech and violates their rights under the Illinois constitution, the Court finds that they have satisfied the requirements for the issuance of a preliminary injunction.

1

### *Standard for a Preliminary Injunction*

The requirements which must be met in order to justify the entry of a preliminary injunction are well established, and they have been summarized by the Appellate Court as follows:

> A preliminary injunction is an "extraordinary" remedy that "should be granted only in situations of extreme emergency or where serious harm would result if the preliminary injunction was not issued." The purpose of preliminary injunctive relief is not to determine controverted rights or decide the merits of the case, but to prevent a threatened wrong or continuing injury and preserve the status quo with the least injury to the parties concerned. In order to obtain preliminary injunctive relief, the plaintiff must establish: (1) a clearly ascertained right in need of protection; (2) irreparable injury in the absence of an injunction; (3) the lack of an adequate remedy at law; and (4) a likelihood of success on the merits of the case. If these elements are met, then the court must balance the hardships and consider the public interests involved. To obtain a preliminary injunction, the plaintiff must raise a "fair question" that each of the elements is satisfied.

*Makindu v. Illinois High Sch. Ass'n*, 2015 IL App (2d) 141201, ¶31 (citations omitted).

Where no answer has been filed, the well-pleaded allegations of a complaint for preliminary injunction will be taken as true. *Joseph Frazier, D.D.S., & George D. Dallas, D.D.S. v. Dettman*, 212 Ill. App. 3d 139, 148, 569 N.E.2d 1382, 1388 (2d Dist. 1991). There is also authority for the proposition that, where the defendant has not answered the complaint, the trial court may not receive or consider affidavits or other extraneous evidence when deciding whether to issue the preliminary injunction. *Russell v. Howe*, 293 Ill. App. 3d 293, 296, 688 N.E.2d 375, 378 (2d Dist. 1997); see also *Kurle v. Evangelical Hosp. Ass'n*, 89 Ill. App. 3d 45, 48, 411 N.E.2d 326, 328 (2d Dist. 1980). This issue was raised with counsel during the course of argument on the pending motion, however, and counsel for both parties agreed that the Court could consider any of the materials submitted by the parties in connection with the request for preliminary injunction.

The question of whether Plaintiffs have a right in need of protection, and the question of whether the Plaintiffs can demonstrate a likelihood of success on the merits of their claims, are separate and distinct questions. Still, it is not uncommon for these two issues to overlap. Such overlap is especially clear in this case, as the parties' briefs demonstrate that they have analyzed these two questions in almost the same way. The Court will also take them up together, as it seems clear that they rise and fall as one.

### *Analysis: Plaintiffs' RFRA Claim*

The first basis Plaintiffs claim for relief is statutory: the Illinois Religious Freedom Restoration Act, 775 ILCS 35/1 ("RFRA"). However, to understand the statutory issues, the Court finds it helpful to summarize the legislative enactments at issue in chronological order.

*Statutes at Issue*

Effective January 1, 1998, the Illinois enacted the Conscience Act. See P.A. 90-246. Finding that "people and organizations hold different beliefs about whether certain health care services are morally acceptable," the legislature provided that no health care provider "shall be civilly or criminally liable … by reason of his or her refusal to perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care service which is contrary to the conscience of such" provider. 745 ILCS 70/4 (original 1998 version). "Conscience" is defined in the Conscience Act as "a sincerely held set of moral convictions arising from belief and in relation to God, or which, though not so derived, arises from a place in the life of its possessor parallel to that filled by God among adherents to religious faiths." 745 ILCS 70/3(e).

Later in 1998, Illinois enacted RFRA. P.A. 90-806, effective December 2, 1998. The law's declared purpose is to "guarantee that a test of compelling governmental interest will be imposed on all State and local (including home rule unit) laws, ordinances, policies, procedures, practices, and governmental actions in all cases in which the free exercise of religion is substantially burdened." 775 ILCS 35/10. To achieve this purpose, RFRA provides that "Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest." 775 ILCS 35/15.

Finally, in 2016 the legislature passed Senate Bill 1564, which amended the provisions of the Conscience Act. The amendments to the statute can be summarized as follows:

- It amended Section 2 (findings and policy) to specify that the Conscience Act could be invoked as a matter of conscience in relation to "providing [or] paying for medical care which was contrary to the objector's convictions." In addition, the legislative amendment also specified that it was "also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care."

- It amended Section 3 to provide the following additional definition of "undue delay": "unreasonable delay that causes impairment of the patient's health."

- It amended Section 6 in the following manner:

  > § 6. Duty of physicians and other health care personnel. Nothing in this Act shall relieve a physician from any duty, which may exist under any laws concerning current standards, of ~~normal~~ medical practice or care ~~practices and procedures,~~ to inform his or her patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of treatment options, provided, however, that such physician shall be under no duty to perform, assist, counsel, suggest, recommend, refer or participate in any way in any form of medical practice or health care service that is contrary to his or her conscience.

3

- It added a new section to the Conscience Act which requires providers to develop protocols which must be followed for invocation of the Act's protections. These protocols must address and provide for the following:

  1. The provider must "inform a patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options in a timely manner, consistent with current standards of medical practice or care."

  2. When the provider is unable to provide care because of an objection of conscience, "then the patient shall either be provided the requested health care service by others in the facility or be notified that the health care will not be provided and be referred, transferred, or given information in accordance with paragraph (3)."

  3. When the provider objects to providing the service in question, the provider must "(i) refer the patient to, or (ii) transfer the patient to, or (iii) provide in writing information to the patient about other health care providers who they reasonably believe may offer" the service in question.

