E-FILED
Monday, 19 June, 2017  06:06:39 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**CENTRAL DISTRICT OF ILLINOIS**

DR. RONALD E. SCHROEDER, et al.,     )
                                    )      No. 17 C 3076
                                    )
              Plaintiffs,   )
                                    )
              v.              )      Hon. Sue E. Myerscough
                                    )
BRUCE RAUNER, et al.,            )      Hon. Magistrate Judge Tom
                     Defendants.  )      Schanzle-Haskins

**PLAINTIFFS' COMBINED MEMORANDUM OF LAW**
**REPLYING IN SUPPORT OF THEIR MOTIONS FOR PRELIMINARY**
**INJUNCTION AND RESPONDING TO THE STATE'S MOTION TO DISMISS**

**INTRODUCTION**      **2**

**FACTS RELEVANT TO THE PENDING MOTIONS**      **4**

     I. The Plaintiff Pregnancy Resource Centers Offer Limited Services      5

     II. Professional Ethics Standards Do Not Dictate Current Standards of Medical Practice or Care or Require Plaintiffs to Comply with P.A. 99-690      6

     III. Plaintiffs' Operations Comply With Current Standards of Medical Care      8

     IV. P.A. 99-690 Is Not Religiously Neutral Or Generally Applicable But Imposes Duties On Plaintiffs That Do Not Arise Under Current Standards of Practice or Care      9

**ARGUMENT**      **10**

**I. PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON MULTIPLE CLAIMS.**      **10**

     A. P.A. 99-690 Violates Plaintiffs' Free Exercise Rights Because It Imposes A Substantial Burden on Plaintiffs And is Neither Religiously Neutral Nor Generally Applicable.      10

     1. The Amendment Cannot Survive Strict Scrutiny's Requirement of a Compelling State Interest and Narrowly Tailored Means      14

         a. The State Cannot Identify a Real and Compelling Problem that Must Be Addressed      14

         b. The Regulation is not a Narrowly Tailored Solution or a Means Least Restrictive of Plaintiffs' Rights      17

     B. The IHRCA Amendment Violates Plaintiffs' Rights of Free Speech      18

     1.      The State Cannot Save P.A. 99-690 Based On a Professional Speech Rationale      20

         a. The PRCs' Speech About Abortion is Not Properly Characterized as Professional Speech.      20

         b. The Speech OF PRCs Cannot Properly Be Characterized as Professional Speech Because It Is Mingled With Non Professional, Fully Protected Speech.      21

         c. Even If All The Speech At The PRCs Could be Characterized as Professional, The Regulation Would Still Be Unconstitutional As Content-based and Viewpoint-based Regulation of Truthful and Non-misleading Speech.      23

     2.      P.A. 99-690 Cannot Survive Strict or Even Intermediate Scrutiny      27

     3. Section 6.1(3) Of P.A. 99-690 Perpetrates An Egregious Constitutional Violation.      27

     C. Plaintiffs Due Process Claims And Overbreadth Claims Merit Relief.      28

**II. The PRCs Satisfy The Remaining Requirements For Preliminary Relief**      **30**

**III.      The State's Motion To Dismiss Should Be Denied.**      **30**

**CERTIFICATE OF SERVICE**      **36**

**APPENDIX**      **37**

     Exhibit 1 - Affidavits of Executive Directors of Plaintiff Pregnancy Centers      37

     Exhibit 2 - Affidavit of Dr. Donna Harrison.      37

## INTRODUCTION

Plaintiffs are entitled to preliminary injunctive relief.   By its terms the amendment of the Health Care Right of Conscience Act of 1977, 745 ILCS 70/1 et. seq., affected by P.A. 99-690 (hereinafter "P.A.99-690" or "the IHRCA Amendment" or "the Amendment"), requires Plaintiffs to take actions that contradict their religious convictions and articulate views with which they disagree *precisely because* they have a religious objections to certain legal treatment options.  This is the epitome of a "substantial burden" on their First Amendment right to practice their religion freely and renders the Amendment on its face not "religiously neutral."  Moreover, because IHRCA applies *only* to conscientious objectors, persons who do not have a religious objection to certain legal treatment options do not have to comply with the duties mandated by P.A. 99-690.

The State denies that the requirements of the Amendment fall on conscientious objectors alone, asserting that legally mandated ethical guidelines require all health care providers to obtain the same informed consent and to refer patients.  But the State has not shown (1) that the ethical guidelines it cites require what the P.A. 99-690 requires or (2) that any Illinois law requires adherence to the cited ethical guidelines.  And, as to both, it has not shown that Illinois law requires non conscientious objectors to secure informed consent for treatments they choose not provide, or to refer clients to (or provide with information about) entities who perform treatments they do not perform.  As not religiously neutral or generally applicable, the Amendment faces strict scrutiny.  And it faces strict scrutiny under the First Amendment's Free Speech clause because it is speaker-based (religious objector), content-based (legal treatment options), and viewpoint-based

("benefits") regulation that compels speech.

The State does not deny that the law compels speech but claims the burden is constitutional. It is not. The State has not, and cannot, show P.A. 99-690 advances an actually-existing interest that can be regarded as compelling or substantial. The State's core claim is that religiously-inspired healthcare providers keep their patients in ignorance of legal treatment options when securing informed consent for a procedure or course of care for a patient. As demonstrated below, the snippets of legislative record relevant to this claim cannot satisfy the State's heavy burden of demonstrating this is an *actual* interest. Further, the State cannot show P.A. 99-690 advances a compelling interest as applied to the procedures and drugs at issue here: elective abortion, sterilization, or contraception. It has offered no factual support for its implausible claim that women in Twenty-First century America are ignorant of these legal treatment options and are unable to locate providers of such procedures or drugs without it being supplied by health care providers. Even if the State could substantiate that its claim were true, generally speaking, it has no application to the Plaintiffs, who intentionally limit the services they offer and inform women that they do not provide, or refer, for abortion, sterilization, or contraception.

The State's claim that the Plaintiffs must comply with P.A. 99-690 proves that it is not narrowly tailored means to promote the government's interests. The State seeks to enforce the law in contexts where there is no realistic possibility that its putative interest is implicated, for example, in cases involving the Plaintiffs, who have no duty to obtain informed consent because they do not treat pregnancy. What is more, the referral/ informational requirements of Section 6.1(3) have nothing to do with informed consent. Finally, P.A. 99-690 is not the least restrictive means to

3

achieve the State's end, which could be furthered by State sponsored messaging, or requiring that caregivers disclose the treatments they do not provide prior to obtaining informed consent.

The Plaintiffs have made the required showing for preliminary relief, including a substantial likelihood of success on the merits, irreparable harm to their First Amendment rights, and a balance of harms and public interest favoring preliminary injunctive relief. Accordingly, Plaintiffs are entitled to preliminary relief enjoining the State from enforcing the Amendment as to Plaintiffs.

The State's motion to dismiss accordingly must be denied. Its motion in essence asks this Court to disregard allegations of the complaint and to draw inferences *against* the Plaintiffs by assuming Plaintiffs' factual allegations are wrong, accepting the State's assertions as true, and reading their Complaint as if it were limited to a facial challenge. The standard governing motions under Fed. R.Civ.P. 12(b)(6) requires the *opposite* approach.

For these reasons, explained in greater detail below, Plaintiffs' motion should be granted, and the State's Motion to Dismiss should be denied.

## FACTS RELEVANT TO THE PENDING MOTIONS

The Plaintiff Pregnancy Resource Centers (hereinafter PRCs) are religiously motivated organizations whose mission is to empower pregnant women to choose to carry their babies to term rather than abortion. The PRCs object, based on conscience, to facilitating abortion, contraception, or sterilization by describing these procedures' so-called benefits, or by referring to (or providing information about) providers of such procedures. Verified Complaint at ¶¶1, 14-16, 24, 28, 36-38; Ex. 1, Schroeder Aff. (hereinafter "Schroeder Aff.") at ¶¶6, 11-12, 16; Ex. 2, Cocks Aff.

