**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| National Institute of Family and Life Advocates, *et al.*, | |
| Plaintiffs, | Case No. 16-cv-50310 |
| | Hon. Iain D. Johnston |
| v. | Magistrate Judge Lisa A. Jensen |
| Mario Treto Jr., | |
| Defendant. | |
| Ronald Schroeder, *et al.*, | |
| Plaintiffs, | Case No. 17-cv-4663 |
| | Hon. Iain D. Johnston |
| v. | Magistrate Judge Lisa A. Jensen |
| Mario Treto Jr., | |
| Defendant. | |

**DEFENDANT'S POST-TRIAL MEMORANDUM OF LAW**

KWAME RAOUL
*Attorney General of Illinois*

Karyn L. Bass Ehler
Christopher Wells
Elizabeth Morris
Sarah J. Gallo
Hannah Jurowicz
John Hazinski
Office of the Illinois Attorney General
*Counsel for Defendant*

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 2

   I.    The Conscience Act .................................................................................................. 2

   II.   Crisis Pregnancy Centers ......................................................................................... 3

   III.  Medical Ethics and the Standard of Care ................................................................ 5

   IV.  Procedural History.................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

   I.    Plaintiffs' Free-Speech Claims Fail Under *Casey* and *Rokita* ............................. 8

      A.    The disclosures required to invoke the Conscience Act's shield are related to medical procedures.................................................................................................................. 10

      B.    The required disclosures are truthful and not misleading.......................... 14

      C.    The disclosures are directly relevant to patients' medical choices............ 16

      D.    Requirements to disclose truthful, non-misleading information about patients' medical options regulate professional conduct even when they affect speech..................... 17

   II.   Even if Heightened Scrutiny Applied to Plaintiffs' Free Speech Claims, the Conscience Act is Constitutional.................................................................................................... 20

      A.    The Act furthers compelling and substantial government interests unrelated to suppressing free expression. ....................................................................................... 21

      B.    The Act is narrowly tailored, and no less restrictive regulations would achieve its purposes. .................................................................................................................. 22

   III.  Plaintiffs' Free-Exercise Claims Fail Because the Conscience Act is Neutral and Generally Applicable................................................................................................... 24

   IV.  The Conscience Act Does Not Impose Unconstitutional Conditions ..................... 27

   V.   Plaintiffs' Facial Challenge Fails .......................................................................... 29

CONCLUSION.................................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) ........................................................ 19

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 570 U.S. 205 (2013) ........................ 27, 28

*Center for Indiv. Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012) .................................. 29

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980) .. 21

*City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416 (1983) .................. 14

*Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003) .............. 26

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .......................................................... 3

*Doe v. Att'y Gen. of Indiana*, 630 F. Supp. 3d 1033 (S.D. Ind. 2022) .................................. 10

*Doe v. Rokita*, 54 F.4th 518 (7th Cir. 2022) ....................................................... passim

*Employment Division, Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) 25, 26

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 283 F. Supp. 3d 629 (W.D. Ky. 2017) .......... 20

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421 (6th Cir. 2019) .................. 10, 20

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) .............................................. 18

*Gonzales v. Carhart*, 550 U.S. 124 (2007) .................................................................... 21

*Grove City College v. Bell*, 465 U.S. 555 (1984) ............................................................. 27

*Ill. Bible Colleges Ass'n v. Anderson*, 870 F.3d 631 (7th Cir. 2017) .................................. 25, 26

*Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013) .................................... 27

*Lawline v. American Bar Ass'n*, 956 F.2d 1378 (7th Cir. 1992) .......................................... 18

*Love v. Vanihel*, 73 F.4th 439 (7th Cir. 2023) ................................................................. 29

*Martinez v. Colvin*, No. 12 CV 50016, 2014 WL 1305067 (N.D. Ill. Mar. 28, 2014) .......... 26, 29

*NIFLA v. Becerra*, 138 S. Ct. 2361 (2018) ................................................................. 11, 19

*NIFLA v. Schneider*, 484 F. Supp. 3d 596 (N.D. Ill. 2020) ................................................. 7

*NIFLA v. Schneider*, 484 F. Supp. 3d at 614 ......................................................... 14, 20, 25

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ...................................................... 18

*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020) ........................................... 18, 19

*Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) ........... passim

*Planned Parenthood v. Rounds*, 530 F.3d 724 (8th Cir. 2008) .......................................... 20

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................................. 15

*Regan v. Taxation With Representation of Wash.*, 461 U.S. 540 (1983) ................................ 28

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ........................ 18

*Rust v. Sullivan*, 500 U.S. 173 (1991) ..................................................................... 27, 28

*Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014) ............................................................. 20

*Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225 (4th Cir. 1989) .................................... 24

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012) .......... 20

*Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) ...................................................... 19

*United States v. Lee*, 455 U.S. 252 (1982) ................................................................... 26

*United States v. Williams*, 553 U.S. 285 (2008) ......................................................... 29

*Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442 (2008) ..................................... 29

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ......................................................... 21

*Whole Woman's Health Alliance v. Hill*, 493 F. Supp. 3d 694 (S.D. Ind. 2020). ........................ 20

**Statutes**

18 Pa. Cons. Stat. § 3205 ............................................................................... 9, 13

2016 Ill. Legis. Serv. P.A. 99-690 ......................................................................... 2

745 ILCS § 70/3 ........................................................................................... 3

745 ILCS § 70/4 ....................................................................................... 2, 3

745 ILCS § 70/6.1 ................................................................................... passim

775 ILCS § 55/1-15 ...................................................................................... 16

Ind. Code § 16-34-2-1.1 .............................................................................. 10, 13

**INTRODUCTION**

The Supreme Court and the Seventh Circuit have long recognized that the government may regulate the medical profession to ensure that patients receive the information they need to make informed decisions about their own healthcare. This authority reflects core principles of biomedical ethics and the standard of care, which prioritize patient autonomy and prohibit inaccurate or misleading counseling about patients' medical options. The Illinois Health Care Right of Conscience Act applies these principles by shielding healthcare providers from liability for refusing to perform a procedure due to a conscience objection, but qualifying that protection to ensure that patients still receive the information necessary to make informed choices.

The crisis pregnancy centers (CPCs) in this case wish to avail themselves of the Act's liability shield while negating their obligation as healthcare personnel to provide truthful, non-misleading information about their patients' medical options. The goal of the CPCs is to convince their patients not to obtain medical care to which the CPCs have a conscientious objection (i.e., abortion, sterilization, and contraception). The CPCs, which assert that they are healthcare providers entitled to the Act's protections, are healthcare facilities in every sense: they are overseen by licensed medical professionals, they provide medical services such as ultrasounds, and they counsel patients about the medical risks of the treatment options to which the CPCs object. They operate this way because they understand the power inherent in a medical appointment to influence a patient's decision. But accompanying that power is an ethical responsibility to safeguard autonomous patient decisionmaking—an essential component of the practice of medicine that the Conscience Act appropriately seeks to protect.