  4. If requested, the provider must provide copies of medical records to the patient or the new provider "without undue delay."

The Conscience Act, it must be remembered, is a shield designed to protect conscientious objectors from having to take actions which violate their moral beliefs. In Defendants' view, SB 1564's amendments to the Conscience Act do not require a provider seeking to invoke that shield to do *anything* that is not also required of him or her under "current standards of medical practice or care." Defendants contend, therefore, that the information, referrals, and protocols required per SB 1564 are simply not required of Plaintiffs as a condition of invoking the Conscience Act unless they are *also* already required of them (and, presumably, all such providers) as a matter of professional ethical responsibility.

Plaintiffs, for their part, dispute that certain of the practices to which they object and from which they wish to remain separate – specifically, abortion – are required under any professional standard of conduct. If the two sides' positions are taken at face value, there is no conflict here. In other words, if (a) SB 1564 does not apply unless the conduct is also required under professional standards of ethics; and (b) discussion of abortion options or referrals to abortion providers are *not* required of providers under applicable standards of professional ethics, then Plaintiffs can never be prevented from invoking the Conscience Act.

However, the very existence of this case suggests that the parties' positions should *not* be taken at face value. It is eminently clear that the parties have dramatically different ideas about whether professional standards of ethics would permit Plaintiffs to make the choices they have made to impose limits on what they will discuss with their patients or assist in referring their patients in obtaining. The Court finds that the professional ethical codes referenced by Defendants, which they concede are not definitive, do *not* establish this as a matter of

4

uncontested fact. Medical ethicists deserve our respect and the Court's attention, but matters of personal conscience are not solely within the province of the professions to decide. Lay persons are likely to fundamentally disagree about these morally challenging matters, and one suspects that the ethical conflict is not wholly resolved among practitioners in their fields.

The Court's concern is that the sharp edges of SB 1564 are obscured behind its invocation of professional ethical standards. Defendants argue that SB 1564 doesn't really change the standards of conduct already imposed on providers by professional licensing requirements, and yet they also argue that SB 1564 serves an important function of making available to patients information they would not otherwise receive. Defendants cannot have it both ways; they cannot argue that SB 1564 addresses an unmet health care need and at the same time argue that its requirements are already part of existing professional standards. Consequently, the Court undertakes its examination of this case on the premise that the question of whether professional standards of conduct require Plaintiffs to engage in the conduct to which they object is a disputed factual issue.

*Plaintiffs' Statutory Argument*

Plaintiffs' concern here is primarily focused on the newly added Section 6.1 and its requirement for the development of protocols which may limit the protections of the Conscience Act. They are concerned with the new and clearer requirement that health care providers must discuss with their patients treatment options to which they object and take action to assist the patient in transferring to a provider who will undertake those options.

Plaintiffs argue that SB 1564 "violates" RFRA.[1] Defendants take the view that the provisions of the Conscience Act are more specific than those of RFRA and the amendments at issue more recent; therefore, Defendants argue, the provisions of the Conscience Act control.

The General Assembly has an ongoing right to amend a statute, and there is no vested right in the mere continuance of a law. *Int'l Union of Operating Engineers Local 965 v. Illinois Labor Relations Bd., State Panel*, 2015 IL App (4th) 140352, ¶30. Plaintiffs do not disagree with this proposition in general terms. In other words, they do not dispute that the 2016 legislature could have specifically amended RFRA or declared it inapplicable to the requirements of the newly enacted SB 1564. They correctly note, however, that SB 1564 does not explicitly state that it is overruling application of RFRA or amending that statute. Because of this, Plaintiffs argue, the Court must pay particular attention to the superseding clause contained in the 1998 RFRA:

> This Act applies to all State and local (including home rule unit) laws, ordinances, policies, procedures, practices, and governmental actions and their

---

[1] The idea that a later statute can "violate" the provisions of an earlier statute, or that the provisions of an earlier statute can override the provisions of a later one, presents a fundamental question about the nature of legislative power in our constitutional system. In researching the pending motion, the Court explored this rather arcane question of "entrenchment," but the end result of the inquiry is that the Court should resolve the issue under more traditional notions of statutory construction. In the interest of "showing its work," the Court sets forth in the appendix to this decision its analysis of how the concept of "entrenchment" plays out in this context.

implementation, whether statutory or otherwise and whether adopted before or after the effective date of this Act.

775 ILCS 35/25.  Plaintiffs are correct that this superseding clause explicitly purports to apply RFRA's provisions to "State … statutory" enactments adopted "after the effective date" of the 1998 RFRA.  Plaintiffs argue, therefore, that the 2016 legislature's freedom to enact the provisions of SB 1564 was constrained or limited by virtue of the action taken by a predecessor legislature in 1998.

Defendants offer a simple solution:  the RFRA's superseding clause is, in effect, trumped by the superseding clause contained in the Conscience Act.  The latter provides as follows:

> This Act shall supersede all other Acts or parts of Acts to the extent that any Acts or parts of Acts are inconsistent with the terms or operation of this Act.

745 ILCS 70/14.  Defendants argue that the Court should honor the Conscience Act's superseding clause because that statute is more specific than RFRA.  There seems to be little doubt as to the correctness of the latter proposition.  See *Morr-Fitz, Inc. v. Quinn*, 2012 IL App (4th) 110398, ¶54 ("The Conscience Act is more specific than the Religious Freedom Act because the Conscience Act deals specifically with the issue of health care, while the Religious Freedom Act would apply to any governmental action that 'substantially burden[s] a person's exercise of religion.'")