4

(hereinafter "Cocks Aff.") ¶¶3, 10; Ex. 3, Dilbeck Aff. (hereinafter "Dilbeck Aff.") at ¶¶2, 10-11.[1]

## I.       The Plaintiff Pregnancy Resource Centers Offer Limited Services

Plaintiffs have a limited mission: to help women with an unplanned pregnancy to decide whether to keep their child.  Plaintiffs seek to empower each client with sufficient information and lay counsel so she can confidently choose life for her unborn child. Complaint ¶¶14, 17-18, 21-23, 29, 33; Schroeder Aff. ¶¶2-9;  Cocks Aff. ¶¶2-3, 6-9; Dilbeck Aff. ¶¶3, 6-7.  The Plaintiffs offer limited medical services (pregnancy test, ultrasound, STD testing and treatment), inform clients of those limited services, and obtain informed consent for them. Complaint ¶¶14, 19, 30-31; Schroeder Aff. ¶7; Cocks Aff. ¶¶4-5 & Attachment One (1st Way Life Center Intake Form); Dilbeck Aff. ¶¶4-5 & Attachment One (Intake, Confidentiality, and Limitations of Service form); **Exhibit 1** to this Memorandum (hereinafter "PRC Director Affs.") ¶¶2-5.[2]  Plaintiffs do not treat women during pregnancy; they advise their clients to seek professional care elsewhere after their limited services are delivered.  Complaint ¶¶14, 19, 30-31; Schroeder Aff. ¶7; Cocks Aff. ¶5; Dilbeck Aff. ¶¶4-5; PRC Director Affs. ¶¶2-5.

PRCs also utilize lay volunteers who assist clients as lay counselors and advocates by sharing publicly available information about abortion and offering personal advice, often with a religious and spiritual content.  Lay volunteers are not and do not hold themselves out as healthcare professionals.  Complaint ¶¶20-21, 32-34; Cocks Aff. ¶¶6-7-10; Dilbeck Aff. ¶¶6-9; PRC Director

---

[1] References to the Complaint are to the Plaintiffs' Verified Complaint.  The affidavits of Dr. Ronald L. Schroeder, Judy K. Cocks, and Tim Dilbeck were attached as Exhibit 1-3 to Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction under Fed.R.Civ.P.65(a) (hereinafter "Pls' PI Mem.").

[2] Plaintiffs have attached additional declarations of Judy Cocks, Tim Dilbeck, and Trudy Bodenbach as **Exhibit 1** to this Memorandum, which are referred to collectively as "PRC Director Affs."

Affs. ¶¶2-5.  The State concedes that informal counseling of this kind is not medical advice and is

not restricted by P.A. 99-690.  See State's Combined Memorandum (hereinafter "Mem.") at 23-24.

### II. Professional Ethics Standards Do Not Dictate Current Standards of Medical Practice or Care or Require Plaintiffs to Comply with P.A. 99-690

The State claims that the various professional ethics codes it cites (1) specify the current

standard of medical practice or care to be followed by all healthcare providers, Plaintiffs included,

and (2) that the current standard of medical practice or care, so understood, mandates the actions

required by P.A. 99-690.  Mem. at 7-13. Neither assertion is factually correct.

First, the Medical Practice Act ("Act") does not state that ethics codes define the medical

standard of care in Illinois.  It authorizes the Illinois Department of Financial and Professional

Regulation (IDFPR) to investigate a physician's alleged "dishonorable, unethical or unprofessional

conduct," "immoral conduct," or "gross negligence" -- which may be unrelated to medical

treatment -- and directs consideration of six factors, one of which is whether the physician's

conduct is "violative of ethical standards of the profession"  68 Ill. Admin. Code 1285.240(a).

Thus, while professional ethics codes may be relevant to whether a physician's behavior is

"dishonorable, unethical, or unprofessional," or "immoral," the Act does not look to them to define

the medical standard of care governing medical treatments performed by providers, which, in all

cases, requires individualized judgments about particular facts based on the physician's education,

training and experience.  See **Exhibit 2**, Harrison Aff. ¶6.[3]

The ethics codes themselves disclaim that they set a standard of *medical* practice or care.

---

[3] The Affidavit of Dr. Donna Harrison is attached to the Plaintiffs' Reply/Response as Exhibit 2 and referred to herein as "Harrison Aff."

The AMA's ethics code directly cautions that the ethical opinions in this chapter "are offered as ethics guidance for physicians and are *not intended to establish standards of clinical practice or rules of law*.")(emphasis added) State's Ex. A.  In a similar vein, ACOG's ethics code admonishes that  "[n]oncompliance with the Code…may affect an individual's initial or continuing Fellowship in [ACOG]"). State's Ex. E.  This shows that professional ethics codes are promulgated by private and voluntary organizations to provide guidance to their members.  They may inform, but do not determine, the standard of care.  See Harrison Aff. ¶¶6, 8(e)-(g), 9-11.  For this reason, the codes may not be mechanically equated with current standards of medical practice or care, as the State would have the court believe.

Further, the State's effort to import ethics codes into the legal standard of care ignores the established common law principle that physicians may arrive at differing professional judgments and yet remain within the standard of care. See, e.g., *Knight v. Haydary*, 223 Ill.App.3d 564, 571 (2d Dist. 1992) ("[b]ecause medicine is a profession which involves the exercise of individual judgment within the framework of established procedures, differences in opinion are consistent with the exercise of due care.")(citing *Walski v. Tisensenga*, 72 Ill.2d 249, 261 (1978); see also, *Holder v. Castleton*, 275 Ill.App.3d 950, 955 (4th Dist. 1995)(in a medical malpractice action, where experts' testimony differed about whether the defendant violated the appropriate standard of care, the question of the applicable medical standard of care was for the jury to decide).  The State's assertion that the professional ethics codes authoritatively define the content of the common law medical standard of care runs afoul of this common law principle recognizing variation of opinion as consistent with the standard of care, and that appropriate care and informed consent for

7

treatment is a fact-specific inquiry.  The cases the State cites (*Goldberg v. Ruskin*, and *Guebard v. Jabaay*) do not expand this principle but require informed consent within the scope of agreed-upon medical treatments.[4]

Second, the State's claim that current standards of medical practice or care require what P.A. 99-690 requires is factually wrong.  The State casts Sections 6 and 6.1 as a simple and uncontroversial informed consent requirement.  But current standards of medical care do not require securing informed consent for treatments that are not being offered.  See Harrison Aff. ¶¶4a & ¶8(a)&(c); Schroeder Aff. ¶¶9-10.   Further, the requirements for informed consent in these areas are subject to vigorous debate within the profession as it relates to elective procedures such as abortion, and the medical standard of care simply does not require discussion of treatments that may be legal but are not medically indicated. See Harrison Aff. ¶¶4a, ¶5b, ¶8(a),(c)&(e), ¶¶9-11; Schroeder Aff. ¶¶9-10.  Finally, the requirements of Section 6.1(3) have nothing to do with informed consent, and likewise, are not required by current standards of medical practice or care. Harrison Aff. ¶¶5&8; Schroeder Aff. ¶¶9-10.  The State's unsupported assertions do not meet -- or defeat -- Plaintiffs' evidentiary showing in any meaningful way.

## III.    Plaintiffs' Operations Comply With Current Standards of Medical Care

Plaintiffs operate their centers in accordance with the current standards of medical practice

---

[4] The State asserts at Mem., 11: "Thus, both the Medical Practice Act and the Nurse Practice Act require medical providers to comply with ethical standards of informed consent." The State's Memorandum cites the Medical Patient Rights Act, 410 ILCS 50/1, et seq., and asserts that it "codifies the rights of patients to obtain care that is consistent with current standards of medical practice, including the right '[t]o receive information concerning his or her condition and proposed treatment.' 410 ILCS 50/3(a)." Mem., 11-12.  This law acknowledges a patient's right to know, but the right to know is limited by the medical standard of care to receive information about the patient's  medical "condition" and "proposed treatment" for the condition.  It does not expand the right to know by referring to ethics standards or to non medically indicated treatments.