Plaintiffs' First Amendment claims fail. Trial testimony established that the medical standard of care requires accurate and unbiased counseling about patients' options, and healthcare providers cannot give one-sided information designed to manipulate patients' choices,

1

regardless of whether the provider personally performs the medical procedure they are discussing. Regulations designed to ensure that patients can make informed medical decisions are constitutional under binding Supreme Court and Seventh Circuit precedent. And requiring compliance with basic standards of patient autonomy as a prerequisite to invoking the Conscience Act's liability shield does not impermissibly burden the free-speech or free-expression rights of healthcare providers. The Court should therefore vacate the preliminary injunction and enter judgment in Defendant's favor on all of Plaintiffs' claims.

## BACKGROUND

I.    **The Conscience Act**

The Illinois Health Care Right of Conscience Act, first enacted in 1977, creates a religious accommodation that protects the rights of healthcare providers by shielding them from liability for refusing to perform a procedure that violates their beliefs. 745 ILCS § 70/4. In 2016, then-Governor Rauner signed amendments to the Act into law. 2016 Ill. Legis. Serv. P.A. 99-690. These amendments tailored the Act's liability shield to ensure that patients still receive accurate and timely information about their medical options even when healthcare providers refuse to offer a treatment option because of a conscience objection.

The amendments specify that to take advantage of the Act's shield, healthcare facilities must adopt written protocols for disclosing certain minimum information about patients' medical options. 745 ILCS § 70/6.1. First, patients must be told about their diagnosis and the risks and benefits of relevant potential treatment options.[1] *Id.* § 6.1(1). Second, patients must either be

---

[1] The Act does not require healthcare providers to advise every patient of every legal treatment option. Rather, section 6.1(1) requires giving this information "consistent with current standards of medical practice or care," 745 ILCS § 70/6.1(1), which allow healthcare providers to limit the discussion of medical options and their risks and benefits based on the patient's particular circumstances, Defendant's Statement of Facts ("D.'s SOF") ¶¶ 87, 96, 98, 118–119.

referred to or given written information about where they can access medical care that they have chosen but the treating provider will not perform. *Id.* § 6.1(3). Third, healthcare providers must provide copies of patients' medical records to patients or their medical providers. *Id.* § 6.1(4).

The Conscience Act applies only to physicians and healthcare personnel who provide medical services. 745 ILCS § 70/4 (shielding providers from liability for refusing to provide a "health care service which is contrary to the conscience"); 745 ILCS § 70/3 (defining "health care"). Within the statutory framework, the Conscience Act amendments come into play only if a healthcare provider has engaged in the practice of medicine, is subsequently subject to a civil or criminal enforcement action arising from their practice, and chooses to raise the Conscience Act as an affirmative defense based on conscience objections to particular medical treatments.[2]

## II.     Crisis Pregnancy Centers

Plaintiffs are CPCs and affiliated individuals and organizations. Joint Pre-Trial Stipulation ¶¶ 1–3. The CPCs are faith-based Christian organizations whose central purpose is to counsel pregnant patients to choose not to have an abortion. *NIFLA* Plaintiffs' Statement of Facts ("NIFLA SOF") ¶¶ 14–15; *Schroeder* Plaintiffs' Statement of Facts ("Schroeder SOF") ¶ 5. They perform medical procedures, including ultrasounds, pregnancy testing, and STI testing. NIFLA SOF ¶¶ 5, 9, 12; Schroeder SOF ¶¶ 19–20. This was not always the case; the CPCs originally offered only material support and other non-medical resources, but began providing medical services because they are useful tools to help influence the patient's decision. D's SOF

---

[2] Some Plaintiffs appear to suggest that the CPCs' counseling does not constitute medical care. *See* Schroeder ECF 236, Schroeder Pls.' Post-Trial Br. (hereinafter "Schroeder Br.") at 6. Were that true, however, the Conscience Act would not apply to such conduct at all, meaning that Plaintiffs would lack standing to challenge the Act's amendments. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013). In any case, Plaintiffs brought this facial pre-enforcement challenge to the amendments, asserting that they are healthcare providers entitled to claim the Act's liability shield; Defendant assumes for the purposes of this memorandum that that is the case.

¶¶ 17–18. The CPCs perform two types of ultrasounds: abdominal, where a probe is pressed against the patient's lower abdomen; and transvaginal, in which a probe is inserted into the patient's vagina up to the cervix to generate an image of the uterus and its contents. D.'s SOF ¶¶ 52–53. Since CPCs have evolved to offer ultrasounds and other medical care, they are now overseen by licensed medical doctors and staffed by licensed nurses and other medical professionals. Joint Pretrial Stipulation ¶¶ 30–33.

The CPCs provide medical options counseling as part of their medical care. *Id.* ¶ 35; D.'s SOF ¶ 56. Although they advertise on their websites that they will inform patients about all of their medical options, the counseling covers only the risks of procedures like abortion, contraception, and sterilization, but not any medical benefits. D.'s SOF ¶¶ 26–33. The CPCs conduct their counseling in this manner because they understand that advising patients about the medical benefits of procedures, as well as providing information about where patients can obtain those procedures, makes it more likely that the patient will choose them. *Id.* ¶ 33. CPCs also track if a patient is "abortion-vulnerable" or "abortion-minded" while gathering personal and medical information from each patient to adjust their counseling to steer a patient away from abortion. *Id.* ¶¶ 43–49.

Although the CPCs do not discuss the medical benefits of abortion, sterilization, and contraception, these procedures have well-established benefits. In general, abortion is a safe procedure for terminating a pregnancy; studies show that it is significantly less likely than childbirth to cause death for the pregnant person. *Id.* ¶ 142. For some pregnant patients with contraindications to pregnancy such as pulmonary hypertension, aortic stenosis, end-stage diabetes, or other cardiac or pulmonary illnesses, abortion is a life-saving treatment, while other patients may medically benefit from abortion for important psychological and personal reasons.

4

*Id.* ¶¶ 138–141. Sterilization and contraception are safe and effective means of preventing pregnancy, and they also are used for particular medical purposes like reducing cancer risk, reducing anemia, and lowering the risk of sexually transmitted infections. *Id.* ¶¶ 156–159.

## III.    Medical Ethics and the Standard of Care

The medical standard of care derives from principles of biomedical ethics, which emphasize patient autonomy as a central tenet. *Id.* ¶¶ 66–69. Counseling pregnant patients about options for continuing or terminating a pregnancy, including discussing the risks and benefits of abortion, is subject to the standard of care. *Id.* ¶¶ 94–100, 152. And healthcare providers with conscience objections to performing a procedure are subject to the same ethical requirement as non-objecting providers to give patients information that allows them to make autonomous medical decisions. *Id.* ¶¶ 120–123, 153, 155. That is, a healthcare provider's personal beliefs do not alter the standard of care and responsibilities owed to patients, including discussing the risks and benefits of medically appropriate treatment options. *Id.* ¶¶ 129, 149. In addition, if a conscience-objecting healthcare provider refuses to offer a treatment option that a patient has chosen, the standard of care requires the provider to give the patient information to help them access that treatment.[3] *Id.* ¶¶ 125–126. These requirements underlie the standard of care for obtaining "informed consent," but they apply to medical options counseling more generally, regardless of whether a healthcare provider is seeking authorization to personally perform a procedure. *Id.* ¶¶ 30, 106–112, 117.

Widely-accepted ethical guidelines that inform the medical standard of care, including the American Medical Association (AMA) Code of Ethics and committee opinions of the

---

[3] Although Plaintiffs do not separately challenge the other requirements of Section 6.1 of the Conscience Act (such as providing copies of medical records and establishing written protocols), those requirements are similarly consistent with the standard of care. D.'s SOF ¶ 103.