Plaintiffs' argument in response is a temporal one.  They argue that the superseding clause in RFRA was adopted at the end of 1998, whereas the superseding clause in the Conscience Act was adopted at the beginning of 1998.  Because RFRA's superseding clause came later, Plaintiffs argue, it should be honored.  This argument is wholly unpersuasive.  The legislation at issue is SB 1564, which was added to the Conscience Act only a few months ago.  True, SB 1564 does not contain its own superseding clause, but it was being added to a statute which *already had* a superseding clause and which SB 1564 did not disturb.[2]  The Court is inclined to agree with Defendants that the Conscience Act's superseding clause at least counters, if not overrides, the one in RFRA.

Rather than decide the issue presented by reference to 'dueling' superseding clauses, however, the Court feels it should refer to the more familiar canons of statutory construction.  The objective in construing a statute is to discern the legislature's intent:

> The fundamental rule of statutory interpretation is to ascertain and effectuate the intent of the legislature. The plain language of a statute remains the best indication of the legislature's intent. When the statutory language is clear, it must be given effect without resort to other aids of interpretation.

---

[2] SB 1564 began as a bill, and its purpose was to alter the language of the Conscience Act. The Conscience Act *already* had a superseding clause, so it is hardly surprising that that SB 1564 did not add *another* superseding clause to the statute.  We can presume that the legislature was aware of the pre-existing superseding clause and that it would continue to be effective.

*People v. Tara*, 367 Ill. App. 3d 479, 484, 867 N.E.2d 961, 967 (2d Dist. 2006) (citations omitted).

The question presented is simply this: did the legislature, in enacting SB 1564, intend that its own enactment would be subject to RFRA, including the requirement of review under a strict scrutiny standard?

The Court begins with the observation that the statutes appear to be in conflict. The subject matter of the two statutes substantially overlaps, as least as far as health care providers are concerned. Both explicitly apply to persons with religious and/or moral objections, and the outcome for the objector may be dramatically different depending on which statute applies. This is not a situation in which the later legislative enactment is of general applicability, and the RFRA might be applied to carve out an exception to it. Here, *both* statutes deal with "religious" or "moral" objections to compliance. Where a health care worker is concerned, the two statutes tread almost exactly the same ground.

There is guidance in the case law on how the Court should proceed in such a circumstance:

> Where two statutes are allegedly in conflict, a court has a duty to interpret the statutes in a manner that avoids an inconsistency and gives effect to both statutes, where such an interpretation is reasonably possible. [Citation.]" *Barragan v. Casco Design Corp.,* 216 Ill.2d 435, 441–442, 297 Ill.Dec. 236, 837 N.E.2d 16 (2005). This court presumes that the legislature would not enact a law that completely contradicts an existing law without expressly repealing the existing law. *Moore v. Green,* 219 Ill.2d 470, 479, 302 Ill.Dec. 451, 848 N.E.2d 1015 (2006). "'For a later enactment to operate as a repeal by implication of an existing statute, there must be such a manifest and total repugnance that the two cannot stand together.' "

*People v. McGuire*, 2015 IL App (2d) 131266, ¶15.

It is presumed that the legislature, in enacting statutes, acts rationally and with full knowledge of all previous enactments. *Mut. Mgmt. Services, Inc. v. Swalve,* 2011 IL App (2d) 100778, ¶8. When the legislature adopts a new statute that appears to conflict with an earlier one, a partial modification of the earlier statute may be found:

> An implied amendment is an act which purports to be independent, but which in substance modifies or adds to a prior act. Amendment by implication is not favored; a statute will not be held to have implicitly amended an earlier statute unless the terms of the later act are so inconsistent with those of the prior act that they cannot stand together. If the two enactments are capable of being construed so that both may stand, the court should so construe them.

*People v. Ullrich*, 135 Ill. 2d 477, 483, 553 N.E.2d 356, 359 (1990).

Certainly RFRA the Conscience Act can stand together, but in some cases – and this appears to be one of them – they irreconcilably conflict. There are rare situations in a "subsequent

enactment may ... serve to modify an earlier enactment by implication." *Application of County Treasurer*, 283 Ill. App. 3d 913, 914, 671 N.E.2d 49, 51 (3d Dist. 1996). Two separate and well-established canons of construction require that the changes wrought by SB 1564 must be given effect:

> When a general statutory provision and a more specific one relate to the same subject, we will presume that the legislature intended the more specific statute to govern. We will also presume that the legislature intended the more recent provision to control.

*Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 346, 898 N.E.2d 631, 644 (2008) (citations omitted).

Based on these presumptions, the Court concludes that, despite the superseding clause in RFRA, the legislature intended that SB 1564 would "govern" and "control," i.e., the Conscience Act would not become immediately ineffective because of a conflict with RFRA. For this reason, the Court finds that Plaintiffs have not demonstrated that they have a right in need of protection under RFRA or that they have a reasonable likelihood of success on their RFRA claim.

### Analysis: Plaintiffs' Constitutional Claim

It is fundamental that the power of the legislature is subordinate to the rights granted to Plaintiffs under the Illinois constitution. Article I, Section 4 of the Illinois constitution provides, in pertinent part, as follows:

> All persons may speak, write and publish freely, being responsible for the abuse of that liberty.

Plaintiffs contend that their rights of free speech under the Illinois constitution are infringed by SB 1564 because it impermissibly mandates "compelled speech."