8

for the limited medical services they perform. Limiting services is permissible under medical standards of care as long as patients are notified of the limitations. Harrison Aff. ¶¶3(a)-(f) & 4(a)-(c); see also, State's Mem. Ex. A, AMA Principles of Medical Ethics, §§1.1.2 & 1.1.7 (noting physicians may decline to create a physician-patient relationship or limit its scope with disclosure of limitations). Plaintiffs comply with medical standards of care when they offer limited services to women seeking their help, notify them of the service limitations, and obtain informed consent for the limited services they provide. Harrison Aff. ¶¶ 3-4, 7.

**IV. P.A. 99-690 Is Not Religiously Neutral Or Generally Applicable But Imposes Duties On Plaintiffs That Do Not Arise Under Current Standards of Practice or Care**

The Illinois Healthcare Right of Conscience Act (IRCA), applies to persons who object, in conscience, to providing treatments classified as legal treatment options. P.A. 99-690 amends IHRCA by requiring PRCs covered by IHRCA to take actions that are not required generally by current standards of medical practice of care, as follows:

- Section 6 and 6.1(1) require PRCs to provide medical advice even when they limit the scope of services they provide. Current standards of medical practice or care do not require this. Harrison Aff. ¶8(a),(c)&(e).

- Section 6.1(1) requires PRCs to have access to healthcare protocols. Current standards of medical practice or care do not require this. Harrison Aff. ¶8(b).

- Section 6.1(2) requires PRCs to provide services, transfers or referrals. Current standards of medical practice or care do not require this. Harrison Aff. ¶¶8(d), 3 & 5(a)-(c).

- Section 6.1(3) requires PRCs to provide information about other healthcare providers that they reasonably believe will provide services a patient desires upon request. Current standards of medical practice or care do not require this. Harrison Aff. at ¶¶8(f) & 5(d).

9

In these ways P.A. 99-690 imposes duties on PRCs that are not required by current standards of medical practice or care of non-IHRCA-covered providers.  Harrison Aff. at ¶8.  In this way P.A. 99-690 is not religiously neutral or generally applicable.

**ARGUMENT**

The grounds for obtaining a preliminary injunction are well-established.  See Plaintiffs' Memo at p. 4.  As explained further below, Plaintiffs are likely to succeed on each of the claims advanced in support of its request for preliminary relief.[5]  The State's rejoinders miss the mark.

**I.      PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON MULTIPLE CLAIMS.**

The Plaintiffs have a strong likelihood of success on their claim that P.A. 99-690 violates their First Amendment rights to free exercise of religion, free speech, and deprives them of due process.

**A.      P.A. 99-690 Violates Plaintiffs' Free Exercise Rights Because It Imposes A Substantial Burden on Plaintiffs And is Neither Religiously Neutral Nor Generally Applicable.**

As explained, Plaintiffs have sincerely held religious objections to taking the specific steps required by P.A. 99-690.  Laws that force persons to speak and act contrary to their religious convictions, or punish them for doing so, do impose a substantial burden upon the free exercise of religion. *See*, *Burwell v. Hobby Lobby Stores*, *Inc.*, 134 S.Ct. 2751, 2777-79 (noting that forcing

---

[5] The State asserts that Plaintiffs are making a facial challenge to P.A.99-0690, Mem., 17, fn.14, and that its motion should be granted because the PRCs allegations cannot show that every application of P.A. 99-690 would be unconstitutional.  In fact, the distinction between as-applied and facial challenges "goes to the breadth of the remedy employed by the Court, not what must be pleaded in the complaint." *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 331 (2010).  Plaintiffs challenge the statute's application to them, and seek a remedy against application of the statute to them, not the world.  By any measure, this is an as-applied challenge.  The State's argument does not justify dismissal for failure to state a claim or denial of preliminary relief.

private citizens to act contrary to their religious beliefs or face legal sanction constitutes a substantial burden on the free exercise of religion). The State's assertion (at Mem. 7) that "Plaintiffs have not made a threshold showing that the Amended Act imposes any burden on their practice of religion, much less a substantial one," flatly ignores this teaching of *Burwell*.

When a substantial burden has been imposed, the relevant question is whether the regulation is religiously neutral or generally applicable. P.A. 99-690 is not. The Supreme Court in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993) explained the test for evaluating laws that burden the free exercise of religion:

> our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. *Employment Div., Dept. of Human Resources of Ore. v. Smith, supra.* Neutrality and general applicability are interrelated, and, as becomes apparent in this case, failure to satisfy one requirement is a likely indication that the other has not been satisfied. *A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.*

Id. At 531-32. While the State asserts that the IHRCA Amendment is a neutral, generally applicable law (Mem. 8-16), Plaintiffs have produced evidence demonstrating that P.A. 99-690 is neither. As the Plaintiffs show in section IV above and in the accompanying declarations, non conscientious objectors are not required to comply with Section 6 or Sections 6.1 but are free to limit services as they see fit, obtain informed consent only for care they provide, and decline to refer clients to (or provide clients with information about) providers who offer treatments they do not provide. Yet the State maintains that Plaintiffs must do each of these things because they conduct tests to see if women who seek their services are pregnant, and because they have religious objections to certain legal treatments: elective abortion, sterilization, and contraception.

11

The Amendment's use of the word "legal" as a modifier of "treatment options" in Sec. 6 and 6.1(1) reveals its intent to expand a physician's duty of informed consent beyond the duty of informed consent applicable under current standards of medical practice or care. "Legal" treatment options include treatments like elective abortion which are not medically indicated but legal. Current standards of medical care do not require securing informed consent for non-medically indicated treatments, such as elective abortion. See Harrison Aff. at ¶¶ 4(a), 8(e), Ex.2, at 7. P.A. 99-690 is thus revealed as an attempt to expand the duty of informed consent, over the objection of religiously motivated practitioners, so as to require discussions of such legal albeit non-medically indicated (and highly controversial) treatments, all on the basis of politicized "ethics codes" crafted by abortion supporters such as the American College of Obstetricians and Gynecologists (ACOG). See Harrison Aff., Ex. 2 at p. 6-7. For this reason, the Amendment is a direct attack on the religious exercise of Plaintiffs and other pro-life medical practitioners, and the opposite of religiously neutral or generally applicable.

The bottom line is this. Plaintiffs can and do provide their limited services consistent with current standards of medical practice or care. See Facts at III. Plaintiffs do not need a benefit from IHRCA in these circumstances because they have no objection to operating as they do. P.A. 99-690 amends IHRCA to impose a *special* burden on religious objectors like Plaintiffs to provide information (as to legal treatment options and providers thereof) that other similarly situated persons do not have to provide under generally applicable medical standards of practice or care. Put another way, P.A. 99-690 amended IHRCA to put religious dissenters in a *worse* position than similarly situated persons without religious objection to these legal treatment options, and as a

result, forces Plaintiffs to take actions that violate their religious convictions.  Under these circumstances, the operation of IHRCA cannot be characterized as limiting a benefit in any meaningful way.  The State's reliance on *Our Savior Evangelical Lutheran Church v. Saville*, 397 Ill.App.3d 1003, 1020 (2d Dist. 2009) & *St John's United Church of Christ v. City of Chicago*, 502 F.3d 616 (7th Cir. 2007) is misplaced because in both of those cases, the laws in question did not strip the religious entity of the benefit of a generally applicable law.  *See*, *St John's*, 502 F.3d at 631 (noting that "the legislature acted again the OMA, however, taking back part of what IRFRA gave: it put religious institutions on the same footing as all other property owners for the purposes of the O'Hare project."); *see also*, *Our Savior*, 922 N.E.2d at 1146, 1147 (showing statute extended religious uses an accommodation, the site plan review process, without stripping religious uses of the benefits of generally applicable law (the special use permit)).  Here, on the contrary, Plaintiffs are being denied the benefit of generally applicable law.