American College of Obstetricians and Gynecologists (ACOG), expressly adopt these principles. *Id.* ¶¶ 74–78, 121–126. At trial, Defendant's expert witness Dr. Paul Burcher testified about how these requirements apply in real-world clinical practice. Dr. Burcher is an OBGYN with decades of experience counseling pregnant patients about their medical options, as well as a medical ethicist who, since obtaining his Ph.D., has published extensively regarding patient autonomy and the ethical obligations in conducting options counseling. *Id.* ¶¶ 59–63. He is also a practicing Catholic with a conscience objection to abortion. NIFLA SOF ¶ 33. Dr. Burcher testified that the medical ethics and the standard of care require healthcare providers, including those with conscience objections, to discuss risks and benefits of medically appropriate treatment options and provide information about accessing care the patient has chosen. D.'s SOF ¶¶ 120–122, 123–131. By the same token, a healthcare provider's choice not to offer a certain treatment does not permit the provider to conduct one-sided or biased medical options counseling based on their personal beliefs in order to steer a patient's decision. *Id.* ¶¶ 123, 127–128.

## IV. Procedural History

Two groups of plaintiffs, comprising CPCs and affiliated individuals and organizations, filed separate pre-enforcement challenges to the Conscience Act amendments against various State officials, including the Secretary of the Illinois Department of Financial and Professional Regulation (IDFPR).[4] The Plaintiff CPCs have not been subject to any lawsuits or enforcement actions in which they have sought to invoke the Conscience Act's liability shield. Instead, their claims seek to preserve their ability to assert that defense in a hypothetical future case.

---

[4] All other State officials have since been dismissed from the case, and the current Secretary of IDFPR is the sole remaining defendant pursuant to Federal Rule of Civil Procedure 25(d).

The case was initially assigned to Judge Kapala, who dismissed all of Plaintiffs' claims except those based on the free-speech and free-exercise clauses of the First Amendment. NIFLA ECF 65 at 3–4.[5] Judge Kapala also granted Plaintiffs' motions for a preliminary injunction, finding that Plaintiffs' free-speech claims had a "better than negligible" chance of success. *Id.* at 7–8.

During fact discovery, Plaintiffs filed motions for summary judgment. While those motions were pending, the case was reassigned to Chief Judge Pallmeyer. Judge Pallmeyer ultimately denied Plaintiffs' motions in a consolidated order in September 2020, finding with respect to the free-speech claims that the Conscience Act amendments stood "on firm constitutional ground." *NIFLA v. Schneider*, 484 F. Supp. 3d 596, 620 (N.D. Ill. 2020).

Soon thereafter, the case was reassigned to the currently-presiding District Judge, who permitted the parties to complete expert discovery. NIFLA ECF 185; Schroeder ECF 160. The consolidated cases proceeded to a bench trial, which was held on September 20–22, 2023.

## ARGUMENT

The Conscience Act protects healthcare providers' right to conscientiously object to providing medical treatments while ensuring that patients are empowered to make informed, timely, and autonomous decisions about their own care. The amendments to the Act achieve this balance by requiring healthcare personnel who wish to invoke the Act as an affirmative defense to liability to discuss risks and benefits of appropriate treatment options and provide written information about how to access care the patient has chosen. These requirements reflect basic

---

[5] Citations to the docket in *NIFLA v. Treto*, No. 16-cv-50310 (N.D. Ill.), are abbreviated as "NIFLA ECF," and *Schroeder et al. v. Treto*, No. 17-cv-4663 (N.D. Ill.), as "Schroeder ECF."

principles of medical ethics and the standard of care, including patients' right to make autonomous medical choices based on accurate, relevant information.

Plaintiffs' free-speech and free-exercise challenges fail. First, binding Supreme Court and Seventh Circuit precedent establish that State regulations of professional conduct like the Conscience Act do not violate providers' right to free speech if they require healthcare providers to give patients truthful, non-misleading information affecting patients' medical choices. Second, even if the Act were subject to a higher level of scrutiny, the statute is constitutional because it furthers a vital government interest and is narrowly tailored to that interest. Third, Plaintiffs' free-exercise claims fail because the Act is a neutral and generally applicable regulation that does not single out conscience objectors or create individualized exemptions. Fourth, the Act does not impose any unconstitutional conditions on Plaintiffs' speech or religious exercise. Finally, Plaintiffs cannot prevail on their facial challenge because they have not argued that the Act is unconstitutional in any context except as applied to the conduct of the CPCs.

## I. Plaintiffs' Free-Speech Claims Fail Under *Casey* and *Rokita*

Under Supreme Court and Seventh Circuit precedent, the government may require medical providers to give truthful, non-misleading information related to patients' medical choices without infringing providers' free-speech rights. Such professional regulations are permissible and not subject to heightened scrutiny, and Plaintiffs' free-speech claims therefore fail as a matter of law.

The Supreme Court articulated the "truthful, non-misleading" standard in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). The plaintiffs, several abortion providers, brought a free-speech challenge to a statute requiring them to provide specific information to patients at least 24 hours before a non-emergency abortion:

(I)     The nature of the proposed procedure or treatment and [] those risks and
        alternatives to the procedure or treatment that a reasonable patient
        would consider material to the decision of whether or not to undergo the abortion.

(II)    The probable gestational age of the unborn child at the time the abortion is
        to be performed.

(III)   The medical risks associated with carrying her child to term.

*Id.* at 902–03 (quoting 18 Pa. Cons. Stat. § 3205(a)(1)). The statute also mandated that the

providers notify patients about informational materials issued by the state describing the unborn

child; the availability of medical assistance benefits for prenatal, childbirth, and neonatal care;

and the legal requirements for fathers to pay child support. *Id.* (quoting § 3205(a)(2)).

The Court rejected the abortion providers' free-speech claims, holding that regulations

requiring "the giving of truthful, nonmisleading information," including "the nature of the

procedure" and "attendant health risks," do not violate the First Amendment. *Casey*, 505 U.S. at

882, 884 (explaining that the physicians' First Amendment rights were implicated "only as part

of the practice of medicine, subject to reasonable licensing and regulation by the state"). The

Court emphasized the government's "substantial" interest "justifying a requirement that a

woman be apprised of the health risks of abortion and childbirth." *Id.* at 882. In addition, because

the statute created an exception that allowed physicians to withhold certain information when

medically necessary, the Court reasoned that the disclosure requirements did "not prevent the

physician from exercising his or her medical judgment." *Id.* at 884.

The Seventh Circuit applied these principles in *Doe v. Rokita*, 54 F.4th 518 (7th Cir.

2022), to reject healthcare providers' free-speech challenge to a law requiring them to advise

pregnant patients before performing an abortion about options for handling fetal remains. The

law required oral and written disclosures that patients "(1) have a right to determine the

disposition of the fetus; (2) they have a right to bury or cremate the fetus; (3) they have a right to

require the abortion provider to bury or cremate the fetus; (4) that medication abortion patients

9

will expel an aborted fetus; and (5) that the abortion provider must allow a medication abortion patient to return an aborted fetus." *Doe v. Att'y Gen. of Indiana*, 630 F. Supp. 3d 1033, 1041 (S.D. Ind. 2022) (citing Ind. Code § 16-34-2-1.1(a)(2)(H)–(J)). The Seventh Circuit upheld these regulations, citing *Casey* for the proposition that "states may require medical providers to give truthful notices."[6] *Rokita*, 54 F.4th at 520; *see also id.* at 521 ("[A] state may require medical professionals to provide information that facilitates patients' choices directly linked to procedures that have been or may be performed.").