Illinois does not interpret its constitutional guarantees in lockstep with their Federal counterparts. Article 1, section 4 of the Illinois constitution may afford greater protection than the first amendment in some circumstances, but this does not mean that greater protection is afforded in every context. *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 446–47, 865 N.E.2d 133, 168 (2006). Plaintiffs have offered no concrete basis on which to conclude that the Illinois constitution's guarantee of free speech would, in this context, provide protections greater than those provided by the First Amendment to the United States Constitution. This means that the Court might properly analyze this issue by reference to cases interpreting either constitutional provision. Most of the caselaw cited by the parties in this regard is from the Federal appellate courts. In the context of deciding State guarantees, Federal authorities are not controlling precedent, as they merely guide the interpretation of State law. *People v. McCauley*, 163 Ill. 2d 414, 436, 645 N.E.2d 923, 935 (1994).

*Compelled Speech and the Standard of Review*

While we normally think of the constitutional guarantee of free speech as preventing the government from stopping citizens from engaging in speech, it is also true that free speech rights include the right to be free from government *compelling* citizens to speak:

> There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees "freedom of speech," a term necessarily comprising the decision of both what to say and what *not* to say.

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796–97, 108 S. Ct. 2667, 2677, 101 L. Ed. 2d 669 (U.S. 1988). Thus, the "government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves." *Knox v. Serv. Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2288, 183 L. Ed. 2d 281 (2012).

SB 1564 does, in fact, compel speech on the part of medical providers in the following respects:

- Section 6 of the Conscience Act previously stated that it did not relieve any provider from "any duty" of practice which may exist under any "current standard." SB 1564 explicitly includes within this provision an affirmative obligation to inform a patient of his or her "legal treatment options," as well as the benefits of those options. Setting aside for the moment the potential justifications for such a requirement, this clearly is government compelled speech.

- SB 1564 adds a new Section 6.1 to the Conscience Act which affirmatively requires the development of protocols which must be followed by providers who seek to use the Act as a shield. This include the requirement that the provider must "inform a patient of ... legal treatment options, and the risks and benefits of legal treatment options ... consistent with current standards of medical practice." Where a provider declines to provide an objected-to service to a patient, the provider must participate in the transfer of the patient to someone the provider "reasonably believe[s] may offer" the service; the three options for doing so include giving "in writing information to the patient about other health care providers."[3]

The threshold question is to decide what standard of review applies. Defendants contend that this is simply a matter of providing patients with the information to make informed treatment decisions, i.e., informed consent, and that such a well-established legal requirement should be subjected to the lowest level of scrutiny, i.e., the rational basis test. Plaintiffs argue that the

---

[3] Not all of the provisions of SB 1564 objected to by Plaintiffs involve compelled speech. For example, Plaintiffs have objections to another option available under the new Section 6.1 (transferring a patient to the non-objecting provider), but this does not appear to be a matter of *speech* per se. The requirement that Plaintiffs must identify providers who they "reasonably believe may offer" the service in question probably is compelled speech.

changes in SB 1564 are not content neutral, and so they trigger the highest level of judicial review, i.e., the test of strict scrutiny.

The Court has reviewed the United States Supreme Court decision in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992), but finds that it gives little direction. Most of the discussion in *Casey* focuses on the separate question of whether an informed consent provision created an "undue burden" on a woman's right to have an abortion. In other words, the woman's right of conduct, not the physician's right to be free from compelled speech, was the focus of that decision. The Court did touch on the latter issue, but with minimal elaboration:

> All that is left of petitioners' argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State. To be sure, the physician's First Amendment rights not to speak are implicated, see *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State, cf. *Whalen v. Roe,* 429 U.S. 589, 603, 97 S.Ct. 869, 878, 51 L.Ed.2d 64 (1977). We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State here.

*Casey*, 505 U.S. at 884, 112 S. Ct. at 2824, 120 L. Ed. 2d 674. Though recognizing that informed consent provisions imposed on physicians do implicate concerns of compelled speech, the Court's treatment of the issue offers little guidance as to the proper standard of review. *Stuart v. Camnitz*, 774 F.3d 238, 249 (4th Cir. 2014) (this "single paragraph in *Casey* does not assert that physicians forfeit their First Amendment rights in the procedures surrounding abortions, nor does it announce the proper level of scrutiny to be applied to abortion regulations that compel speech").

The Court therefore turns to Federal appellate decisions since *Casey* which have more directly analyzed the standard of review to be applied to informed consent provisions. It should not escape notice that the underlying practice at issue in most of these is the highly divisive issue of abortion. The statutes at issue in those cases, however, can be fairly characterized falling on both sides of the abortion divide. Some statutes were designed to bring women increased information about the fetus, which clearly reflects an effort by the legislatures in those States to convince women about the importance of fetal life. Other statutes had the opposite design: trying to ensure that patients were informed of their right to opt for abortion. In an odd sense, it should be reassuring to all that *both* types of statutes are, to the extent they involve compelled speech by the physician, subjected to the same type of review, because the issue is not the correctness of the position but the degree to which the government can require private speakers to endorse it.

Having reviewed the Federal appellate decisions relied on by the parties, the Court finds that the Third Circuit's decision in *King v. Governor of the State of New Jersey*, 767 F.3d 216, (3d Cir. 2014), and the Fourth Circuit's decision in *Stuart v. Camnitz*, 774 F.3d 238, 249 (4th Cir. 2014), are the most persuasive in concluding that an intermediate standard of review should be utilized. The intermediate standard of review recognizes the State's traditional interest in regulating

medical providers while still providing for meaningful protection of the providers' right to be free from compelled speech.