An example proves the point.  Section 9 of IHRCA provides that persons with religious objections are not relieved "from obligations under the law of providing emergency medical care." That is a true limitation of the benefit provided by IHRCA, with the underlying duty being religiously neutral and generally applicable.  P.A. 99-690 does not operate this way.  It imposes duties on religious objectors that other similarly situated healthcare providers without religious objections are not required to comply with.  Thus, P.A. 99-690 does not amend IHRCA to "tailor" or limit the benefits of IHRCA.   P.A. 99-690 amends IHRCA to impose special burdens on religious objectors.  The protection afforded by the free exercise clause is properly characterized as a constitutional right, not a state-conferred benefit.  *Church of the Lukumi Babalu Aye, Inc. v. City*

*of Hialeah*, 508 U.S. at 531.

Because P.A. 99-690, is not religiously neutral or generally applicable, it violates the Plaintiffs' rights to free exercise of religion unless it satisfies strict scrutiny as applied to the Plaintiffs. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)(under strict scrutiny the Court must look "beyond broadly formulated interests" and determine whether "particular religious claimants" may not be exempted."). The State's showing falls far short of that required to enforce the law at this stage.

1. **The Amendment Cannot Survive Strict Scrutiny's Requirement of a Compelling State Interest and Narrowly Tailored Means**

The State cannot prove that P.A. 99-690 advances an actual compelling interest. Even if it could, it cannot show that it is a narrowly tailored and least restrictive means to achieve its goals.

a. **The State Cannot Identify a Real and Compelling Problem that Must Be Addressed**

The State cannot show that that P.A. 99-690 advances an actually existing problem that can be realistically characterized as compelling or even substantial. More fundamentally, the State's justification has no application to the Plaintiffs, and therefore, P.A. 99-690 is unconstitutional as applied to them.

The State claims that P.A. 99-690 was necessary to prevent religiously-inspired healthcare providers from keeping patients in ignorance of legal treatment options that are inconsistent with the provider's religious beliefs. At issue in this case are legal treatment options to which the Plaintiffs have a conscientious objection, i.e. elective abortion, sterilization, or contraception. The idea apparently is that a woman will not know elective abortion, sterilization, or contraception are

treatment options unless a doctor tells her. The State's interest is imagined. It blinks reality to suggest that any woman who has a condition for which abortion, sterilization, or contraception is an option does not know about these procedures or drugs as well as the whereabouts of persons who are willing, able, and indeed eager, to provide those things. Precisely because these legal treatment options are matters of common knowledge, the idea that a woman cannot give informed consent for treatment of a pregnancy unless the option of elective abortion is explicitly discussed is wholly untenable.

The State's Memorandum (Mem. 3) references legislative history said to recount actual incidents that supposed to justify P.A. 99-690. Even taken at face value, the generalized testimony of one doctor (Dr. Maura Quinlan) about a handful of incidents where doctors allegedly agreed to treat a patient and recommended a course of treatment without adequately advising the patients is too slim a showing to satisfy the State's burden to show an actually existing and compelling interest. Further, the actual evidentiary value of the incidents is almost impossible to ascertain without further detail, being rank hearsay. *See Greater Baltimore Center for Pregnancy Concerns v. Mayor and City Council of Baltimore, supra*, 2014 U.S. Dis. LEXIS 176718 at \*46 (Testimony at City hearing "recount[ed] stories from others and [did] not come from personal knowledge, making it inadmissible hearsay."); *see also* Harrison Aff. at ¶¶9-10. Similarly, the State cannot satisfy its burden by sheer speculation about what the public may or may not know. See Mem.16-18.

The State must have credible evidence of a real problem requiring a regulatory solution. *See, Plaintiffs' Memo,* 6-8; *see also*, *Wollschlaeger v. Governor of the State of Florida*, 848 F.3d

1293, 1302-03 (11th Cir. 2017)(en banc)(noting that state enacted challenged law "based on these six anecdotes," and finding all but one provision violated First Amendment on that basis). Heightened judicial scrutiny of legislative action means robust judicial scrutiny which, in turn, relies on the adversarial process. As a result, the State must marshal its evidence, and in cases like this the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 391, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). From this it follows that until the State marshals its evidence, Plaintiffs can test it, and until this Court has had a chance to evaluate that record, Plaintiffs' must prevail. *Ipse dixits* or staged testimony is insufficient to satisfy the State's burden of proof.

More fundamentally, the State's claim for a state interest based on informed consent has no meaningful application to Plaintiffs' activities. Plaintiffs do not agree to treat the pregnancies of their clients. They inform their potential clients of the limited services they offer, obtain informed consent for those services, and advise clients to seek the care of a doctor for their pregnancies should they choose to carry their babies to term.

The truth of the matter is that the Plaintiffs advance the same interest in individual autonomy, which is the foundational principle of informed consent, by providing women with information relevant to their pregnancy choices, information women choose to receive voluntarily from the PRCs. The PRCs' clients leave with more, not less information. The apparent premise of the legislation -- that women who leave the PRCs after learning they are pregnant do not know they can procure an abortion -- is completely without support in the legislative history, and risible

in view of the PRCs' mission to openly acknowledge a woman's legal right to choose abortion but to advocate for a life-giving alternative. Put simply, the State cannot justify application of P.A. 99-690 to the PRCs on an informed consent rationale that has no meaningful relationship to the limited scope of their mission and actual operations.

Finally, the referral, transfer and informational requirements of Section 6.1(3)(iii) have nothing to do with informed consent. That provision operates to force Plaintiffs to act as communication officers for the State or personal secretaries for any person who requests referral, transfer or information. This requirement, which can be satisfied by anyone able to go to the phone book or use the internet, is wholly unprecedented and unnecessary. It furthers convenience, not an actual interest that can be deemed substantial or compelling in any way.

> **b.** **The Regulation is not a Narrowly Tailored Solution or a Means Least Restrictive of Plaintiffs' Rights**

P.A. 99-690 utterly fails to satisfy the tailoring requirements of strict scrutiny. It does not satisfy the requirement of narrow tailoring, and is not a least restrictive means of regulation.

P.A. 99-690 is not narrowly tailored. It is grossly overbroad in compelling Plaintiffs to obtain informed consent for care they do not provide and which they tell women they cannot recommend or facilitate. It is grossly overbroad, and utterly unnecessary, in requiring Plaintiffs to serve as referral agents for persons who provide procedures or drugs to which they object in good conscience, and as personal secretaries to women who seek such procedures or drugs despite the mass marketing of these procedures and drugs.

P.A. 99-690 is also radically underinclusive because it does not apply to similarly situated providers who do not have religious objections to legal treatment options. These persons are free

to limit the scope of medical services rendered. They do not have to obtain informed consent for procedures they do not provide. And they do not have to refer clients to, or provide them with information about, service-providers. Of course, this lack of precision also undermines the State's claim that P.A. 99-690 advances any important interest. *See, e.g., Lukumi*, 508 U.S. at 546 (noting that "it is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order…when it leaves appreciable damage to that supposedly vital interest unprohibited.").