The Conscience Act, unlike the laws in *Casey* and *Rokita*, does not impose a mandate on healthcare providers but establishes how providers can claim the Act's liability shield. Even assuming that the Act implicates Plaintiffs' free speech rights, however, under *Casey* and *Rokita*, regulations requiring healthcare providers to give patients information are constitutional if the information is (1) related to a medical procedure; (2) truthful and not misleading; and (3) relevant to patients' medical choices. *See EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 428 (6th Cir. 2019) (citing *Casey*, 505 U.S. at 882). The Conscience Act amendments satisfy each of these elements.

## A. The disclosures required to invoke the Conscience Act's shield are related to medical procedures.

There is no dispute that the Conscience Act amendments' disclosure requirements are related to medical procedures. The statute requires information about patients' medical treatment options and how they can access care they have chosen. 745 ILCS § 70/6.1. The counseling offered at the CPCs is expressly about these procedures, as it includes specific advice about the

---

[6] The Seventh Circuit confirmed that the relevant holding of *Casey* remains good law after *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), since "the norm that units of government may require physicians (and other professionals) to provide accurate information to their clients long predates *Casey* and has not been disturbed since." *Rokita*, 54 F.4th at 520.

risks of medical procedures like abortion. Joint Pre-Trial Stipulations ¶ 35. Moreover, the CPCs offer this counseling in conjunction with other medical procedures they perform such as transvaginal and abdominal ultrasounds, pregnancy testing, and STI testing, which are all procedures on which the CPCs rely when counseling patients about their options. D.'s SOF ¶¶ 18, 56; NIFLA SOF ¶¶ 5, 9, 12; Schroeder SOF ¶¶ 19–20.

Plaintiffs do not contest these facts. Instead, they argue that *Casey* and *Rokita* apply only when the healthcare provider personally offers the medical procedure being discussed with the patient. NIFLA Pls.' Post-Trial Br. (hereinafter "NIFLA Br.") at 3; Schroeder Br. at 5–6. But this novel limitation is the plaintiffs' invention: it does not appear in *Casey*, *Rokita*, or any other case applying the "truthful, non-misleading" standard.

Plaintiffs' argument depends on a misreading of *NIFLA v. Becerra*, 138 S. Ct. 2361 (2018), which did not abrogate the relevant holding of *Casey*. In *NIFLA v. Becerra*, the Supreme Court struck down a California law that required CPCs to "disseminate a government-drafted notice on site" advising patients about the availability of abortion services. *Id.* at 2369. The Court held that this uniform notice did not fall under *Casey* because it did not "facilitate informed consent to a medical procedure" and "[i]n fact, it is not tied to a procedure at all." *Id.* at 2373. Rather than helping patients make informed choices during clinical visits, the mandatory notice was a "government-drafted script" that "applie[d] to all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered, or performed." *Id.* at 2371, 2373. In reaching its conclusion, the Court reaffirmed the holding of *Casey* that requiring healthcare providers to offer patients complete information about their medical options does not violate the First Amendment. *Id.* at 2373. And in *Rokita*, the Seventh Circuit also confirmed that *NIFLA v. Becerra* did not abrogate this part of *Casey*, explaining that the opinion

11

[did] not question the propriety of requirements that medical professionals alert patients to laws that affect medical choices. To the contrary, [*NIFLA v. Becerra*] cited with approval the portion of *Casey* holding that a state may require medical professionals to provide information that facilitates patients' choices directly linked to procedures that have been or may be performed.

*Rokita*, 54 F.4th at 521.

Contrary to Plaintiffs' contention, nowhere in *NIFLA v. Becerra* did the Court suggest that the holding of *Casey* applies only to situations where a healthcare provider personally offers the procedures about which they are required to give information. In fact, *Casey* approved of a much broader set of disclosure requirements; the statute at issue required abortion providers to advise patients about subjects far beyond the health care they offered, including the risks and benefits of childbirth, the availability of medical assistance benefits for neonatal care, and fathers' legal obligation to pay child support. *See* 18 Pa. Cons. Stat. § 3205(a). Similarly, the law in *Rokita* required abortion providers to tell patients that they were legally allowed to bury or cremate fetal remains on their own, without the assistance of the abortion provider. Ind. Code § 16-34-2-1.1(a)(2)(I)(i). In both cases, the statutes were upheld because they required giving information that was pertinent to patients' choices—even when that information related to treatments or services the providers did not offer.

Plaintiffs' proposed limitation also defies principles of medical ethics that require options counseling to be accurate and unbiased, regardless of whether the provider offers each of the options they discuss with their patients. D.'s SOF ¶¶ 92, 94–96, 121, 123. To be sure, as *Rokita* shows, consistency with medical standards of care is not a prerequisite to lawful government regulation under *Casey*. *See Rokita*, 54 F.4th at 520–21 (upholding the statute without attempting to determine whether required disclosures were already required under standards of medical practice). But the fact that Plaintiffs' legal theory contradicts the requirements of the standard of

12

care provides an additional basis to reject their attempt to establish a novel rule found nowhere in *Casey* or *Rokita*.

Plaintiffs and their experts contend that counseling need not be unbiased and comprehensive unless the healthcare provider is seeking "informed consent" to personally perform a medical procedure. Plaintiffs' experts, as staunch supporters of CPCs, have an obvious interest in promoting such an artificially narrow view of informed consent that is out of step with medical-ethical guidelines. *See* D.'s SOF ¶¶ 160–166; NIFLA SOF ¶ 21. In contrast, Defendant's expert Dr. Burcher, who himself conscientiously objects to abortion, testified to the generally accepted rule: the standard of care requires conscience objectors to follow informed consent principles when counseling about abortion despite the fact that they do not perform the procedure. D.'s SOF ¶¶ 103–111. For example, AMA Code of Ethics section 1.7 specifically addresses conscience objectors (who, by definition, do not perform medical procedures to which they object), requiring them to "[u]phold standards of informed consent and inform the patient about all relevant options for treatment, including options to which the physicians morally objects." *Id.* ¶ 123.