*Applying the Intermediate Standard of Review*

The Third Circuit discussed the countervailing interests involved in the regulation of professional speech:

> We believe that commercial and professional speech share important qualities and, thus, that intermediate scrutiny is the appropriate standard of review for prohibitions aimed at either category. Like commercial speech, professional speech is valuable to listeners and, by extension, to society as a whole because of the "informational function" it serves. [P]rofessionals have access to a body of specialized knowledge to which laypersons have little or no exposure. Although this information may reach non-professionals through other means, such as journal articles or public speeches, it will often be communicated to them directly by a licensed professional during the course of a professional relationship. Thus, professional speech, like commercial speech, serves as an important channel for the communication of information that might otherwise never reach the public.

> Additionally, like commercial speech, professional speech also "occurs in an area traditionally subject to government regulation." As we have previously explained, States have traditionally enjoyed broad authority to regulate professions as a means of protecting the public from harmful or ineffective professional services. Accordingly, as with commercial speech, it is difficult to ignore the "common-sense" differences between professional speech and other forms of protected communication.

> Given these striking similarities, we conclude that professional speech should receive the same level of First Amendment protection as that afforded commercial speech. Thus, we hold that a prohibition of professional speech is permissible only if it "directly advances" the State's "substantial" interest in protecting clients from ineffective or harmful professional services, and is "not more extensive than necessary to serve that interest."

*King*, 767 F.3d at 234–35 (citations omitted). The Fourth Circuit applied a similar rationale in *Stuart*, finding that compelled speech in the context of physician-patient interaction treads the same established ground as requirements pertaining to informed consent disclosures:

> Traditional informed consent requirements derive from the principle of patient autonomy in medical treatment. Grounded in self-determination, obtaining informed consent prior to medical treatment is meant to ensure that each patient has "the information she needs to meaningfully consent to medical procedures." As the term suggests, informed consent consists of two essential elements: comprehension and free consent. Comprehension requires that the physician convey adequate information about the diagnosis, the prognosis, alternative

11

treatment options (including no treatment), and the risks and likely results of each option. Physicians determine the "adequate" information for each patient based on what a reasonable physician would convey, what a reasonable patient would want to know, and what the individual patient would subjectively wish to know given the patient's individualized needs and treatment circumstances. Free consent, as it suggests, requires that the patient be able to exercise her autonomy free from coercion. It may even include at times the choice *not* to receive certain pertinent information and to rely instead on the judgment of the doctor. The physician's role in this process is to inform and assist the patient without imposing his or her own personal will and values on the patient. The informed consent process typically involves a conversation between the patient, fully clothed, and the physician in an office or similar room before the procedure begins. Once the patient has received the information she needs, she signs a consent form, and treatment may proceed.

*Stuart*, 774 F.3d at 251–52 (citations omitted).

To survive intermediate scrutiny, a law concerning speech (1) must serve or advance a substantial governmental interest unrelated to the suppression of free speech; and (2) must not burden substantially more speech than necessary to further that interest. *People v. Minnis*, 2016 IL 119563, ¶36. "[I]n other words, it must be narrowly tailored to serve that interest without unnecessarily interfering with first amendment freedoms." *Id.*

Defendants argue that the State's interest in this arena is "protecting the health and autonomy of its citizens by ensuring that they receive the information that they need to make informed medical decisions." The Court agrees that this is a substantial government interest. The power of the legislature to license and regulate the provision of health care is long-standing and beyond doubt. *People for Use of Dep't of Registration & Educ., v. Graham*, 311 Ill. 92, 94, 142 N.E. 449, 450 (1924); *Lasdon v. Hallihan*, 377 Ill. 187, 193, 36 N.E.2d 227, 230 (1941).

In terms of the benefit of SB 1564, however, it must be noted that some of the more dire hypothetical circumstances Defendants suggest it would address are already covered by the Conscience Act as it existed prior to amendment. The Act continues to provide as follows:

> Nothing in this Act shall be construed so as to relieve a physician or other health care personnel from obligations under the law of providing emergency medical care.

745 ILCS 70/6. Consequently, the benefit to be achieved by the statute is limited to non-emergency situations in which a patient may desire, or might benefit from, additional information about the "legal treatment option" of abortion. The question then turns to whether the State has, through SB 1564, compelled speech more than is necessary to serve this interest and without unduly interfering with Plaintiffs' freedoms.

Defendants argue that the State's action is here very narrowly tailored, because SB 1564 operates only within the confines of the conduct which is already required of providers per their professional ethics. As noted above, whether that is true remains an unresolved factual question.

Furthermore, Defendants' position raises another question: even if one were to assume that professional ethics codes do require the kind of conduct objected to by Plaintiffs, does the *law* already it require it? The Court has not been provided with authority to answer this question, and its own examination of the Medical Practice Act does not reveal that a basis for discipline of a physician for failure to adhere to professional standards *per se*. See 225 ILCS 60/22.