Finally, P.A. 99-690 is not the least restrictive means to effect its purported interest in furthering informed consent of pregnant women. The least restrictive means would be for the State to fill the imagined information gap by public service announcements that advance its reproductive rights agenda or to ensure that persons securing informed consent for a course of care disclose relevant treatment options that they cannot in good conscience provide. The State did not pursue that approach. Instead, it seeks to commandeer the Plaintiffs, and other similarly situated conscientious objectors, to serve the State's purpose of disseminating information about the very legal treatment options, and providers of those treatments, to which they object on conscience grounds. In that respect P.A. 99-690 is not in any meaningful sense about "informed consent" or about protecting individuals from unscrupulous healthcare providers. Its real aim is to force precisely those with religious objections to certain treatment options, and precisely because they have such objections, to discuss the "benefits" of the treatments they believe are gravely immoral, and to refer patients upon their request to providers of those objectionable treatments. For this reason, Plaintiffs have demonstrated a likelihood of success on their Free Exercise claim.

18

**B.      The IHRCA Amendment Violates Plaintiffs' Rights of Free Speech**

P.A. 99-690, as applied to the PRCs, is an archetypal example of flagrantly unconstitutional governmental regulation targeting dissenters to make them mouth the orthodoxies of the day.  As applied to the PRCs, P.A. 99-690 compels speech based on criteria that are: (1) speaker-based (religious objector); (2) content-based (must address legal treatment options); and (3) viewpoint-based (must discuss supposed benefits of "legal treatment options"). It forces them to address certain "legal treatment options," to convey information about the supposed "benefits" of the treatments, and to provide upon request information about persons who will provide the procedures and drugs to which they conscientiously object.  The duty to speak added by the Amendment is not based on a *medical* standard of care, which limits informed consent to the medical care offered, and even then, requires only discussion of medically-indicated treatment options to be discussed within that scope of services.  To the extent that they advise an expansion of elective abortion discussions beyond current standards of medical practice or care, the Amendment does so on social and political, not medical, grounds.  Harrison Aff ¶11, Ex.2 at pp. 2-7, 10 (Committee Opinion No. 1).  The State, through the Amendment, forces physicians and healthcare providers to act as its agents to further its social and political agenda.  Because P.A. 99-690 compels speech based on speaker-based, content-based, and viewpoint-based criteria, it is subject to strict scrutiny.  *See, e.g.*, *Reed v. Town of Gilbert*, __ U.S. __, 135 S.Ct. 2218, 2230 (2015) (emphasizing that content-based and viewpoint-based regulations must withstand strict scrutiny).  P.A. 99-690 cannot survive strict scrutiny; in fact, it cannot withstand even intermediate scrutiny.

19

      **1.**      **The State Cannot Save P.A. 99-690 Based On a Professional Speech Rationale**

The State asserts the Amendment is lawful regulation of "professional speech."  The speech at issue here is not professional speech.  It is speech by private citizens about abortion and the taking of human life, matters of urgent public and private concern, and for that reason commands the highest protection available under the First Amendment..

      **a.**      **The PRCs' Speech About Abortion is Not Properly Characterized as Professional Speech.**

The PRCs are not engaged in professional speech when they discuss abortion with their clients. Professional speech is different.  It arises out of "personalized services to a client based on the professional's expert knowledge and judgment." See *King v. Governor of the State of New Jersey*, 767 F.3d 216 (3rd Cir. 2014)(citing *Moore-King v. Cty. Of Chesterfield*, Va, 708 F.3d 560, 469 (4th Cir. 2013)(defining professional speech as a professional "providing personalized advice in a private setting to a private client."); *Wollschlaeger v. Governor of the State of Florida*, 840 F.3d 1159, 1189 (11th Cir. 2015)(defining professional speech as "uttered in furtherance of a profession that occurs within the professional-client relationship), cited with approval in *Wollscshlaeger v. Governor of the State of Florida*, 848 F.3d 1293 (11th Cir. 2017)(en banc); see also, *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002)(addressing professional speech as taking place within the doctor-patient relationship and noting that professional speech may be "entitled to strongest protection our Constitution has to offer.")(citing *Florida Bar v. Went For it, Inc.*, 515 U.S. 618, (1995).

As already noted, the PRCs limit their services to the women they treat—a pregnancy test,

the results of a limited ultrasound, and sometimes limited STD testing and antibiotic

treatment—and do not undertake to treat a client's pregnancy to term. If a pregnancy is indicated

by a pregnancy test and ultrasound, the information is relayed to the client, and she is advised to

seek a doctor's care if she chooses to carry the baby to term. Dr. Schroeder does speak with

patients but he does not take the patients as clients; rather, he tells women they need to seek the

care of a doctor for their pregnancy. Because the Plaintiffs do not treat the pregnancy they do not

have to obtain the client's informed consent for a course of treatment for pregnancy. While it is

true that lay volunteers (sometimes called advocates or counselors) discuss elective abortion, an

alternative to childbirth that is within clients' common knowledge, this speech by volunteers who

do not hold themselves out as providing medical advice is not professional, but private, speech,

and the State concedes as much. See Mem. 23-24. Thus, the informed consent requirements

cannot be justified as a regulation of professional speech because the speech of lay volunteers

about abortion is simply not professional speech.

> **b.     The Speech OF PRCs Cannot Properly Be Characterized as Professional Speech Because It Is Mingled With Non Professional, Fully Protected Speech.**

The narrow band of professional speech in which Plaintiffs engage when assisting women

cannot justify the coerced-speech requirements of P.A. 99-690 also because it is inextricably

intertwined in a much larger conversation, in which, by far, lay speech about abortion

predominates. This speech falls squarely into speech traditionally protected by the First

Amendment, and commanding the highest protection of the First Amendment. *See Evergreen*

*Ass'n, Inc. v. City of New York,* 740 F.3d 233, 249 (2d Cir. 2014), ("[E]xpression on public issues

21

has always rested on the highest rung on the hierarchy of First Amendment values."citing *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913 (1982)).  When such protected speech is intertwined with professional speech, strict scrutiny still applies.  *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796 (1988);*Greater Baltimore Center For Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore,* 2016 U.S. Dist. LEXIS 184046, *38 (2016).

The constitutional violation worked by forcing the PRCs to comply with P.A. 99-690 is apparent once the inapplicable professional speech justifications for regulation are set aside. Requiring the Plaintiffs to comply with P.A. 99-690 forces them to articulate views that are diametrically opposed to their religious convictions, their principles, and their very reasons for speaking with the women who visit with them.  Adding insult to injury, P.A. 99-690 forces the Plaintiffs to act as referral agents for, or provide women with information about, those who provide the very procedures and drugs that the Plaintiffs believe are immoral and harmful. Governmental efforts to coerce speech or action that undermine a speaker's own speech are blatantly unconstitutional.[6]  Indeed, First Amendment protection from laws requiring speakers to

---

[6] See *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943) (State could not compel salute and pledge of allegiance to the flag of the United States: "if there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."); *Wooley v. Maynard*, 430 U.S. 705 (1977) (State of New Hampshire had no interest sufficiently compelling to justify requiring display of state motto on their license plates); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995) ("'Since *all* speech inherently involves choices of what to say and what to leave unsaid,' (citation omitted), one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say,'"); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974) (Florida statute requiring a newspaper to print a reply to an article "exacts a penalty on the basis of the content of a newspaper.").

contradict their own views is so robust that it applies even in the case of commercial speech, which normally receives less constitutional protection. *See*, *Pacific Gas & Elec. Co. v. Public Util. Comm'n,* 475 U.S. 1, 11 (1986).

> **c.** **Even If All The Speech At The PRCs Could be Characterized as Professional, The Regulation Would Still Be Unconstitutional As Content-based and Viewpoint-based Regulation of Truthful and Non-misleading Speech.**

Even if the speech regulated by the State by P.A. 99-690 could be realistically characterized as professional speech, the Amendment would still be unconstitutional. The reason is simple: the Plaintiffs' speech is truthful and non-misleading. There is no authority for the proposition that the State has unfettered discretion to regulate truthful, non-misleading speech. Indeed, such a claim defies precedent.