Even if Plaintiffs were correct that standards of "informed consent," narrowly defined, apply only when a healthcare provider secures authorization to perform a procedure, the underlying principles of medical ethics still require that all counseling must be patient-centered and discuss the risks and benefits of treatment options. *Id.* ¶¶ 87–90, 92, 94–102, 117-118. For example, a physician counseling a patient with a muscle injury about whether to opt for a steroidal injection or physical therapy is ethically required to advise the patient about the risks and benefits of each option, and the fact that the physician is not seeking informed consent to personally provide physical therapy is altogether irrelevant. *See id.* ¶¶ 96, 109 (citing Burcher

13

testimony discussing examples). As the Supreme Court made clear in *Casey*, what matters is not the technical definition of "informed consent" but whether a regulation requires information designed to ensure that patients can make informed medical choices. *Casey*, 505 U.S. at 883 (noting that "informed choice need not be defined in such narrow terms" and explaining that the government may enact "a reasonable measure to ensure an informed choice").[7]

Finally, Plaintiffs' argument is impossible to reconcile with the counseling that occurs at the CPCs, to which abortion is directly and necessarily relevant. Plaintiffs argue, for example, that abortion is not related to their pregnancy options counseling because it is not an alternative to a medical procedure that they offer. NIFLA Br. at 4. But abortion is necessarily one of the medical options available to a pregnant patient, since the only alternative to proceeding with childbirth is terminating the pregnancy. Joint Pretrial Stipulation ¶ 22; *NIFLA v. Schneider*, 484 F. Supp. 3d at 614 (Pallmeyer, C.J.). Given the intrinsic link between the choices available to a pregnant patient and the fact that CPCs advertise that they will counsel patients about all their options, D.'s SOF ¶¶ 25–30, Plaintiffs' contention that their counseling is unrelated to abortion rings hollow. In this context, the counseling offered at CPCs directly relates to medical procedures, including abortion.

### B.  The required disclosures are truthful and not misleading.

The Conscience Act amendments require giving only truthful, non-misleading information about patients' medical options. Healthcare providers who wish to invoke the Act's liability shield must truthfully advise patients about their medical condition, discuss risks and benefits of treatment options, and provide information "about other health care providers who

---

[7] Indeed, Plaintiffs' arguments track the Supreme Court's reasoning in *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 444 (1983), which was expressly overruled in *Casey*. *See City of Akron*, 462 U.S. at 443–45 (holding that disclosure requirements were unconstitutional because they exceeded the narrowest definition of "informed consent"); *see also Casey*, 505 U.S. at 882.

they reasonably believe may offer the health care service" the patient has chosen. 745 ILCS § 70/6.1. Plaintiffs do not contend that any of these requirements involve counseling in an untruthful or misleading way. Indeed, the evidence shows that abortion, sterilization, and contraception have many benefits. *Supra* at 4–5; *see also* Schroeder Br. at 9 (contending that these risks and benefits are "commonly known"). For a person who does not wish to be pregnant, abortion has the benefit of terminating the pregnancy, which is a legal treatment option in Illinois. *See* 775 ILCS § 55/1-15. But abortion also reduces the significant risk of death for patients with contraindications to pregnancy, which can be fatal. D.'s SOF ¶¶ 137–139. Sterilization and contraception also have clearly-established medical benefits, as Plaintiffs' experts acknowledge; besides preventing pregnancy, they are both accepted treatments for particular medical conditions. *Id.* ¶¶ 156–159.

Plaintiffs nonetheless object to these truthful, non-misleading disclosures as impermissible "content- and viewpoint-based" regulations of speech. NIFLA Br. at 6; Schroeder Br. at 9–10. But the Conscience Act amendments do not target a particular viewpoint or single out certain speakers; instead, they reflect a standard of care that applies broadly to all healthcare providers, and they require that patients receive accurate and timely information about their medical options, regardless of the nature of any conscience objection. Because the Act does not distinguish "based on the message a speaker conveys," *see Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), but rather imposes generally applicable requirements on all healthcare providers who wish to avail themselves of the liability shield, it is viewpoint-neutral. Similarly, the statute does not discriminate against particular speakers; the Act as a whole protects conscience objectors, and the amendments tailor that protection to ensure that all medical options counseling

15

is consistent with generally applicable standards of care. As a result, providers with conscience objections are subject only to requirements already shouldered by their non-objecting peers.

Plaintiffs contend that the Act is a content-based regulation because it requires healthcare providers to convey certain categories of information. NIFLA Br. at 6; Schroeder Br. at 10. But *Casey* and *Rokita* establish that the government can require such disclosures to ensure that patients make informed medical choices, regardless of whether they affect the "content" of providers' speech. The regulations upheld in *Casey*, for example, not only required abortion providers to give certain types of medical information but also mandated that they mention and make available government-written materials about unborn fetuses. *Casey*, 505 U.S. at 881. In other words, the government had literally scripted the content of the abortion providers' speech, but because that requirement was sufficiently related to patients' medical decisions, the Court held that it did not violate the First Amendment. *Id.* at 882–83. Here, too, the required disclosures are linked to patients' decisions about whether to opt for legal medical procedure and are not unconstitutional content-based regulations of speech. *See Rokita*, 54 F.4th at 521.

### C. The disclosures are directly relevant to patients' medical choices.

Counseling about the risks and benefits of appropriate treatment options, as well as options for accessing care, is essential to patients' medical decisions. Knowing the risks and benefits of a treatment option necessarily informs the choice of whether to seek that treatment. D.'s SOF ¶ 68, 87–89, 136. Similarly, informing patients about providers who offer the patient's chosen treatment necessarily contributes to patients' decisions about where and how to obtain care. *See id.* ¶¶ 125–126, 131. Indeed, the fact that this information is relevant to patients' medical choices is precisely why Plaintiffs object to providing it, since they understand that patients who are advised about the benefits of a procedure like abortion and where they can obtain one may be more inclined to select that option. *Id.* ¶ 33.

16

Plaintiffs contend that the CPCs' failure to discuss both risks and benefits does not affect patients' choices because there is information about abortion online. NIFLA Br. at 8. But *Casey* and *Rokita* do not hold that a disclosure obligation is permissible only if a patient will not be able to access relevant information elsewhere. *See, e.g.*, *Casey*, 505 U.S. at 882 (upholding the requirement to inform patients that an abortion has "consequences to the fetus"). And for good reason: the potential to access publicly available information about medical procedures does not make this counseling any less vital to patient autonomy. Nor does the availability of information on the internet alter a medical provider's ethical obligations to not only provide general information but tailor their advice to the circumstances of each patient. D.'s SOF ¶¶ 87, 96, 98, 118–119. For example, patients who know that a treatment option is generally available may not be sure whether that option is appropriate or safe *for them*. Moreover, even when patients are aware that a treatment option exists, healthcare providers must be able to dispel myths and misconceptions about that treatment—including by filtering out misinformation from unreliable internet sources. *Id.* ¶¶ 29, 82–83. And refusing to provide timely information about abortion in particular can effectively force a choice onto some patients, who may lose the ability to obtain a medication abortion and be forced to seek a surgical abortion that could be either medically too risky or simply unaffordable. *Id.* ¶¶ 131, 154. Providing this information in the context of an individual clinical encounter is therefore essential to patients' choices about their medical care, regardless of whether other general information is publicly available.

### D. Requirements to disclose truthful, non-misleading information about patients' medical options regulate professional conduct even when they affect speech.

Plaintiffs contend that the Conscience Act amendments are unconstitutional because they target speech rather than professional conduct. NIFLA Br. at 3; Schroeder Br. at 4–5. But *Casey* and *Rokita* confirm that regulations of the medical profession requiring that patients receive

truthful, non-misleading information from their providers about their medical choices are constitutional even when the regulated conduct involves speech.