Either one of the two possible answers to this question creates a problem for Defendants. If professional codes of conduct are already incorporated into the *legal requirements* applicable to providers like Plaintiffs, what does SB 1564 accomplish? Conversely, if the ethical requirements cited by Defendants do not already have the force of law as to all providers, why does the legislature now impose them legally *only on conscientious objectors?*

Herein lies the critical concern with SB 1564. If the legislative purpose to be served by SB 1564 is to impose on providers the legal obligation to make the referrals or engage in the discussions objected to by Plaintiffs, why has the State singled out only conscientious objectors as providers who must carry that message? The Conscience Act and SB 1564 say nothing specific about particular issues such as abortion or contraception, but these issues lurk below the deceptively calm surface of the invocation of professional standards. The fact that Plaintiffs have brought this suit because of their concerns about counseling or referring their patients with respect to abortion certainly speaks to how close to the surface those concerns are; the focus of discussion in the legislative history of SB 1564 confirms it. The nature of Plaintiffs' concerns, and of the legislature's *sub silentio* purpose, implicate special concerns:

> When evaluating compelled speech, we consider the context in which the speech is made. *Riley,* 487 U.S. at 796–97, 108 S.Ct. 2667. Here, the context is a public debate over the morality and efficacy of contraception and abortion, for which many of the facilities regulated by Local Law 17 provide alternatives. "[E]xpression on public issues has always rested on the highest rung on the hierarchy of First Amendment values."

*Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 249 (2d Cir. 2014).

It is, then, of particular concern that SB 1564 seeks to compel speech on "public issues," and that it imposes its restrictions selectively upon only those who may invoke a conscientious objection to participation in them.

There is some truth to Defendants' response, namely, that the legislature is simply placing a condition upon those who seek to invoke the statute's protections. See, e.g., *Our Savior Evangelical Lutheran Church v. Saville*, 397 Ill. App. 3d 1003, 1019, 922 N.E.2d 1143, 1156 (2d Dist. 2009) (granting churches a benefit may come with conditions not generally applicable to others). Still, short of its citation to professional standards which it agrees are not definitive and which do not bear the force of law, the State has offered little to establish that all providers of obstetric or prenatal care are required to do the things which SB 1564 will require of Plaintiffs.

It should be remembered that the physician-patient relationship is a consensual one. *Smith v. Pavlovich*, 394 Ill. App. 3d 458, 466, 914 N.E.2d 1258, 1266 (5th Dist. 2009). If a patient decides to pursue treatment options to which the physician morally objects, there is nothing in

existing law which appears to require the physician's participation to assist the patient in that course. "[W]hen a physician refuses to treat a patient needing further treatment," his or her duty to the patient is not breached unless the patient is not given "a reasonable time to find substitute care." *Magana v. Elie*, 108 Ill. App. 3d 1028, 1034, 439 N.E.2d 1319, 1323 (2d Dist. 1982). It bears repeating: the Conscience Act, and therefore the entirety of the present discussion, involves only *non-emergent* medical situations. Consequently, SB 1564's amendments to the Conscience Act, though cloaked in the language of "professional standards," appear to expand the physician's duties to the patient. Again, it is highly problematic that this expansion is effective only as to conscientious objectors in particular, and not health care providers in general.

The State has really not addressed why it must rely on conscientious objectors like Plaintiffs to provide their non-emergent patients with information about the very procedures to which Plaintiffs object. There has not been a showing that Plaintiffs are somehow possessed of more or better information about the location of other providers willing to provide the objected-to services. There has not been an explanation of why the State could not as easily, and perhaps more efficaciously in the information age, maintain that information and make it available to the public. Why must the State, which licenses and regulates those who provide the objected-to services, rely on the very people who object to the services to be the source of information about them?

The Court concludes that Plaintiffs have raised a "fair question" about whether SB 1564 unnecessarily burdens their right to be free from government compelled speech to a degree more than necessary to serve the State's interest in educating patients. The Court now moves to consider the question of what, if any, injunctive relief is appropriate.

### *Other Factors Necessary for Injunction*

Plaintiffs must show that they will suffer irreparable injury in the absence of an injunction. Where a violation of constitutional rights has been alleged, a further showing of irreparable injury is not required. *Makindu v. Illinois High Sch. Ass'n*, 2015 IL App (2d) 141201, ¶42. Plaintiffs allege that their right to be free from government compelled speech is in jeopardy, so this requirement is met.

Plaintiff must also show that they lack an adequate remedy at law. The Court finds that no legal remedy would suffice here. The requirement that Plaintiffs submit protocols for the State for approval is days away from being effective. The Appellate Court's affirmance of an injunction in a not dissimilar circumstance in *Morr-Fitz, Inc. v. Quinn*, 2012 IL App (4th) 110398, appears to support the conclusion that there is no remedy at law sufficient here.

The last factor for the Court to consider is whether the equities warrant the entry of such an order. In balancing the equities, the trial court must weigh the benefits of granting the injunction against the possible injury to the opposing party; the court should also consider the injunction's effect on the public interest. *Makindu*, 2015 IL App (2d) at ¶47. Defendants assert that there is significant injury to the public, and specifically to patients who may not be adequately informed of their options for procedures to which Plaintiffs object. However, the injury to the public is significantly diminished by virtue of the fact that the Conscience Act does not apply to situations in which emergency care is required; it offers Plaintiffs no refuge in such circumstances. The

Court finds that the balance favors protection of Plaintiffs' arguable constitutional speech rights against the convenience the State may achieve by utilizing Plaintiffs as the vehicle for communicating treatment options for non-emergent patients.

Consequently, the Court finds that Plaintiffs have proven their entitlement to the entry of a preliminary injunction to enjoin enforcement of the compelled speech aspects of SB 1564's amendments to the Conscience Act. The Court agrees with Defendants that there is no necessity that this injunction be entered as to Defendant Rauner, so it is entered only against Defendant Schneider in his official capacity as Secretary of the Illinois Department of Financial & Professional Regulation.