As an initial matter, P.A. 99-690's content and viewpoint based regulation of speech cannot be saved based on the State's admitted authority to regulate the professions as a general matter. Long ago, the Supreme Court noted that attorneys have the right to speak freely, subject only to the government regulating with "narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433, 438–39 (1963); *see also*, *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002)(addressing professional speech as taking place within the doctor-patient relationship and noting that professional speech may be "entitled to strongest protection our Constitution has to offer.")(citing *Florida Bar v. Went For it, Inc.*, 515 U.S. 618, (1995). Recently, the Court quoted *Button*, which dealt with government regulation of speech to communicate with individuals who might be in need of legal services, for the proposition that "it is no answer…to say that the purpose of these regulations was merely to insure high professional standards and not to curtail free expression." *Reed v. Town of*

23

*Gilbert*, *supra*, ___ U.S. ___, 135 S.Ct. 2218, 2229 (2015). *Button* states the bottom line here: "a

state may not, under the guise of prohibiting professional misconduct, ignore constitutional rights."

*Button*, 371 U.S. at 439.  The Supreme Court has repeatedly struck down content-based regulation

of truthful professional speech even when deemed commercial in thrust.[7]  There can be no

question that the speech of physicians is likewise protected.  See, e.g., *King*, 767 F.3d 216 (3rd Cir.

---

[7] See, e.g., *Peel v. Attorney Registration & Disciplinary Com'n*, 496 U.S. 91, 110 S. Ct. 2281, 110 L. Ed. 2d 83 (1990) (attorney has right under standards of commercial speech to advertise his or her certification as a trial specialist by the National Board of Trial Advocacy); *Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466, 108 S. Ct. 1916, 100 L. Ed. 2d 475 (1988), *cert. denied*, 490 U.S. 1107, 109 S. Ct. 3160, 104 L. Ed. 2d 1022 (1989) (state may not categorically prohibit lawyers from soliciting legal business by sending truthful and non deceptive letters to potential clients known to face a particular legal problem); *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 105 S. Ct. 2265, 85 L. Ed. 2d 652 (1985) (striking down rule against soliciting or accepting legal employment through advertisements containing information and advice regarding a specific legal problem and rule banning use of illustrations in attorney advertisements); *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S. Ct. 2875, 77 L. Ed. 2d 469 (1983) (federal statute prohibiting the mailing of unsolicited advertisements for contraceptives is an unconstitutional restriction of commercial speech); *In re R.M.J.*, 455 U.S. 191, 102 S. Ct. 929, 71 L. Ed. 2d 64 (1982) (holding the following restrictions on lawyer advertising violative of the First Amendment: 1) prohibiting deviation from precise listing of practice areas specified in an addendum to the rule; 2) prohibiting identification of jurisdiction in which the lawyer is licensed to practice; and 3) prohibiting the mailing of announcement cards to persons other than lawyers, clients, former clients, personal friends and relatives); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S. Ct. 2691, 53 L. Ed. 2d 810 (1977) (holding that non misleading advertising by attorneys is protected commercial speech); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 97 S. Ct. 2010, 52 L. Ed. 2d 675 (1977) (prohibition of advertising or display of contraceptives not justified on grounds that ads would be offensive and embarrassing to those exposed to them or that permitting such ads would legitimize sexual activity of young people);*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976) (ban on advertising prescription drug prices not justified by state's interest in maintaining professionalism of licensed pharmacist; commercial speech protected by First Amendment but may be regulated by time, place and manner restrictions or if false, deceptive or misleading or if it proposes illegal transaction); *Bigelow v. Virginia*, 421 U.S. 809, 95 S. Ct. 2222, 44 L. Ed. 2d 600 (1975) (paid commercial advertisement in newspaper protected by First Amendment; conviction of newspaper editor for encouraging or prompting an abortion through the sale of a publication overturned).

24

2014)(speech of medical professionals); *Wollschlaeger v. Governor of the State of Florida*, 840 F.3d 1159, 1189 (11th Cir. 2015)(cited with approval in *Wollschlaeger v. Governor of the State of Florida*, 848 F.3d 1293 (11th Cir. 2017)(en banc); *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002).

More fundamentally, there is no "professional speech" exception to the effectively *per se* bar on viewpoint discrimination imposed by free speech guarantees.  In *Reed*, *supra*, the Court restated its longstanding view that "discriminating among viewpoints—or the regulations of speech based on the the specific motivating ideology or the opinion or perspective of the speaker is a more blatant and egregious form of content discrimination."  *Reed v. Town of Gilbert*, ___ U.S. ___, 135 S.Ct. 2218, 2230 (2015).  The prohibition of viewpoint discrimination is a core principle that applies to all categories of free speech regulation and cannot be cast aside based on the application of other analytical frameworks.  For example, *Rosenberger* demonstrates that even in a nonpublic forum, where government's ability to regulate is greatest, it cannot engage in viewpoint discrimination.  *See*, *e.g. Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829 (1992).  ).  Likewise, the Supreme Court's decision *Sorrell*, indicates that even when regulating commercial speech, which is traditionally given less protection under the First Amendment, the "State may not . . .burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell*, 564 U.S. 552, 577-579 (2011). These cases make plain that the State's viewpoint-based regulation of truthful and non-misleading speech is undoubtedly subject to strict scrutiny.

In fact, this case provides an archetypal example of the need for strict scrutiny.  As applied

to these Plaintiffs, the implications of the State's citation to codes promulgated by private voluntary organizations, particularly the code promulgated by one group of practitioners in the most relevant area, i.e. the American College of Obstetricians and Gynecologists (ACOG), are truly chilling. This line of argument represents nothing less than an invitation for this Court to take sides with it and ACOG (or others), and to ignore the deep divisions that the procedures and drugs at issue here have created in the medical profession, in terms of ethics and medical judgment. Harrison Aff. ¶¶6&11, and Ex 2 (AAPLOG Committee Opinion 1). The State's position, if accepted, means that every physician must practice medicine in keeping with ACOG's views, although those views are highly contested.

Fortunately, the protection afforded free speech dooms the State's embrace of ACOG's views as dispositive of how physicians must speak and act with respect to elective abortion, sterilization, or contraception. In this divisive debate (as in others) the State may not choose sides and stifle truthful speech based on the "fear that speech might persuade," or the "fear that people will make bad decisions if given truthful information." *Sorrell*, 564 U.S. 552, 577-579 (2011). "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *U.S. v. Alvarez*, 567 U.S. 709, 132 S.Ct. 2537, 2547 (plurality opinion of Kennedy, J.)(citing G. Orwell, Nineteen Eighty–Four (1949) (Centennial ed.2003)). In *U.S. v. National Treasury Employees Union*, 513 U.S. 454 (1995), the Supreme Court quoted Justice Brandeis' observation that "[f]ear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women.... To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced." Id. At 664 (*citing Whitney v.*

*California*, 274 U.S. 357, 376, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (concurring opinion).

The Plaintiffs have a right to perform their mission without the State dictating how they should deliver their message, particularly when the speech at issue addresses highly sensitive issues such as abortion in a truthful and non-misleading way. But P.A. 99-690 strips them of that right by requiring them to discuss elective abortion, sterilization, and contraception as well as the supposed "benefits" of these drugs and procedures as reckoned by ACOG; and it requires the PRCs to give out information about abortion providers. These requirements will necessarily interfere with how the Plaintiffs fashion their pro-life message, and thus unconstitutionally interfere with their speech. See *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 2016 U.S. Dist. LEXIS 184046, at *50, quoting *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 249 (2d Cir. 2014) (further case history omitted).

**2.      P.A. 99-690 Cannot Survive Strict or Even Intermediate Scrutiny**

For the reasons stated above, the PRCs insist that the State must satisfy strict scrutiny, and therefore demonstrate an actually existing problem that counts as a compelling interest. The State calls for intermediate scrutiny. P.A. 99-690 fails under either standard for the reasons explained above: the State cannot show an actual problem that P.A. 99-690 addresses that counts as either compelling or substantial; it cannot satisfy the requirement of narrow tailoring never mind use of the least restrictive means. See Argument supra at A.1a,1b.