The fact that professional conduct is effectuated through speech does not insulate it from regulation. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949))). For example, the government may enforce ethics rules for the legal profession, despite the fact that such rules almost entirely involve dictating what people can and cannot say. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 457 (1978) (upholding a ban on in-person attorney solicitation and explaining that "speech is an essential but subordinate component"); *Lawline v. American Bar Ass'n*, 956 F.2d 1378, 1386 (7th Cir. 1992) (upholding a prohibition on the unauthorized practice of law). There are abundant examples of similar "communications that are regulated without offending the First Amendment": the exchange of information about securities, corporate proxy statements, the exchange of price and production information among competitors, and employers' threats of retaliation for the labor activities of employees. *Ohralik*, 436 U.S. at 456.

Plaintiffs principally rely on *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020), to argue that "speech is speech." But *Otto* did not concern a physician-disclosure law of the kind at issue in *Casey* and *Rokita*, which requires providers to disclose certain information in connection with the provision of healthcare services; rather, it concerned municipal ordinances that barred a

particular kind of talk therapy,[8] reasoning that such ordinances impermissibly targeted speech rather than conduct. *Otto*, 981 F.3d at 865. Although there are some contexts in which "drawing the line between speech and conduct can be difficult," *NIFLA v. Becerra*, 138 S. Ct. at 2373; *see, e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055, 1064 (9th Cir. 2022), *cert. denied*, No. 22-942, 2023 WL 8531854 (U.S. Dec. 11, 2023) (concluding that conversion therapy is conduct, not speech), this is not one: the Supreme Court and the Seventh Circuit have drawn that line for regulations requiring patients be told about their medical options. *Casey* and *Rokita* make clear that giving patients full information to make medical decisions is part of the "practice of medicine, subject to reasonable licensing and regulation by the State." *Casey*, 505 U.S. at 884. *Otto* does not apply.

Plaintiffs also cite *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023). But *303 Creative* did not involve medical options counseling or even the regulation of licensed professional conduct; instead, the Court relied on the parties' stipulation that the plaintiff was engaged in "expressive" conduct in designing websites. *Id.* at 582, 593–94 (noting that the websites were "expressive in nature, using text, graphics, and in some cases videos to celebrate and promote the couple's wedding and unique love story"). The Court held that public accommodations laws infringe the First Amendment when "applied to expressive activity." *Id.* at 592 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 578 (1995)). Plaintiffs do not allege that their medical options counseling is "expressive" in any sense that would be relevant under *303 Creative*. Even if they did, for the reasons explained above, *Casey* and *Rokita* confirm that requirements to provide truthful, non-misleading information linked to patients' medical choices are permissible regulations of the practice of medicine and not restrictions on expressive speech.

---

[8] Specifically, the ordinances prohibited "conversion therapy," i.e., talk therapy meant to change a person's sexual orientation or preferences. *Otto*, 981 F.3d at 859.

19

**II.      Even if Heightened Scrutiny Applied to Plaintiffs' Free Speech Claims, the Conscience Act is Constitutional**

Plaintiffs premise their arguments on the assumption that heightened scrutiny applies to the Conscience Act amendments. These arguments fail at the threshold because regulations of professional conduct that ensure patients receive truthful, non-misleading information about their medical choices are not subject to any form of heightened scrutiny. In both *Casey* and *Rokita*, courts upheld the challenged regulations without weighing the strength of the government's interest or evaluating whether the regulations were narrowly tailored. *See Casey*, 505 U.S. at 881–84; *Rokita*, 54 F.4th 520–21. Instead, as the Seventh Circuit held in *Rokita*, such laws are constitutional because they fall within the government's longstanding power to ensure informed medical decisions. *Rokita*, 54 F.4th at 520. To the extent that Chief Judge Pallmeyer considered the applicability of heightened scrutiny to be an open question at the summary-judgment stage, *see NIFLA v. Schneider*, 484 F. Supp. 3d at 614, *Rokita* has since answered it—no such scrutiny is required. Other courts have reached the same conclusion and, applying *Casey*, declined to apply heightened scrutiny. *E.g.*, *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 575 (5th Cir. 2012) (calling *Casey*'s analysis "the antithesis of strict scrutiny"); *EMW*, 920 F.3d at 428–29; *Planned Parenthood v. Rounds*, 530 F.3d 724, 734–35 (8th Cir. 2008); *Whole Woman's Health Alliance v. Hill*, 493 F. Supp. 3d 694, 761 (S.D. Ind. 2020).

Even if the Conscience Act were subject to heightened scrutiny—which, in the Seventh Circuit, it is not—Plaintiffs are wrong in seeking to apply *strict* scrutiny. Because *Casey* requires deference to regulations requiring truthful, non-misleading information about medical options, courts choosing to apply heightened scrutiny have used the framework of intermediate scrutiny. *E.g.*, *Stuart v. Camnitz*, 774 F.3d 238, 245 (4th Cir. 2014); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 283 F. Supp. 3d 629, 636 (W.D. Ky. 2017), *rev'd and remanded*, 920 F.3d 421 (6th

20

Cir. 2019). This approach is consonant with the judicial analysis of other types of regulations, such as those affecting commercial speech, where the government also has greater regulatory leeway. *See, e.g.*, *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562 (1980) (applying intermediate scrutiny to law affecting commercial speech, "an area traditionally subject to government regulation"). Regardless of the standard, however, Plaintiffs' arguments fail because the Act is properly tailored to protect compelling interests.

### A. The Act furthers compelling and substantial government interests unrelated to suppressing free expression.

The Act expressly promotes the State's interest in "ensur[ing] that conscience-based objections do not cause impairment of patients' health." 745 ILCS § 70/6.1. More specifically, the Act ensures that patients treated by healthcare providers with conscience objections also receive accurate, timely information about their treatment options necessary to make autonomous medical choices, as well as reliable information about other providers who offer the care they have chosen. These provisions reflect the government's compelling interest in regulating the medical profession to protect patients. *See Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("There can be no doubt the government 'has an interest in protecting the integrity and ethics of the medical profession.'" (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997))).

The State has a compelling interest in ensuring that the Act's liability shield is not used to deprive patients of information required by the medical standard of care, and the testimony at trial confirmed that patients at the CPCs are being denied the information the Act requires. The CPCs use outreach and marketing tools like search engine optimization to advertise their services to people who are seeking abortion care. D.'s SOF ¶¶ 25–27. These services are aimed at pregnant patients who are in crisis and vulnerable, including individuals who are minors, are experiencing domestic violence, or have low reading comprehension or limited English

proficiency. *Id.* ¶ 37. Their websites promise pregnant patients that they will receive counseling about all of their options. *Id.* ¶¶ 28–30. In reality, at the patient's appointment the CPCs describe only the risks—and not the benefits—of procedures like abortion, contraception, and sterilization, as part of an attempt to influence the patient's medical choice. *Id.* ¶¶ 31–33; NIFLA SOF ¶ 14. This evidence establishes that the CPCs engage in selective disclosure that undermines patients' autonomy and puts them at risk. The legislative history and regulatory background of the Conscience Act amendments shows that they were motivated by similar concerns that conscience objectors were not meeting the standard of care. D.'s SOF ¶¶ 1–16.