Specifically, Defendant Schneider is enjoined from enforcement of the following provisions of the Conscience Act as amended by SB 1564:

- The requirement in Section 6 that a medical provider must inform a patient of "legal treatment options, and risks and benefits of treatment options," with respect to a treatment option to which Plaintiffs have a conscientious objection as defined in the Conscience Act in order to invoke the Act; and

- With the exception of subparagraph 4, all of Section 6.1, specifically including the development of protocols, to the extent it requires conduct to which Plaintiffs have a conscientious objection.

Finally, the Court notes Plaintiffs request that this injunction should protect not only them, but also all health care providers who have a conscientious objection to the requirements of SB 1564, citing *Morr-Fitz* in support. The Court finds that Plaintiffs misreads *Morr-Fitz*. It is clear that the Appellate Court in that case restricted the approved injunctive relief to the plaintiffs *in that case*. See *Morr-Fitz*, 2012 IL App (4th) at ¶¶ 82-84 (defendants enjoined from enforcement "against plaintiffs"; trial court injunction modified to enjoin only enforcement "against these plaintiffs"). Consequently, the relief here is entered only as to Plaintiffs.

### *Conclusion*

This case has been resolved by reference to the constitutional right to be free from compelled speech. It is prudent to remember that the issue here is not a dispute over the merits of the message, but the government's power to compel a citizen to speak it. For the reasons stated above, the Court concludes that Plaintiffs have raised a fair question as to whether their right to be free from government compelled speech is violated by SB 1564, and so the Court enjoins its enforcement against them as stated above. This injunction is effective until the conclusion of the case or further order of Court.

12/20/16
Date

_____
Hon. Eugene G. Doherty, Circuit Judge

15

*Appendix*

As noted above, the Court has resolved the interplay between RFRA and SB 1564 as one of statutory construction. The Court could have reached the same conclusion by application of the prohibition against "entrenchment" – the ability of a legislature to bind future legislatures. Consequently, while discussion of that esoteric issue is not perhaps strictly required to reach the decision above, it remains highly germane to the analysis of Plaintiffs' RFRA claim. The Court therefore sets forth its analysis in that regard in this appendix.

What Plaintiffs are arguing for is application of what is generally considered impermissible: "entrenchment" of a law such that a subsequent legislature is constrained in its ability to depart from it:

> It has long been conventional wisdom among constitutional lawyers that "one legislature may not bind the legislative authority of its successors." More specifically, a legislature may not "entrench" a law by forbidding subsequent repeal or amendment, or by imposing heightened procedural hurdles, such as supermajority voting rules that were not necessary to enact the law in the first place. For example, Congress would not be permitted to enact a statute requiring a balanced federal budget "in perpetuity," or with an attached prohibition on repeal, or a prohibition on repeal by less than a two-thirds majority. If Congress did enact such a statute, the purported entrenchment would presumably be invalidated by courts (to the extent they would find the issue justiciable). And it could be legally ignored by subsequent Congresses: notwithstanding the statutory language, a congressional majority in pursuit of an unbalanced budget would be free to repeal or override the pre-existing statute pursuant to the standard second-in-time rule. This, at least, is the consensus view among constitutional theorists.

Daryl Levinson, Benjamin I. Sachs, *Political Entrenchment and Public Law*, 125 Yale L.J. 400 (2015) (footnote citations omitted).

The United States Supreme Court has commented on the principle that a legislature may not generally bind or restrict future legislatures:

> In his Commentaries, Blackstone stated the centuries-old concept that one legislature may not bind the legislative authority of its successors:
>
>> "Acts of parliament derogatory from the power of subsequent parliaments bind not.... Because the legislature, being in truth the sovereign power, is always of equal, always of absolute authority: it acknowledges no superior upon earth, which the prior legislature must have been, if it's *[sic]* ordinances could bind the present parliament." 1 W. Blackstone, Commentaries on the Laws of England 90 (1765).
>
> In England, of course, Parliament was historically supreme in the sense that no "higher law" limited the scope of legislative action or provided mechanisms for

placing legally enforceable limits upon it in specific instances; the power of
American legislative bodies, by contrast, is subject to the overriding dictates of
the Constitution and the obligations that it authorizes.

*United States v. Winstar Corp.*, 518 U.S. 839, 872, 116 S. Ct. 2432, 2453–54, 135 L. Ed. 2d 964
(1996) (plurality opinion) (footnote omitted).  Ten years later, Justice Scalia restated the same
understanding in a concurring opinion:

> Among the powers of a legislature that a prior legislature cannot abridge is, of
> course, the power to make its will known in whatever fashion it deems
> appropriate—including the repeal of pre-existing provisions by simply and clearly
> contradicting them. Thus, in *Marcello v. Bonds,* 349 U.S. 302, 75 S.Ct. 757, 99
> L.Ed. 1107 (1955), we interpreted the Immigration and Nationality Act as
> impliedly exempting deportation hearings from the procedures of the
> Administrative Procedure Act (APA), despite the requirement in § 12 of the APA
> that "[n]o subsequent legislation shall be held to supersede or modify the
> provisions of this Act except to the extent that such legislation shall do so
> expressly," 60 Stat. 244. The Court refused "to require the Congress to employ
> magical passwords in order to effectuate an exemption from the Administrative
> Procedure Act." 349 U.S., at 310, 75 S.Ct. 757. We have made clear in other
> cases as well, that an express-reference or express-statement provision cannot
> nullify the unambiguous import of a subsequent statute. In *Great Northern R. Co.
> v. United States,* 208 U.S. 452, 465, 28 S.Ct. 313, 52 L.Ed. 567 (1908), we said of
> an express-statement requirement that "[a]s the section ... in question has only the
> force of a statute, its provisions cannot justify a disregard of the will of Congress
> as manifested either expressly *or by necessary implication* in a subsequent
> enactment." (Emphasis added.) A subsequent Congress, we have said, may
> exempt itself from such requirements by "fair implication"—that is, *without* an
> express statement. *Warden v. Marrero,* 417 U.S. 653, 659–660, n. 10, 94 S.Ct.
> 2532, 41 L.Ed.2d 383 (1974). See also *Hertz v. Woodman,* 218 U.S. 205, 218, 30
> S.Ct. 621, 54 L.Ed. 1001 (1910).