**3.      Section 6.1(3) Of P.A. 99-690 Perpetrates An Egregious Constitutional
          Violation.**

The compelled speech requirements of 6.1(3) merits separate treatment because their very presence bespeaks the ideological dimension of this dispute. First, this requirement has nothing to

do with informed consent. Second, the State's effort to defend compelled speech requirements of 6.1(3)(iii) fails because the medical practice codes cited by the State as well as current standards of medical practice or care do not require a referral or anything like the duty imposed by 6.1(3)(iii). See Harrison Aff. ¶6; Schroeder Aff. ¶10; see also, State's Ex. A at 1.1.7(f)(recognizing that physician may decline to refer).

The overreaching that 6.1(3)(iii) represents is significant. That requirement, which can be satisfied by anyone able to use a phone book or the internet, is not a regulation of professional speech. It is compelled speech of the most blatant and worst kind. The wholly unprecedented (and unnecessary) nature of this requirement shows that P.A. 99-690 is designed to commandeer the speech of private citizens and force them to further a reproductive rights and sexual health agenda which is directly contrary to their principles. Plaintiffs view these procedures and drugs as contrary to the health and welfare of all involved, and wish to share their views with others.

Here again, the good news for the Plaintiffs is that this provision is hopelessly unconstitutional. Even utility companies do not have to convey information contrary to their economic interest. See *Pacific Gas & Elec. Co. v. Public Util. Comm'n,* 475 U.S. 1, 11 (1986). The unconstitutionality of the compelled speech requirement is more certain here, because "[e]xpression on public issues has always rested on the highest rung of First Amendment values." *NAACP v. Clairborne Hardware Co.*, 458 U.S. 886, 913 (1982). For the same reason, the State's reliance on *Nat'l Inst. of Family & Life Advocates v. Harrison*, 839 F.3d 823 (9th Cir. 2016), invites this Court to error. A decision that gives the less protection to speech advancing views on deeply divisive issues of great public importance than the protection enjoyed by utility companies

28

turns free speech values upside down.

C.     **Plaintiffs Due Process Claims And Overbreadth Claims Merit Relief.**

Defendants maintain that Plaintiffs fail to adequately state due process claims because the language of the Amended Act referencing "consistent with current standards of medical practice or care" (745 ILCS 70/6.1) is not unconstitutionally vague.  But the State's repeated reference to the ACOG ethics code, the most favorable to the State's position -- despite the deep division among professionals on the procedures and drugs at issue here, See Harrison Aff. ¶¶6&11, and Ex 2 (AAPLOG Committee Opinion 1) -- shows that the statutory duty is not clear but forces the Plaintiffs to "guess what the law requires," and "invites, indeed encourages arbitrary and discriminatory enforcement."  *Chicago v. Morales*, 527 U.S. 41, 56-57 (1999).  The State's defense of P.A. 99-690 demonstrates the real risk that the standard used in disciplinary or other actions will be derived from ideological viewpoints located in one or other ethics code, not based on a *medical* standard of practice or care.  Accordingly, the PRCs due process concerns about how P.A. 99-690 will be enforced against their activities are real, not imagined.  This is particularly true if the State's position were to be accepted that ethics codes determine the medical standard of care.  Then the "current" medical standard of care would become a moving target, changing with ACOG's whim, and riding roughshod over contrary ethics positions within the profession.

The Amendment is also overbroad as applied to the Plaintiffs who provide only limited

services.  The State cites a parade of emergency scenarios to justify the reach of the statute, but these do not apply to the Plaintiffs who correctly tell women to go to the emergency room if the an emergency situation is identified.  As demonstrated above with respect to Plaintiffs' free exercise claim, the Amendment is grossly overbroad.  See I.A.1.b.  The State removes some of the overbreadth by interpretation.  Mem. 22-24.  But an overbreadth problem remains: the State's unjustifiable effort to compel the Plaintiffs to articulate views that contradict their principles, although the Plaintiffs' speech is truthful and non-misleading.

**II.     The PRCs Satisfy The Remaining Requirements For Preliminary Relief**

 As demonstrated in their opening brief, the Plaintiffs satisfy the remaining requirements for preliminary relief for the reasons stated in their opening brief. See Ps' PI Mem. at 13-14.

**III.     The State's Motion To Dismiss Should Be Denied.**

On a motion to dismiss for failure to state a claim the Court "must determine whether the complaint states "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).  The requirement of facial plausibility means "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.  The State's Motion to dismiss asks this Court to disregard the controlling standard by construing the

30

Complaint against the PRCs and disregarding their allegations.

Plaintiffs state claims for violation of their First Amendment rights to free exercise of religion and free speech, as well as a Due Process claim based on vagueness. As shown above, the Plaintiffs allege (and support) their claim that P.A.99-0690 amends the IHRCA in a way that forces them to act contrary to their conscience while leaving non-conscientious objectors unregulated and forces them to speak and act in ways that contradict their sincerely held religious beliefs and their principles. The State counters by asserting that P.A. 99-0690 imposes no new substantive requirement. Mem. 7-12. In essence, the State asks this Court to disregard allegations of the complaint, draw inferences *against* the Plaintiffs, and accept the State's assertions as true. The governing standard requires the *exact opposite* procedure.

The Plaintiffs state a valid claim for violation of their associational rights. The facts show that individuals have disassociated with 1st Way because they do not wish to comply with the law and fear sanctions. Decl. of Judy Cocks, Ex.2 to Ps' PI Memo, ¶¶12-13. The Supreme Court has noted that freedom of speech and expressive association are "delicate and vulnerable as well as extremely precious to our society," and has observed that the "threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." *National Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963). It has refused to tolerate laws that would impose liability based on nothing more than association. See *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982)(stating that the right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct…that itself was not protected). P.A. 99-690 burdens the Plaintiffs' associational rights by

31

forcing people to choose between complying with the law that violates their beliefs, defying the law under threat of sanction or liability, or disassociating from the Plaintiffs' and their good works. Plaintiffs state a claim for relief of their First Amendment associational rights.

Plaintiffs' state claims for denial of Equal Protection of the laws. As noted, they allege (and show) that other similarly situated providers do not have to comply with the duties imposed by P.A. 99-690. Defendants argue that Plaintiffs have failed to state an Equal Protection claim because health care providers "who refuse to provide patients with information are not at all 'similarly situated' to health care providers who have no objection to providing patients such information." (State's Memo., p. 27). [Citation omitted.] The statute, however, does not set up some general distinction between health care providers who want to provide information to their patients and health care providers who do not. For example, it does not apply to medical care providers who elect not to provide referrals to other health care providers because of concerns over possible malpractice exposure or because of concerns they will lose those patients (and a loss of income) if referred out. Instead, the statute singles out from all health care providers only those health care providers who have conscience-based objections and imposes duties only on them. See e.g., 740 ILCS 70/6.1. The comparison group (medical providers who do not have religiously motivated conscience based objections) are in all respects similarly situated to those who are burdened by the statute, with the exception of the distinction set up by the statute as a basis for treating certain members of the comparison group differently – religiously motivated conscience based objections. Defendants' argument is mistaken because it conflates the group of persons potentially subject to the duties of P.A. 99-690 (all health care providers) with the statute's

32

unconstitutional basis for distinguishing among and burdening members of that group

(conscience-based objections to certain legal treatment options). Plaintiffs state a claim.[8]

Plaintiffs state claims for violation of the federal statutes actionable under 42 U.S.C.