**B. The Act is narrowly tailored, and no less restrictive regulations would achieve its purposes.**

The Conscience Act does not burden more speech than necessary to achieve the substantial interest of ensuring that healthcare providers with conscience objections give their patients the information necessary to make autonomous choices. As a threshold point, the Act is narrowly tailored in that it imposes no affirmative obligations on any providers, much less on Plaintiffs specifically. Rather, the Act grants conscience objectors a benefit—a liability shield— that is conditioned on their compliance with the medical standard of care. But even setting aside that critical distinction, the limitations themselves are narrowly tailored.

First, the Act is narrowly tailored to conform to the existing medical standard of care. The amendments ensure that healthcare providers who invoke the Act's shield must give patients the same basic information that all providers are required to give, consistent with principles of biomedical ethics. D.'s SOF ¶¶ 87–90, 94–102. Plaintiffs deny these ethical requirements, arguing that they apply only in the narrow context in which a provider is seeking informed consent to personally perform a procedure. NIFLA Br. at 10; Schroeder Br. at 15–16. But the testimony of Plaintiffs' experts contradicts guidelines like the AMA Code of Ethics that reflect

views of mainstream medical ethicists, and their conclusory opinions have no support in commonly-cited ethical guidelines. These opinions cannot be deemed credible given their experts' admitted personal commitment to—and, in the case of Dr. Boles, his public lobbying for—the ideological aims of the CPCs. *See* D.'s SOF ¶¶ 160–166. Nor can the opinions of Plaintiffs' experts somehow be justified as heterodox but ultimately reasonable interpretations of biomedical ethics. If accepted, these opinions would effectively eliminate the obligation of healthcare providers to offer unbiased counseling, allowing providers to prioritize their personal beliefs over the duty to inform. The standard of care does not permit subordinating patient autonomy to a healthcare provider's personal beliefs in this way. *See id.* ¶¶ 80, 98, 118–121.

The Act is also narrow in terms of its structure and scope. Unlike the requirements upheld in *Casey*, for example, the Act does not require providers to promote materials scripted by the government. Instead, by requiring options counseling only to the extent "consistent with current standards of medical practice or care," 745 ILCS § 70/6.1, the Act leaves judgment and discretion to healthcare providers to determine which treatment options are appropriate in each case based on medical facts and the patient's circumstances. D.'s SOF ¶ 98, 119. And the Act comes into play only when a healthcare provider declines to offer a treatment due to conscience objection and then seeks to invoke the Act's liability shield, meaning that its regulations narrowly address the State's interest in ensuring that conscience-objecting healthcare providers disclose sufficient information to meet the patient's specific needs.

Finally, the Conscience Act amendments are the least restrictive means of ensuring that the Act's liability shield does not deprive patients of critical information. Plaintiffs contend that rather than amending the Act, the State should fund public awareness campaigns. Schroeder Br. at 14. But general information on billboards and commercials is fundamentally different from

medical options counseling in several key respects. First, the context of an individualized clinical encounter is uniquely powerful and tends to shape patients' decisions in a way that general information does not. D.'s SOF ¶¶ 83, 130. Second, knowing that a procedure exists is fundamentally different from knowing that the procedure is appropriate or safe for one's own medical condition and circumstances, and healthcare providers must ensure that patients receive tailored advice. *Id.* ¶¶ 87, 96, 98, 118–119. This individualized counseling includes combatting medical misinformation from the internet, social media, and other sources to which patients may have been exposed. *Id.* ¶¶ 29, 82–83. As a result, even if the State implemented public awareness campaigns like the ones Plaintiffs suggest, it would still be necessary to tailor the Conscience Act to comport with the standard of care during face-to-face clinical encounters at the CPCs. *See Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1232 (4th Cir. 1989) (rejecting an argument that a public awareness campaign was a sufficient alternative to disclosure requirements where the disclosures were "tailored to that group which would most desire the information and make an informed decision on the basis of it").

### III. Plaintiffs' Free-Exercise Claims Fail Because the Conscience Act is Neutral and Generally Applicable

The Act is a religious accommodation for healthcare providers who object to performing certain medical procedures. The amendments tailor this accommodation to ensure that conscience-objecting providers disclose information consistent with the standard of care and principles of medical ethics that apply equally to counseling by non-objecting providers. Because the First Amendment does not confer a right to be exempted from neutral, generally applicable laws, the government may tailor a religious accommodation to ensure that providers adhere to standards of care.

Under *Employment Division, Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), laws that are neutral and generally applicable with respect to the free exercise of religion do not violate the First Amendment. *Id.* at 878–79 ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."). Neutral and generally applicable laws are constitutional if they have a rational basis. *Ill. Bible Colleges Ass'n v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017).

The Conscience Act does not impose special burdens on conscience objectors but instead seeks to ensure that their counseling is consistent with broadly applicable medical standards of care. As already discussed, the requirement to discuss risks and benefits of medically appropriate treatment options is a fundamental medical-ethical obligation for any healthcare provider, regardless of whether they have a conscience objection. *Supra* at 13–14. In the case of the written information requirement, the Act actually eases requirements for conscience objectors in comparison to what would be required under widely-accepted ethical guidelines, which recommend not just written information but a formal referral, making compliance with the Act *less* onerous for providers with conscience objections. D.'s SOF ¶ 125.

Plaintiffs contend that the Act is not neutral and generally applicable because it applies only to conscience objectors. *See* NIFLA Br. at 15; Schroeder Br. at 15. This argument entirely ignores the statutory context: since the Act is itself a religious accommodation that protects healthcare providers with conscience objections, any tailoring or revision of this accommodation naturally applies to those same providers. Although Chief Judge Pallmeyer rejected Plaintiffs' identical arguments at the summary judgment stage, Plaintiffs do not acknowledge—let alone rebut—the Court's holding. *See NIFLA v. Schneider*, 484 F. Supp. 3d at 623.

Plaintiffs' argument amounts to a claim that once the government enacts a religious accommodation, it is prohibited from modifying or repealing that accommodation. This is wrong as a matter of law; under *Smith*, there is no First Amendment right to a religious accommodation to be free from neutral and generally applicable regulations. *Smith*, 494 U.S. at 878–879. And there is no constitutional requirement that a statute creating a religious accommodation be unlimited. *See United States v. Lee*, 455 U.S. 252, 261 (1982) (rejecting a claim that a religious exemption from social security taxes was unconstitutional because it was limited to certain categories). Moreover, Plaintiffs' arguments would penalize a legislature for enacting a religious accommodation by prohibiting it from ever modifying that accommodation—a powerful disincentive to enact any accommodation in the first place. And, as a doctrinal matter, it is absurd to suggest that a religious accommodation would be constitutional if originally enacted with certain limitations, but unconstitutional if first enacted in a broader form and then later tailored to include identical limitations. For these reasons, the fact that the Conscience Act as a whole applies uniquely to providers with conscience objections does not trigger heightened scrutiny under the free-exercise clause.

To the extent Plaintiffs attempt to fall back on other free-exercise arguments in their reply briefs, such as those based on individual exemptions or "hybrid-rights claims," *see Ill. Bible Colleges*, 870 F.3d at 640, these theories were not raised in Plaintiffs' opening briefs and are forfeited, *see Martinez v. Colvin*, No. 12 CV 50016, 2014 WL 1305067, at *9 (N.D. Ill. Mar. 28, 2014). In any event, the Conscience Act does not confer discretion to allow individual exemptions from its requirements. And Plaintiffs' have not articulated a hybrid-rights claim because they have not shown a burden on their free speech, as discussed above. *See Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 765 (7th Cir. 2003) ("Appellants

have identified no constitutionally protected interest upon which the [law] infringes, as they must in order to establish a hybrid rights claim requiring heightened scrutiny.").