> To be sure, legislative express-reference or express-statement requirements may
> function as background canons of interpretation of which Congress is
> presumptively aware. For example, we have asserted that exemptions from the
> APA are "not lightly to be presumed" in light of its express-reference
> requirement, *Marcello, supra,* at 310, 75 S.Ct. 757; see also *Shaughnessy v.
> Pedreiro,* 349 U.S. 48, 51, 75 S.Ct. 591, 99 L.Ed. 868 (1955). That assertion may
> add little or nothing to our already-powerful presumption against implied repeals.

> > "We have repeatedly stated ... that absent a clearly established
> > congressional intention, repeals by implication are not favored. An
> > implied repeal will only be found where provisions in two statutes
> > are in irreconcilable conflict, or where the latter Act covers the
> > whole subject of the earlier one and is clearly intended as a
> > substitute." *Branch v. Smith,* 538 U.S. 254, 273, 123 S.Ct. 1429,

155 L.Ed.2d 407 (2003) (plurality opinion) (internal quotation
marks and citations omitted).

See also *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290
(1974). When the plain import of a later statute directly conflicts with an earlier
statute, the later enactment governs, *regardless* of its compliance with any earlier-
enacted requirement of an express reference or other "magical password."
For the reasons set forth in the majority opinion, in the Higher Education
Technical Amendments and the Debt Collection Improvement Act, Congress
unambiguously authorized, without exception, the collection of 10–year–old
student-loan debt by administrative offset of Government payments. In doing so,
it flatly contradicted, and thereby effectively repealed, part of § 207(a) of the
Social Security Act. This repeal is effective, regardless of whether the express-
reference requirement of § 207(b) is fulfilled.

Despite our jurisprudence on this subject, it is regrettably not uncommon for
Congress to attempt to burden the future exercise of legislative power with
express-reference and express-statement requirements. See, *e.g.,* 1 U.S.C. § 109; 5
U.S.C. § 559; 25 U.S.C. § 1735(b); 42 U.S.C. § 2000bb–3(b); 50 U.S.C. §§
1547(a)(1), 1621(b). In the present case, it might seem more respectful of
Congress to refrain from declaring the invalidity of the express-reference
provision. I suppose that would depend upon which Congress one has in mind: the
prior one that enacted the provision, or the current one whose clearly expressed
legislative intent it is designed to frustrate. In any event, I think it does no favor to
the Members of Congress, and to those who assist in drafting their legislation, to
keep secret the fact that such express-reference provisions are ineffective.

*Lockhart v. United States,* 546 U.S. 142, 148–50, 126 S. Ct. 699, 703–04, 163 L. Ed. 2d 557
(2005) (Scalia, J., concurring). Note that one of the statutes Scalia mentioned in *Lockhart* was
the Federal version of the Illinois RFRA and its superseding clause. 42 U.S.C. § 2000bb–3(b).
The concept of requiring a "magical password" to exempt a later statute from an earlier one is
essentially the same as the position taken here by Plaintiffs, i.e., that the 2016 legislature could
have made the 1998 RFRA inapplicable to SB 1564, but only by expressly declaring that this is
what it was doing.

Plaintiffs argue that the United States Supreme Court has not invoked this limitation in the
context of the Federal RFRA, which has been applied so as to invalidate subsequent
Congressional action. Of the cases cited by Plaintiff for this proposition, one did not involve
Congressional action, but administrative regulations. See *Burwell v. Hobby Lobby Stores, Inc.*,
134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014). Clearly, the issue under discussion is not present
when the challenged law is a regulatory rule, rather than a legislative enactment. But Plaintiffs
are correct; there have been such cases. See, e.g., *Gonzales v. O Centro Espirita Beneficente
Uniao do Vegetal*, 546 U.S. 418, 423, 126 S. Ct. 1211, 1216, 163 L. Ed. 2d 1017 (2006) (finding
that provision of Controlled Substances Act violated Federal RFRA). However, the Court is
unaware of any Federal or Illinois reviewing court decision in which the court ever actually

*discussed* whether RFRA (either the Federal or Illinois version) could limit a subsequent legislative enactment.

In this respect, the Court agrees with Justice Scalia that the superseding clauses should be certainly be considered in discerning legislative intent "as background canons of interpretation," but no "magical password" of express exclusion should be required. *Lockhart*, 546 U.S. at 148–50, 126 S. Ct. at 703–04, 163 L. Ed. 2d 557. The foregoing analysis of the concept of "entrenchment" would, therefore, would lead the Court, albeit in a much longer route, to the same destination at which it had already arrived: that any conflict between RFRA and SB 1564 should be resolved by reference to established canons of statutory construction.