§1983 (Counts 7 - 9 of their Complaint). In *Planned Parenthood of Indiana, Inc. v.*

*Commissioner of the Indiana State Dept. of Health*, 699 F.3d 962 (2012), the Court summarized

the analytical frameworks governing this inquiry. First, it noted that

> three factors help determine whether a federal statute creates private rights
> enforceable under § 1983: (1) Congress must have intended that the provision in
> question benefit the plaintiff; (2) the asserted right must not be so vague and
> amorphous that its enforcement would strain judicial competence and (3) the
> provision giving rise to the asserted right must be couched in mandatory, rather
> than precatory, terms.

*Id.* at 972-73 (internal quotations omitted). The Court continued:

> [T] o create judicially enforceable private rights, the statute must be phrased in
> terms of the persons benefited with an unmistakable focus on the benefited class.
> It must confer[ ] entitlements sufficiently specific and definite to qualify as
> enforceable rights. In other words, the statute must contain "rights-creating
> language" that unambiguously creates an individual entitlement. Once a plaintiff
> demonstrates that a statute confers an individual right, the right is presumptively
> enforceable by §1983. The defendant may defeat this presumption by
> demonstrating that Congress shut the door to private enforcement either
> expressly, through specific evidence from the statute itself, or impliedly, by
> creating a comprehensive enforcement scheme that is incompatible with
> individual enforcement under §1983.

*Id*. At 973-74 (internal quotations and citations omitted). Applying that framework, the Seventh

---

[8] Defendants also argue that Plaintiffs' equal protection claims "add nothing to their other constitutional claims" and should be dismissed on the same bases as those other claims. It is obvious that claims can sometimes overlap, *see, e.g.*, *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92 (1972)(striking down a content-based ban on picketing under equal protection), but that provides no basis for dismissing Plaintiffs' claim. If the Court enters relief on the First Amendment claims, then there will be no need to provide relief under equal protection. But that is a question for another day.

Circuit held that "free-choice-of-provider" provision of Medicaid conferred an individual right enforceable via §1983. *Id.* at 974. In doing so, it explicitly rejected the argument that the statutory provisions conferred no rights enforceable under §1983 because the provisions were contained in spending legislation. *Id*. at 976.

The federal statutes that Plaintiffs rely upon in this action confer a right to be free from discrimination (in the form of disciplinary action or liability) because they will not refer for abortion (or its equivalent) are enforceable via §1983. First, by its terms each piece of legislation is intended to benefit Plaintiffs, entities who provide limited medical services under the direction of individual physicians serving as medical directors. The so-called Hyde/Weldon Amendment, 114 P.L. 113, Title V, §507(d), provides that no federal funds may be made available to any state or local government if it subjects an institution or individual healthcare entity to discrimination because that entity does not provide, or refer for, abortions, *see* §507(d)(1), and defines the term healthcare entity broadly, see *id.* at (d)(2). The so-called Coats-Snowe Amendment, 42 U.S.C. §238n, specifically prohibits recipients of federal funds from "discriminating against a health care entity because that entity refuse to perform induced abortions, provide referrals for abortions, or make arrangements for abortions,' 42 U.S.C. §238n(a)(1)&(2) defines healthcare entity broadly to include individual physicians (as well as entities). 42 U.S.C. §238n(c)(2). The so-called Church Amendment, 42 U.S.C. §300a-7 prohibits recipients from discriminating against an "individual" based on whether they "performance or assistance" sterilization or abortion. Second, the right conferred by each statute is well defined: the right to be free from discrimination based on specified criteria. Third, the statutory language is mandatory, not precatory.

34

There is no question that these provisions are intended to protect the identified entities from discrimination. It is true that these provisions relate to federal spending but that does not determine the outcome, as the Seventh Circuit has recognized in *Planned Parenthood*, *supra*.[9]

In this regard, the cases cited by the State are not controlling and not persuasive. *Cenzon-DeCarolo v. Mount Sinai Hosp*. 629 F.3d 695 (2nd Cir. 2010), ignores the statutory intent to benefit the plaintiffs, by providing protection, and does not take into account the role that §1983 plays in providing a remedy. *Nead v. Board of Trustees of Eastern IL University*, 2006 WL 1582454 (C.D. Ill. June 6, 2006) and *Monicivaiz v. DeKalb Cty.*, 2004 WL 539994 (N.D. Ill. March 12 2004), conduct an improper, truncated, analysis inconsistent with *Planned Parenthood*, *supra*, and neglect §1983's role as remedy for violations of federally protected rights.

Finally, the Plaintiffs' ability to proceed under §1983 is not negated by the possibility of an administrative enforcement action. As the Seventh Circuit noted in *Planned Parenthood, supra,* "[o]nce a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983. The defendant may defeat this presumption by demonstrating that Congress shut the door to private enforcement either expressly, through specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Planned Parenthood*, 699 F.3d at 973-74. The State cannot make that showing here; it has not tried.

P.A. 99-690 does discriminate against providers based on their religious convictions. It

---

[9] Although not dispositive, it bears noting that two of the statutes the Plaintiffs rely upon were not incorporated into spending legislation proper, but rather Title 42, the same Title in which 42 U.S.C. §1983, a statute designed to remedy violation of civil rights arising under federal law, is located.

requires referral or "providing information," which is tantamount to a referral as a practical matter because its purpose is to force Plaintiffs to point those who asks in the direction of providers of drugs and services, which they cannot in good conscience do. The Plaintiffs rely upon provisions that are designed to protect their conscience, and those provisions should be liberally construed in light of that remedial purpose. *See*, *e.g. U.S. v. Genendo Pharmaceutical, N.V.*, 485 F.3d 958, 963-64 (7th Cir. 2007)(construing Food, Drug, and Cosmetic Act broadly in light of the "well-accepted principle that remedial legislation…is to be given a liberal construction…."). For these reasons, Plaintiffs state claims for violations of these federal statutes as enforced via 42 U.S.C. § 1983.

## CONCLUSION

The State has not satisfied the demanding standard required to secure dismissal. Plaintiffs state valid causes of action, and have made the showing required to justify preliminary relief on several claims at this stage of the proceedings. The Plaintiffs' Motion for a Preliminary Injunction should be granted and the State's Motion to Dismiss should be denied.

Respectfully submitted this 19th day of June, 2017.

/s/Thomas Olp

Thomas Brejcha
Thomas Olp  ARDC#3122703
Thomas More Society
19 South LaSalle St., Suite 603
Chicago, IL 60603
(312) 782-1680
tolp@thomasmoresociety.org

Attorneys for Plaintiffs

36

## CERTIFICATE OF SERVICE

Thomas Olp, certifies that he served a copy of the foregoing PLAINTIFFS' COMBINED
MEMORANDUM OF LAW IN SUPPORT OF THEIR RESPONSE TO DEFENDANTS'
MOTION TO DISMISS AND IN SUPPORT OF THEIR REPLY TO PLAINTIFFS' RESPONSE
TO THEIR MOTIONS FOR PRELIMINARY INJUNCTION  upon:

> LISA MADIGAN
> Attorney General of Illinois
>
> Sarah H. Newman
> Michael T. Dierkes,
> Assistant Attorneys General General Law Bureau
> 100 W. Randolph St., 13th Fl. Chicago, Illinois 60601
> snewman@atg.state.il.us
> mdierkes@atg.state.il.us
>
> Joshua I. Grant
> Assistant United States Attorney
> Central District of Illinois
> 318 South 6th Street
> Springfield, Illinois 62701
> 217-492-4450
> joshua.grant@usdoj.gov

through the Court's CM/ECF system on June 19, 2017.  Parties of record may obtain a
copy through the Court's CM/ECF system.  The undersigned certifies that no part of record
requires service of documents through any means other than the CM/ECF system.

> /s/ Thomas Olp

## APPENDIX

**Exhibit 1 - Affidavits of Executive Directors of Plaintiff Pregnancy Centers**
**Exhibit 2 - Affidavit of Dr. Donna Harrison.**