## IV. The Conscience Act Does Not Impose Unconstitutional Conditions

Plaintiffs' unconstitutional conditions arguments fail at the outset because, for the reasons already discussed, Plaintiffs have not shown that even a direct requirement to comply with the Act's enumerated disclosures would burden their First Amendment rights. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612 (2013) ("A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing."). But even if Plaintiffs had made such a showing, the Act still would not impose unconstitutional conditions.

First, the Conscience Act's shield is purely elective—no healthcare providers, including Plaintiffs, are required to abide by these procedures. By choosing to invoke the Conscience Act, healthcare providers voluntarily agree to follow its procedures for ensuring that patients receive adequate counseling. *See Rust v. Sullivan*, 500 U.S. 173, 199 n.5 (1991) ("By accepting Title X funds, a recipient voluntarily consents to any restrictions placed on any matching funds or grant-related income."). At the same time, Plaintiffs are free to choose not to avail themselves of the Conscience Act's liability shield and thereby avoid any conditions to which they object. *See Grove City College v. Bell*, 465 U.S. 555, 574 (1984) (holding that the plaintiff college could "terminate its participation in" a federal funding program "and thus avoid the requirements" to which it objected); *see also Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 570 U.S. 205, 214 (2013) ("[I]f a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds."). Moreover, it does not create an unconstitutional condition if CPCs are subject to pre-existing requirements of the standard of care, because "although government may not place obstacles in the path of [person's] exercise of … freedom of [speech], it need not

27

remove those not of its own creation." *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549–50 (1983) (alterations in original).

The conditions included in the Act are also permissible because they are properly limited to the specific purpose of tailoring the liability shield to ensure providers are meeting the standard of care, and they do not restrict speech in any other contexts. *See Agency for Int'l Dev.*, 570 U.S. at 218–219 (explaining that a condition is unlawful only if it reaches "protected conduct outside the scope of the federally funded program"). For example, in *Rust v. Sullivan*, 500 U.S. 173 (1991), the Supreme Court rejected claims that Title X's prohibition on funding for "programs where abortion is a method of family planning" constituted "viewpoint-discriminatory conditions on government subsidies" that penalized speech about abortion. *Id.* at 192. The Court upheld the statute because "the regulations do not force the Title X grantee to give up abortion-related speech; they merely require that the grantee keep such activities separate and distinct from Title X activities." *Id.* at 196. Here, as in *Rust*, Plaintiffs remain free to express their conscience-based views, both inside and outside the clinical setting, so long as they also provide medical options counseling consistent with the requirements of the statute and the standard of care. *See id.* at 198 (holding that the conditions had not denied plaintiffs "the right to engage in abortion-related activities" outside the program); *cf. Regan*, 461 U.S. at 544 & n.6 (upholding a condition prohibiting tax-exempt organizations from lobbying because the statute authorized lobbying activities through a different tax classification). Through the Conscience Act, Illinois has chosen to shield specific conduct from liability, and it may permissibly specify the conditions under which that same conduct will be protected. *See Agency for Int'l Dev.*, 570 U.S. at 217 (distinguishing "between conditions that define the federal program and those that reach outside it").

## V.     Plaintiffs' Facial Challenge Fails

Plaintiffs have not supported their claim that the Conscience Act amendments are facially unconstitutional. Facial challenges are "disfavored" because they "rest on speculation" and "raise the risk of premature interpretation of statutes on the basis of factually barebones records." *Center for Indiv. Freedom v. Madigan*, 697 F.3d 464, 476 (7th Cir. 2012) (quoting *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450–51 (2008)). In general, "relief should be no greater than necessary to protect the rights of the prevailing litigants." *Rokita*, 54 F.4th at 521.

In their briefs, Plaintiffs make little to no effort to press their facial challenge, and only the *Schroeder* Plaintiffs even attempt an argument.[9] They contend that the Conscience Act is "overbroad," but this argument simply repackages their claims that the law is unconstitutional as applied to the CPCs. *See* Schroeder Br. at 8–9. The doctrine of overbreadth applies only when a statute "prohibits a substantial amount of protected speech," since such prohibitions "deter[] people from engaging in constitutionally protected speech." *United States v. Williams*, 553 U.S. 285, 292–93 (2008). But Plaintiffs do not identify any way in which the Act might chill speech or stifle free expression, since the law places no restriction on the ability of healthcare providers with conscience objections to continue to express and promote their religious views so long as they also provide counseling consistent with the standard of care.

Even if Plaintiffs could show that the Act somehow deterred or stifled speech, the amendments would still have a "plainly legitimate sweep" that defeats any overbreadth claim. *See Williams*, 553 U.S. at 292. Plaintiffs' theory of First Amendment liability essentially seeks to

---

[9] For their part, the *NIFLA* Plaintiffs have forfeited their facial challenge altogether by failing to raise it. *Love v. Vanihel*, 73 F.4th 439, 449 (7th Cir. 2023) (holding that a facial constitutional challenge not properly preserved in the district court was forfeited); *Martinez*, 2014 WL 1305067, at *9 (arguments not raised in an opening brief are forfeited).

create a (novel and unsupported) carve-out from the general rule of *Casey* and *Rokita*. By Plaintiffs' own reasoning, the Act would be unconstitutional only as applied to healthcare facilities that provide counseling about a particular treatment option but refuse to perform that treatment because of a conscience objection. *See* NIFLA Br. at 7; Schroeder Br. at 7. This carve-out would not apply to the countless hospitals and clinics that do not limit which treatments are offered at the medical practice or facility based on religious beliefs. For example, under Plaintiffs' theory, the Act would be constitutional as applied to OBGYNs with conscience objections working at hospitals where other physicians can and do provide the treatments to which they object. Thus, even if Plaintiffs' free-speech theory had merit, most of the Act's applications would fall within its plainly legitimate sweep, and Plaintiffs' facial challenge should be rejected.

Finally, any injunctive relief in these cases would narrowly apply only to potential enforcement actions brought by Defendant. The Conscience Act amendments also apply in civil suits, and Plaintiffs lack Article III standing to obtain an injunction restricting future civil litigation by an individual who is not a party to these cases. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 40, 44 (2021) (holding that "no court may lawfully enjoin the world at large" and rejecting the contention that Article III allows "federal judges [to] enjoin state courts and clerks from entertaining disputes between private parties"); *see also* Fed. R. Civ. P. 65(d) (limiting who may be bound by an injunction).

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court vacate the preliminary injunction and enter judgment in Defendant's favor on all of Plaintiffs' claims.

Dated: December 18, 2023

Respectfully submitted,

KWAME RAOUL
*Attorney General of Illinois*

By: /s/ John Hazinski

Karyn L. Bass Ehler
Christopher Wells
Elizabeth Morris
Sarah J. Gallo
Hannah Jurowicz
John Hazinski
Office of the Illinois Attorney General
115 S. Lasalle, 20th Fl.
Chicago, IL 60601
(312) 814-3000
John.Hazinski@ilag.gov

31